SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------

MADISON REALTY CAPITAL, L.P.,

                    Plaintiff,

      -against-

TRACY SUTTLES,

                Defendant.

-------------------------------------------------------------

Index No.         /2008

**AFFIDAVIT OF JOHN J. SOREL IN SUPPORT OF MOTION FOR AN ORDER AWARDING IMMEDIATE POSSESSION OF PLEDGED COLLATERAL, AND INJUNCTIVE RELIEF**

STATE OF NEW YORK     )
                         ) ss.:
COUNTY OF NEW YORK   )

JOHN J. SOREL, being duly sworn, deposes and says:

1.     I am Managing Director of Madison Realty Capital Advisors, the authorized servicer for plaintiff Madison Realty Capital, L.P. ("Madison"), and have personal knowledge of the facts set forth herein. I submit this affidavit in support of Madison's motion for an Order: (i) directing defendant Tracy Suttles ("Suttles") to immediately deliver and turn over to Madison all of the assets, property, accounts, deposits, contracts, receivables, fees, investments, books and records, and all other documentation and information relative to each and all of SE Marina Way Partnership, L.P. ("Marina") and SE Marina Way, LLC, including but not limited to all of their income, cash flow, profits, capital distributions rents, revenues, receivables, all of which have been contractually pledged by Suttles to Madison as collateral security for a $10,750,000 loan by Madison, which is in default; and (ii) enjoining Suttles, during the pendency of this action (and temporarily pending the hearing of this motion), from transferring, hypothecating, selling, pledging, assigning or otherwise disposing of or removing from its current location, any and all

of the assets, accounts, property, cash flow, rents, income, profits, deposits, receivables, fees, investments, contracts, and books and records of Marina and SE Marina Way, LLC.

2.      Pursuant to a promissory note, dated January 29, 2007 (the "Note"), Madison made a $10,750,000 loan to Suttles, and to entities owned and controlled by him, specifically: Marina, Pirate's Lake, Ltd. ("Pirate's Lake); 7500 Bellaire Mall, L.P. ("7500 Bellaire Mall"); 6425 Gess Ltd.; Wildflower TDS, L.P., Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; and 9632 Partners Ltd. (collectively, the "Obligors"). (A true copy of the Note is annexed hereto as Exhibit A).

3.      By a written guaranty, dated January 29, 2007, Suttles is also a guarantor of the indebtedness owed by the Obligors to Madison pursuant to the Note. (A true copy of the Guaranty is annexed hereto as Exhibit B).

4.      Pursuant to a Deed of Trust and Security Agreement, dated January 29, 2007 ("Deed of Trust"), Marina, and its co-obligors Pirate's Lake and 7500 Bellaire Mall, conveyed certain property to a designated trustee, in trust, as collateral security for Obligors' obligations under the Note. (A true copy of the Deed of Trust is annexed hereto as Exhibit C).

5.      The property interests conveyed by Marina, Pirate's Lake, and 7500 Bellaire Mall under the Deed of Trust include, but are not limited to: (i) a valid duly perfected first mortgage lien on property owned and conveyed by Marina (the "Marina Property"); (ii) a valid duly perfected subordinate lien on property in Harris County, Texas, owned and conveyed by 7500 Bellaire Mall (the "Sharpstown Mall"); and (iii) a valid duly perfected subordinate lien on property owned and conveyed by Pirate's Lake (the "Pirate's Lake Property"). See, Exhibit C.

6.      As additional collateral security for the Obligors' obligations to Madison under the Note and Deed of Trust, on January 29, 2007 Suttles executed and delivered to Madison a Pledge and Security Agreement (Partnership Interests), a true copy of which is annexed hereto as Exhibit D, pursuant to which Suttles, as the sole member of SE Marina Way., LLC, General Partner of Marina, pledged to Madison, and granted to it a security interest in, all of his right, title and ownership interest in Marina including, without limitation: (i) all of Suttles' interest in the capital of Marina and in all of the profits and distributions of Marina to which Suttles shall at any time be entitled; and (ii) all of his right, title and interest to the assets of Marina including, without limitation, real property, profits, revenues, operating accounts, account receivables, fixtures, chattels and articles of personal property.

7.      Madison perfected its security interest in Suttles' ownership interest in Marina by filing with the Texas Secretary of State a UCC-1 Financing Statement. (A true copy of the UCC-1 Financing Statement is annexed hereto or Exhibit E).

8.      As further collateral security for the Obligors' obligations to Madison under the Note and Deed of Trust, on January 29, 2007, Suttles, as owner of a partnership interest in Marina, also executed and delivered to Madison a Pledge and Security Agreement (Membership Interests), a true copy of which is annexed hereto as Exhibit F, pursuant to which Suttles pledged to Madison, and granted to it a security interest in and transferred to Madison as collateral security, all of his 100% membership interest in SE Marina Way, LLC, the general partner of Marina, including, without limitation: (i) all of Suttles' interest in the capital of SE Marina Way, LLC and all of profits and distributions of Marina to which Suttles shall at any time be entitled; and (ii) all of his right, title, and interest to the assets of Marina, including, without limitation,

3

real property, profits, revenues, operating accounts, account receivables, fixtures, chattels and articles of personal property.

9. Madison perfected its security interest in Suttles' membership interests in SE Marina Way, LLC by filing with the Texas Secretary of State a UCC-1 Financing Statement. (A true copy of the UCC-1 Financing Statement is annexed hereto or Exhibit G).

10. Because SE Marina Way, LLC is wholly owned by Suttles, and Marina is owned by Suttles (99%) and SE Marina Way, LLC (1%), pursuant to both of the aforesaid Pledge and Security Agreements (collectively, the "Pledge Agreements"), and the aforementioned UCC-1 filings, Madison has duly perfected security interests in 100% of the ownership interests of Marina. The pledged ownership interests in Marina and SE Marina Way, LLC shall collectively be referred to herein as the "Pledged Interests."

11. In addition to the pledge by Suttles of his ownership interests in Marina and SE Marina Way, LLC, Suttles caused Marina itself to enter into a Cash Management Agreement with Madison, also dated January 29, 2007, and a true copy of which is annexed hereto as Exhibit H.

12. Pursuant to the Cash Management Agreement, Marina agreed, inter alia, that upon the occurrence of an Event of Default of the Note and Deed of Trust, Marina and Suttles, as Marina's Manager, were obliged to instruct the tenants of the Marina, and all persons maintaining open accounts with Marina, or with whom Marina does business on an "accounts receivable" basis, to deliver all payments due under such accounts to a specified lock box address. Further pursuant to the Cash Management Agreement, Madison was provided a security interest in the lock box account, and is entitled to cause the deposit bank to pay over to Madison all funds deposited therein.

45468/0010-3109978v3

13.    By a letter to the Obligors, dated March 22, 2007, Madison provided due notice to the Obligors, including Suttles, of certain defaults under the Note and Deed of Trust, including, but not limited to, the conveyance by 7500 Bellaire Mall of the Sharpstown Mall to an entity called Urban Mall Houston, LP, on the very day that the Note, Deed of Trust, Pledge Agreements and the other related loan documents were executed by Obligors and delivered to Madison. This transfer constitutes a violation of Section 10(b) of the Deed of Trust, and, along with the other events described in the March 22, 2007 notice, are Events of Default under Section 21 of the Deed of Trust. As such, they are also Events of Default under the Note and both of the Pledge Agreements.[1] (A true copy of the March 22, 2007 notice is annexed hereto as Exhibit I).

14.    Also pursuant to the March 22, 2007 written notice, Madison provided the Obligors with the requisite opportunity to cure the noticed defaults within thirty (30) days. Obligors did not cure the defaults. By letter dated July 2, 2007, Madison, through its attorneys, sent a notice of acceleration of the indebtedness due under the Note. (A true copy of the acceleration notice is annexed hereto as Exhibit J)

15.    As the result of the Obligors' default, and Madison's acceleration of the indebtedness owed under the Note, Madison commenced foreclosure proceedings against the Marina Property in Galveston County, Texas, and a foreclosure sale was noticed and posted for October 2, 2007.

---

[1] Madison has commenced in this Court a separate action to recover from Suttles and the other Obligors the full indebtness due under the Note, by way of a motion for summary judgment in lieu of complaint pursuant to CPLR § 3213 (the "Note Action").

16.    Subsequently, the Obligors requested of Madison that it postpone the foreclosure of the Marina Property, and that it not seek to foreclose the Pirate's Lake Property, until the first Tuesday in December, 2007.  In exchange, the Obligors promised to pay the entire unpaid balance of the Note by November 30, 2007.

17.    Consequently, pursuant to a written Forbearance Agreement, dated September 28, 2007, a true copy of which is annexed hereto as Exhibit K, Madison granted the Obligors' request, and, among other things, agreed to forbear from foreclosing the Marina Property and the Pirate's Lake Property, subject to the terms set forth therein.

18.    By entering into and executing the Forbearance Agreement, the Obligors, and each and all of them, including Suttles, expressly acknowledged and agreed as follows:

    (i)    that the Note was properly accelerated by Madison; and

    (ii)    that the Obligors were indebted to Madison, as of September 21, 2007, in the principal amount of $10,062,850.97, together with accrued and unpaid interest of $556,811.09.

See, Exhibit K (p.2).

19.    Neither Suttles nor any of the Obligors repaid the loan in full by November 30, 2007, as required by the Forbearance Agreement, resulting in the termination of the forbearance period.  Madison is therefore entitled to enforce any and all of its rights under any and all of the loan documents.

20.    Each and both of the Pledge Agreements provide (at ¶¶ 9 (a) – 9(h)) that in the event of a default thereunder, Madison shall be entitled to enforce its security interests in the Pledged Interests, and to take immediate possession of all pledged collateral. See, Exhibits D and F.

6

21.    In addition, for Madison to effectuate its rights under the Cash Management Agreement, it is necessary that all of the tenants and account payors of Marina be notified to deliver their payments to the designated lock box. While Suttles is obliged pursuant to the Cash Management Agreement to deliver these notices, it is apparent that he will not do so.

22.    Under the Pledge Agreements (Exhibits D and F, ¶¶ 9(a) – 9(h)), and pursuant to a written Conditional Assignment of Management Agreement, a true copy of which is annexed hereto as Exhibit L, Madison has the absolute right, as a consequence of Suttles' and the Obligors' defaults under the Note and Deed of Trust, to displace Suttles as the Manager of Marina, which would enable Madison to notify the tenants and other account payors of Marina to send their payments to the lock box. To exercise this contractual right, however, Madison requires the requested order of this Court directing that Madison be put into possession of all of its loan collateral, including all of the books and records of Marina and SE Marina Way, LLC. Minimally, Suttles should be directed immediately to provide Madison with the identities and addresses of all of the tenants of the Marina Property, and of all of account payors from whom Marina is owed receivables.

23.    Based upon the foregoing, and upon the accompanying Memorandum of Law, Madison is entitled to: (i) immediate possession of the Pledged Interests in Marina and SE Marina Way, LLC, including but not limited to any and all assets, profits, revenues, property, accounts, deposits, contracts, receivables, fixtures, fees, investments, books and records, and all other documentation and information relative to each of Marina and SE Marina Way, LLC; and (ii) the requested injunctive relief.

MADISON REALTY CAPITAL
ADVISORS, LLC, authorized servicer for
MADISON REALTY CAPITAL, L.P.

By:    John J. Sorel
Title:    Managing Director

Sworn to before me
this 29th day of April, 2008

Notary Public

SHOSHANA T. CARMEL
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01CA6153596
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES OCT. 10, 2010

45468/0010-3109978v3

# EXHIBIT A

## NOTE

$10,750,000.00

Dated: Houston, Texas
January 29, 2007

**NOTE** (hereinafter, the "**Note**") made this 29th day of January, 2007, by **SE MARINA WAY PARTNERSHIP, LP**, a Texas limited partnership, **PIRATE'S LAKE, LTD.**, a Texas limited partnership, **7500 BELLAIRE MALL LP**, a Texas limited partnership, **6425 GESS, LTD.**, a Texas limited partnership, **WILDFLOWER TDS, L.P.**, a Texas limited partnership, **SHALAMAR SAN MARCOS PROPERTIES, LTD.**, a Texas limited partnership, **WINDSOR TDS, L.P.**, a Texas limited partnership, **9632 PARTNERS, LTD.**, a Texas limited partnership, and **TRACY SUTTLES**, individually, each having an address at 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036, Attention: Tracy Suttles (collectively hereinafter, the "**Maker**") for the benefit of **MADISON REALTY CAPITAL, L.P.**, a Delaware limited partnership, its successors and/or assigns, as their interests may appear, (collectively, the "**Payee**"), having offices at 261 Madison Avenue, 18th Floor, New York, New York 10016.

**FOR VALUE RECEIVED**, Maker promises to pay to the order of Payee, at 261 Madison Avenue, 18th Floor, New York, New York 10016, or at such other place as Payee may designate to Maker in writing from time to time, the principal sum of Ten Million Seven Hundred Fifty Thousand and 00/100 Dollars ($10,750,000.00), together with interest thereon at the Interest Rate, calculated in the manner hereinafter set forth from and including the date of this Note to the date this Note is paid in full, as follows:

A.    On the date hereof, interest on the principal sum of this Note from the date hereof to February 1, 2007 at the Interest Rate.

B.    Thereafter, interest only at the Interest Rate on the outstanding Principal Balance shall be due monthly and shall be paid monthly in arrears, commencing on March 1, 2007, and monthly thereafter on the first (1st) day of each month (the "**Payment Date**") until the Maturity Date (each such monthly payment, a "**Monthly Payment**").

C.    Thereafter, on the Maturity Date, the entire outstanding principal balance of this Note, together with all accrued and unpaid interest through the Maturity Date at the Interest Rate, and all other sums payable to the holder of this Note (whether pursuant to this Note, the Mortgage or Other Security Documents (as hereinafter defined)) shall become due and payable.

For the purposes of this Note, these terms shall be defined as follows:

1.    The term "**Interest Rate**" as used in this Note shall mean interest at the annual rate equal to the higher of (i) Fourteen and One-Quarter Percent (14.25%), per annum, or (ii) Six Percent (6.00%) plus the Prime Rate (the "Interest Rate") from the date of this Note to the Maturity Date. Changes in the Interest Rate to be charged hereunder based on the Prime Rate shall take effect immediately upon the occurrence of any change in the Prime Rate.



RE:50260\9044\328166v2

MADISON 00024

2.  The term **"Prime Rate"** shall mean the annual rate of interest which is the highest prime lending rate of interest most recently in effect (as published in the Money Rates Column in The Wall Street Journal or if The Wall Street Journal fails to publish such rate, such other publication as Payee shall designate in its sole discretion). A certificate made by an officer of Payee stating the Prime Rate in effect on any given day, for the purposes hereof, shall be conclusive evidence of the Prime Rate in effect on such day. The Prime Rate is a base reference rate of interest adopted by Payee as a general benchmark from which Payee determines the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness and Maker acknowledges and agrees that Payee has made no representations whatsoever that the Prime Rate is the interest rate actually offered by Payee to borrowers of any particular creditworthiness. In the event that the concept of the Prime Rate shall no longer exist, then the Prime Rate shall be deemed to be the Prime Rate as last reported in The Wall Street Journal.

3.  The term **"Principal Balance"** shall mean the outstanding principal balance of this Note from time to time.

4.  The term **"Maturity Date"** as used in this Note shall mean the earlier of (i) January 28, 2008, or (ii) such sooner date, by acceleration or otherwise, as may be applicable pursuant to the terms hereof, at which time the entire Debt shall become due and payable.

5.  The term **"Debt"** shall mean all principal, interest and other sums of any nature whatsoever, which may or shall become due to Payee in accordance with the provisions of this Note, the Mortgage or Other Security Documents.

6.  The term **"Mortgage"** shall mean collectively those two (2) certain Deed of Trusts dated the date hereof in the principal amount of $10,750,000.00, encumbering premises more particularly set forth on Schedule A thereof.

7.  The term **"Other Security Documents"** shall mean any of the documents other than this Note or the Mortgage, now or hereafter executed by the Maker or others, and by or in favor of Payee, which wholly or partially secure or guarantee payment of this Note, or which otherwise pertain to the Loan.

Any capitalized terms used herein but not defined shall have the meanings ascribed to them in the Mortgage or Other Security Documents.

Interest shall be computed on the basis of a year of 360 days and actual days elapsed.

It is hereby expressly agreed that the entire Debt shall become immediately due and payable at the option of Payee on the happening of any default or event by which under the terms of this Note, the Mortgage or the Other Security Documents, the Debt may or shall become due and payable, and that all of the terms, covenants and provisions contained in this Note, the Mortgage or the Other Security Documents which are to be kept and performed by the Maker are hereby made a part of this Note to the same extent and with the same force and effect as if they


RE\50260\9044\328166v2

MADISON 00025

were fully set forth herein. The Payee hereof may exercise this option to accelerate during any default by the Maker regardless of any prior forbearance.

A payment shall not be deemed to have been made on any day unless such payment has been received by Payee, at the required place of payment, in U.S. dollars by no later than 1:00 p.m. (New York time) on such day. Whenever any payment to Payee hereunder would otherwise be due (except by reason of acceleration) on a day that is not a Business Day, such payment shall instead be due on the next succeeding Business Day. If any installment of principal, interest or other sums due hereunder or under the Mortgage or any Other Security Document are not paid on the date on which same are due, the Maker shall pay to the Payee a late charge of ten percent (10.00%) of such unpaid installment as a late payment charge, such late charge to be immediately due and payable without demand by the Payee.

From the date hereof through and including the six (6) month anniversary of the date of this Note, subject to the following provisions and provided that, simultaneously with such prepayment, Borrower shall pay to Payee a prepayment premium in an amount equal to six (6) Monthly Payments such that Payee shall have received not less than six (6) full Monthly Payments hereunder, less Monthly Payments previously made to Payee, then, Maker shall have the right to prepay the Principal Balance in whole only, along with interest, additional interest, and any other sums due under the Note, the Mortgage or the Other Security Documents upon not less than ninety (90) days prior irrevocable written notice by Maker (a "**Prepayment Notice**"), in which event such prepayment shall be accompanied by payment of accrued interest to and including the date of prepayment.

From the date that is one (1) day following the six (6) month anniversary of the date of this Note through and including the Maturity Date of this Note, subject to the following provisions and provided that, simultaneously with such prepayment, Borrower shall pay to Payee a prepayment premium in an amount equal to twelve (12) Monthly Payments such that Payee shall have received not less than twelve (12) full Monthly Payments hereunder, then, Maker shall have the right to prepay the Principal Balance in whole only, along with interest, additional interest, and any other sums due under the Note, the Mortgage or the Other Security Documents upon the giving a Prepayment Notice, in which event such prepayment shall be accompanied by payment of accrued interest to and including the date of prepayment.

Maker acknowledges that this Note and Maker's obligations under this Note are and shall at all times continue to be absolute and unconditional in all respects. This Note sets forth the entire agreement and understanding of Payee and Maker. Maker hereby waives valuation, appraisement, presentment, demand for payment, notice of non-payment, notice of dishonor, protest or notice of protest of this Note, lack of diligence, delays in collection or enforcement of this Note, notice of the intention to accelerate, and the benefit of all applicable law affording any right or redemption or cure.

This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers, and shall be binding upon them and their successors and assigns. If any payment under this Note is not made when due, Maker agrees to pay all costs of collection when incurred, including reasonable attorneys' fees, which costs shall be added to the amount due under this Note and shall be receivable therewith.

RE\50260\9044\328166v2

MADISON 00026

The indebtedness herein evidenced by this Note is secured by the Mortgage and the Other Security Documents.

The terms of this Note shall be governed by and construed in accordance with the laws of the State of New York, and/or the State of Texas, at the Payee's sole discretion.

Maker does hereby agree that upon the occurrence of an Event of Default (as such capitalized term is defined in the Mortgage), or upon the failure of Maker to pay the Debt in full on the Maturity Date, Payee shall be entitled to receive and Maker shall pay interest on the entire Debt at the rate of twenty-four (24%) percent per annum or at the maximum rate of interest which Maker may by law pay, whichever is lower (the "**Default Rate**"), to be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt. This charge shall be added to the Debt, and shall be deemed secured by the Mortgage. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Payee by reason of the occurrence of any Event of Default.

This Note is subject to the express condition that at no time shall Maker be obligated or required to pay interest or late fees on the principal balance due hereunder at a rate which could subject Payee to either civil or criminal liability as a result of being in excess of the maximum interest rate or late fees which Maker is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Maker is at any time required or obligated to pay interest or late fees on the principal balance due hereunder at a rate in excess of such maximum rate, the Interest Rate, the Default Rate, or the late charge as the case may be, shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest or late charge due hereunder. All sums paid or agreed to be paid to Payee for the use, forbearance, or detention of the Debt, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of this Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in the Mortgage or any of the Other Security Documents, it is not the intention of Payee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

No delay on the part of Payee in exercising any right or remedy under this Note, the Mortgage or the Other Security Documents or failure to exercise the same shall operate as a waiver in whole or in part of any such right or remedy. No notice to or demand on Maker shall be deemed to be a waiver of the obligation of Maker or of the right of Payee to take further action without further notice or demand as provided in this Note, the Mortgage and the Other Security Documents.

Each of Payee's rights and remedies under this Note shall be in addition to all of its other rights and remedies under the Mortgage, Other Security Documents and applicable law.

RE\50260\9044\328166v2

**TIME IS OF THE ESSENCE** with regard to Maker's performance of all the terms, covenants and conditions of this Note.

Any provision of this Note, the Mortgage or the Other Security Documents that is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof or affecting the validity or enforceability of such provision.

All of the provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Maker (and the undersigned representative of Maker, if any) represents that Maker has full power, authority and legal right to execute and deliver this Note and that the Debt hereunder constitutes a valid and binding obligation of Maker.

All notices to be given under this Note shall be given in the same manner as provided in the Mortgage.

This Note, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Maker hereby irrevocably and unconditionally waives, and Payee, by its acceptance of this Note, irrevocably and unconditionally waives, any and all right to trial by jury in any action, suit or counterclaim arising in connection with, out of or otherwise relating to this Note, the Mortgage or the Other Security Documents.

Maker, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, (a) submits to personal jurisdiction in the State of New York, or at Payee's election, each and all counties in which the properties defined in the Mortgage are located, over any suit, action or proceeding by any person arising from or relating to this Note or the Mortgage, (b) agrees that any such action, suit or proceeding may be brought in any State or Federal Court of competent jurisdiction sitting in New York County, New York, or at Payee's election, each and all counties in which the properties defined in the Mortgage are located, (c) submits to the jurisdiction of such courts, and (d) to the fullest extent permitted by law, agrees that Maker will not bring any action, suit or proceeding in any other forum (but nothing herein shall affect the right of the holder of this Note to bring any action, suit or proceeding in any other forum). Maker further consents and agrees to service of any summons, complaint or other legal process in any such suit, action or proceeding by registered or certified U.S. Mail, postage prepaid, to Maker at the address set forth on page 1 hereof, and consents and agrees that such service shall constitute in every respect valid and effective service (but nothing herein shall affect the validity or effectiveness of process served in any other manner permitted by law).

**[Remainder of Page Intentionally Left Blank]**

RE\50260\9044\328166v2

**IN WITNESS WHEREOF,** Maker has duly executed this Note the day and year first above written.

**SE MARINA WAY PARTNERSHIP, LP**

By: SE Marina Way, L.L.C.
   its general partner

By: _____
   Name: Tracy Suttles
   Title:  Manager

**PIRATE'S LAKE LTD.**

By: Pirate's Lake Management, L.L.C.
   its general partner

By: _____
   Name: Tracy Suttles
   Title:  Manager

**7500 BELLAIRE MALL, LP**

By: 7500 Bellaire Mall Management, Inc.
   its general partner

By: _____
   Name: Tracy Suttles
   Title:  President

**6425 GESS, LTD.**

By: 6425 Gess Management, Inc.
   its general partner

By: _____
   Name: Tracy Suttles
   Title:  President

**WILDFLOWER TDS, L.P.**

By: Wildflower General Partner, LLC
   its general partner

By: _____
   Name: Tracy Suttles
   Title:  Manager

RE\50260\9044\328166v2

MADISON 00029

**SHALAMAR SAN MARCOS PROPERTIES, LTD.**

By: Shalamar San Marcos Management, LLC
    its general partner

By: _____
    Name: Tracy Suttles
    Title: Manager

**WINDSOR TDS, L.P.**

By: Windsor TDS Management, Inc.
    its general partner

By: _____
    Name: Tracy Suttles
    Title:  President

**9632 PARTNERS, LTD.**

By: TraCyn Inc.
    its general partner

By: _____
    Name: Tracy Suttles
    Title:  President

_____
Tracy Suttles, individually

MADISON 00030

STATE OF TEXAS          )
                        )   ss.:
COUNTY OF HARRIS        )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of SE Marina Way, L.L.C., general partner of SE Marian Way Partnership, LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public

STATE OF TEXAS          )
                        )   ss.:
COUNTY OF HARRIS        )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of Pirate's Lake Management, L.L.C., general partner of Pirate's Lake Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public

P:E\50260\9044\328166v2

MADISON 00031

STATE OF TEXAS      )
                         )   ss.:

COUNTY OF HARRIS    )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of 7500 Bellaire Mall Management, Inc., general partner of 7500 Bellaire Mall LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

_____
Notary Public


STATE OF TEXAS      )
                         )   ss.:

COUNTY OF HARRIS    )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of 6425 Gess Management, Inc., general partner of 6425 Gess, Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

_____
Notary Public

MADISON 00032

STATE OF TEXAS            )
                          )    ss.:
COUNTY OF HARRIS          )


On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of Wildflower General Partner, LLC, general partner of Wildflower TDS L.P., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public


STATE OF TEXAS            )
                          )    ss.:
COUNTY OF HARRIS          )


On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of Shalamar San Marcos Management, LLC, general partner of Shalamar San Marcos Properties, Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public


RE\50260\9044\328166v2

MADISON 00033

STATE OF TEXAS                    )
                                 )    ss.:
COUNTY OF HARRIS                 )


On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of Windsor TDS Management, Inc., general partner of Windsor TDS, L.P., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

_____
Notary Public


STATE OF TEXAS                    )
                                 )    ss.:
COUNTY OF HARRIS                 )


On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of TraCyn Inc., general partner of 9632 Partners, Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

_____
Notary Public

R E\50260\9044\328166v2

STATE OF TEXAS )
        )   ss.:
COUNTY OF HARRIS )

   On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                 _____
                 Notary Public

> **BRAD EDWARD PORTER**
> Notary Public, State of Texas
> My Commission Expires
> February 21, 2010

RE\50260\9044\328166v2

MADISON 00035

# EXHIBIT B

# GUARANTY

Houston, Texas

January 29, 2007

In consideration of advances, loans, extensions of credit, renewals, acquisition of notes, mortgages, and other instruments for payment of money due or to become due, heretofore made to or for the account of **SE MARINA WAY PARTNERSHIP, LP, PIRATE'S LAKE, LTD., 7500 BELLAIRE MALL LP, 6425 GESS, LTD., WILDFLOWER TDS, L.P., SHALAMAR SAN MARCOS PROPERTIES, LTD., WINDSOR TDS, L.P., 9632 PARTNERS, LTD., and TRACY SUTTLES,** having an address at 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036, Attention: Tracy Suttles (hereinafter collectively, referred to as "Borrower") by **MADISON REALTY CAPITAL, L.P.,** its successor and/or assigns, as their interests may appear, having offices at 261 Madison Avenue, 18th Floor, New York, New York 10016 (hereinafter referred to as "Lender"), the undersigned (each, any and all of whom being hereinafter referred to individually and, if more than one, collectively, as "Guarantor"), jointly and severally (if more than one) hereby absolutely and unconditionally guarantees to Lender the prompt payment of claims of every nature and description of Lender against Borrower and any and every obligation and liability of Borrower to Lender or whatsoever nature and howsoever evidenced, whether now existing or hereafter incurred, whether originally contracted with Lender, or subsequently acquired by Lender, in whole or part, whether direct or indirect, absolute or contingent, secured or not secured, matured or not matured, including, but not limited to those payments, obligations and liabilities contained in the Note, Mortgage and Other Security Documents (each as defined in that certain Note executed simultaneously herewith), all of which are hereinafter referred to as "Obligations").

1.    Guarantor hereby covenants and agrees to and with Lender, its successors and/or assigns, that if Borrower shall at any time default in the payment or performance of the Obligations, Guarantor, in each and every instance, shall and will forthwith pay such Obligations to the Lender, its successors and assigns, and shall and will forthwith faithfully perform and fulfill all of the Obligations, and will forthwith pay to Lender any and all damages that may arise as a result of any default by Borrower under any of the Obligations (including, without limitation, all reasonable attorneys' fees, disbursements and court costs suffered or paid by Lender in any action or proceeding between Lender and Borrower, between Lender and Guarantor or between Lender and any third party or otherwise) caused by any such default and/or by the enforcement of this Guaranty.

2.    The Guarantor agrees that, with or without notice or demand, it shall reimburse Lender for all costs and expenses (including, without limitation, reasonable attorneys fees, disbursements and court costs) incurred by Lender in connection with any action or proceeding brought by Lender to enforce the obligations of the Guarantor under this Guaranty.

3.    The Guarantor agrees that all moneys available to Lender for application in payment or reduction of the Obligations may be applied by Lender in such manner and in such amounts and at such time or times and in such order, priority and proportions as Lender may elect.

REI\50260\9044\328166v2

MADISON 00158

4.     The Guarantor hereby consents that, from time to time, before or after any default by Borrower, with or without further notice to or assent from the Guarantor, any security at any time held by or available to Lender for any obligation of Borrower, or any security at any time held by or available to Lender for any obligation of any other person or party secondarily or otherwise liable for all or any portion of the Obligations, may be exchanged, surrendered or released and any obligation of Borrower, or of any such other person or party, may be changed, altered, renewed, extended, continued, surrendered, compromised, waived or released in whole or in part, or any default with respect thereto waived, and Lender may fail to set off and may release, in whole or in part, any balance of any deposit account or credit on its books in favor of Borrower, or of any such other person or party, and may extend further credit in any manner whatsoever to Borrower, and generally deal with Borrower or any such security or other person or party as Lender may see fit; and the Guarantor shall remain bound under this Guaranty notwithstanding any such exchange, surrender, release, change, alteration, renewal, extension, continuance, compromise, waiver, inaction, extension of further credit or other dealing.

5.     The Guarantor hereby waives (a) notice of acceptance of this Guaranty and of the making of any loan or any advance to Borrower; (b) presentment and demand for payment of the Obligations or any portion thereof; (c) protest and notice of dishonor or default to the Guarantor or to any other person or party with respect to the Obligations or any portion thereof, (d) all other notices to which the Guarantor might otherwise be entitled; and (e) any demand for payment under this Guaranty.

6.     This Guaranty is an absolute and unconditional guaranty of payment and performance and not of collection. The Guarantor waives any right to require that any action be brought against Borrower or any other person or party or to require that resort be had to any security or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person or party.

7.     Guarantor's obligations under this Guaranty shall remain in full force and effect without regard to, and shall not be modified, impaired or affected by, or diminished by reason of, any event or circumstance that might otherwise constitute a legal or equitable discharge of Guarantor, including, without limitation: (a) any amendment, extension or modification of, or addition or supplement to, any of the terms, conditions or provisions of any indebtedness of Debtor to Lender, or (b) any compromise, release, consent, extension, indulgence or other action or inaction in respect to any of the terms, conditions or provisions of any Obligations of Borrower to Lender; or (c) any consent, indulgence, exercise or non-exercise by Lender of any right, power or remedy under or in respect of any Obligations, or any waiver of any such right, power or remedy or any dealings or transactions or matter or thing of any kind or nature between Borrower and Lender; or (d) any bankruptcy, insolvency, reorganization, arrangement, adjustment, composition, liquidation, or the like of Borrower, or the discharge or release of Borrower in any such bankruptcy proceeding; or (e) any limitations of Borrower's liability that may now or hereafter be imposed by any statute, regulation or rule of law, or any illegality, irregularity, invalidity or unenforceability, in whole or in part, of any of the Obligations; or (f) any other circumstance, whether or not the Guarantor shall have had notice or knowledge thereof, or (g) any modification or waiver of or change in any of the terms, covenants, conditions or provisions of any of the Obligations, notwithstanding that such modifications or amendments increase the liability of Guarantor hereunder.

- 2 -

MADISON 00159

8.    Each reference herein to Lender shall be deemed to include its successors and assigns, in whose favor the provisions of this Guaranty shall also inure. Each reference herein to the Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of the Guarantor, all of whom shall be bound by the provisions of this Guaranty, provided, however, that the Guarantor shall in no event or under any circumstance have the right without obtaining the prior written consent of Lender, in Lender's sole and absolute discretion, to assign or transfer the obligations and liabilities of the Guarantor under this Guaranty, in whole or in part, to any other person, party or entity.

9.    No delay on the part of Lender in exercising any right or remedy under this Guaranty or failure to exercise the same shall operate as a waiver in whole or in part of any such right or remedy. No notice to or demand on the Guarantor shall be deemed to be a waiver of the obligation of the Guarantor or of the right of Lender to take further action without notice or demand as provided in this Guaranty.

10.    This Guaranty may be modified, amended, changed or terminated only by an agreement in writing signed by Lender and the Guarantor. No waiver of any term, covenant or provision of this Guaranty shall be effective unless given in writing by Lender, and if so given by Lender, shall be effective only in the specific instance in which given.

11.    The Guarantor acknowledges that this Guaranty and the obligations of the Guarantor under this Guaranty are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever that might otherwise constitute a defense to this Guaranty and the obligations of the Guarantor under this Guaranty or the obligations of any other person or party (including, without limitation, Borrower) relating to this Guaranty or otherwise with respect to the Obligations. This Guaranty sets forth the entire agreement and understanding of Lender and the Guarantor, and the Guarantor absolutely, unconditionally and irrevocably waives any and all right to assert any defense, setoff, counterclaim or crossclaim of any nature whatsoever with respect to this Guaranty or the obligations of the Guarantor under this Guaranty or the obligations of any other person or party (including, without limitation, Borrower) relating to this Guaranty or otherwise with respect to the Obligations, or in any action or proceeding brought by Lender to collect the Obligations, or any portion thereof, or to enforce the obligations of the Guarantor under this Guaranty. The Guarantor acknowledges that no oral or other agreements, understandings, representations or warranties exist with respect to this Guaranty or with respect to the obligations of the Guarantor under this Guaranty, except those specifically set forth in this Guaranty.

12.    The Guarantor hereby irrevocably and unconditionally waives, and Lender by its acceptance of this Guaranty irrevocably and unconditionally waives, any and all rights to trial by jury in any action, suit or counterclaim arising in connection with, out of or otherwise relating to this Guaranty.

13.    Notwithstanding any payments made by the Guarantor pursuant to the provisions of this Guaranty, the Guarantor shall have no right of subrogation in and to any of the Obligations or the payment thereof until the Obligations have been paid in full to Lender or performed and all preference periods have lapsed. The Guarantor agrees that if any payment made by the Borrower or the Guarantor to Lender or any portion of the Obligations is rescinded,

MADISON 00160

recovered from or repaid by Lender, in whole or in part in any bankruptcy, insolvency or similar proceeding instituted by or against the Borrower or Guarantor, this Guaranty shall continue to be fully applicable to such Obligations to the same extent as though the payment so recovered or repaid had never originally been made on such Obligations regardless of, and, without giving effect to, any discharge or release of the Guarantor's obligations hereunder granted by Lender after the date hereof.

14.    Any notice, request or demand given or made under this Guaranty shall be in writing and shall be hand delivered or sent by Federal Express or other reputable overnight courier service or by postage prepaid registered or certified mail, return receipt requested, to the respective addresses set forth at the beginning or end of this Guaranty, as the case may be, and shall be deemed given (i) if sent by hand, when delivered; (ii) if sent by Federal Express or other reputable courier service, one (1) day following deposit with such courier service; or (iii) if sent by registered or certified mail, three (3) business days after being postmarked. Refusal to accept delivery of a notice shall be deemed delivery thereof. Each party to this Guaranty may designate a change of address by notice given to the other party fifteen (15) days prior to the date such change of address is to become effective. Notices required or permitted to be given hereunder may be given by a party's attorneys.

15.    This Guaranty is, and shall be deemed to be, a contract entered into under and pursuant to the laws of the State of New York and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State of New York, and/or the State of Texas, at Lender's sole discretion without regard to the principles of conflicts of law of such State. No defense given or allowed by the laws of any other state or country shall be interposed in any action or proceeding hereon unless such defense is also given or allowed by the laws of the State of New York.

16.    The Guarantor agrees to submit to personal jurisdiction in the State of New York, New York County or, at Lender's sole discretion, each and all counties in which the properties defined in the Mortgage are located, in any action or proceeding arising out of this Guaranty and, in furtherance of such agreement, the Guarantor hereby agrees and consents that, without limiting other methods of obtaining jurisdiction, personal jurisdiction over the Guarantor in any such action or proceeding may be obtained within or without the jurisdiction of any court (including, without limitation, a United States court) located in and for New York County or, at Lender's sole discretion, each and all counties in which the properties defined in the Mortgage are located, and that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the Guarantor by registered or certified mail to or by personal service at the last known address of the Guarantor, whether such address is within or without the jurisdiction of any such court.

17.    Each of the Guarantors hereby represent and warrant:

(a)    That this Guaranty constitutes the legal, valid and binding obligations of the Guarantor, enforceable against the Guarantor in accordance with its terms, subject to any applicable bankruptcy, insolvency or other similar law now or hereinafter in effect;

(b)    Neither this Guaranty nor any of the documents executed in connection with the Loan to which the Guarantor is a party will violate any provision of law, rule, or

- 4 -

MADISON 00161

regulation or any order of any court or other governmental agency to which the Guarantor is subject, the organizational documents of Guarantor, if any, the provisions of any agreement or instrument to which the Guarantor is a party or by which the Guarantor or any of the Guarantor's properties or assets are bound, or be in conflict with, result in a breach of, or constitute a default under (with or without notice or lapse of time), any such agreement or instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any properties or assets of the Guarantor.

(c)     No action or approval by or of and no filing or registration with any governmental or public body or authority, any subdivision thereof, or the consent of any other person or entity, or any other legal formality is required in connection with the entering into, performance or enforcement of this Guaranty, except those as have been obtained or taken and with respect to which a copy or other satisfactory evidence thereof has been furnished to Lender.

(d)     The financial statements and tax returns of the Guarantor delivered to Lender are true, complete and accurate.

(e)     The Guarantor shall not terminate or dissolve or suspend Guarantor's usual business activities, or convey, sell, lease, transfer or otherwise dispose all or a substantial part of the Guarantor's assets during the term of this Guaranty.

18.     No exculpatory provisions, if any, contained in any of the Obligations shall in any event or under any circumstance be deemed or construed to modify, qualify or affect in any manner whatsoever the personal recourse obligations and liabilities of the Guarantor under this Guaranty.

19.     In the event that there is more than one guarantor, this Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterpart shall be an original and all of which together shall constitute a single agreement of guaranty. The failure of any party listed below to execute this Guaranty, or any counterpart hereof, shall not release any other party from his obligations hereunder.

[Remainder of Page Intentionally Left Blank]

RE\50260\9044\328166v2

MADISON 00162

IN WHEREOF, the Guarantor has duly executed this Guaranty the day and year first above set forth.

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036
SS#: 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

## ACKNOWLEDGMENT

STATE OF TEXAS
COUNTY OF HARRIS

On the 29th day of January, 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.



BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

Notary Public

RE\5026\0\9044\328166v2

MADISON 00163

# EXHIBIT C



*NOTE TO CLERK/RECORDER:*
*THIS INSTRUMENT IS ALSO A FIXTURE FILING STATEMENT*

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OF YOUR DRIVER'S LICENSE NUMBER.

## DEED OF TRUST AND SECURITY AGREEMENT

**Date:**   January 29, 2007

**Grantor:**   SE MARINA WAY PARTNERSHIP, LP, PIRATE'S LAKE LTD. AND 7500 BELLAIRE MALL LP

**Grantor's Mailing Address:** 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036, Attention: Tracy Suttles

**Trustee:**   JACK O. NORMAN

**Trustee's Mailing Address:** 4245 North Central Expressway, Suite 350, Dallas, Texas 75205

**Beneficiary:** MADISON REALTY CAPITAL, L.P., its successors and/or assigns, as their interests may appear.

**Beneficiary's Mailing Address:**     261 Madison Avenue, 18th Floor
New York, New York 10016
Attention: Julie Breslin

## Note

**Date:**   January 29, 2007

**Amount:** Ten Million Seven Hundred Fifty Thousand and 00/100 Dollars ($10,750,000.00)

**Maker:** SE MARINA WAY PARTNERSHIP, LP, PIRATE'S LAKE, LTD., 7500 BELLAIRE MALL LP, 6425 GESS, LTD., WILDFLOWER TDS, L.P., SHALAMAR SAN MARCOS PROPERTIES, LTD., WINDSOR TDS, L.P., 9632 PARTNERS, LTD., and TRACY SUTTLES, indivually

**Payee:** MADISON REALTY CAPITAL, L.P., its successors and/or assigns, as their interests may appear.

**Final Maturity Date:** January 28, 2008

**Terms of Payment:**   Payable as therein provided.

## Property (including any improvements):

REV502609044\328166v2

MADISON 00037

See Schedule A

**Prior Lien(s) (including recording information):  None**

**Other Exceptions to Conveyance and Warranty:**

For value received and to secure payment of the note, Grantor conveys the property to Trustee in trust.  Grantor warrants and agrees to defend the title to the property.  If Grantor performs all the covenants and pays the note according to its terms, this deed of trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

**Grantor's Obligations**

Grantor agrees to:

1. keep the property in good repair and condition;
2. pay all taxes and assessments on the property when due and deliver copies of paid tax receipts to Beneficiary on or before January 15th of each year during the term of the Note;
3. preserve the lien's priority as it is established in this deed of trust;
4. maintain, in a form acceptable to Beneficiary, an insurance policy that:
   - a.    covers all improvements for their full insurable value as determined when the policy is issued and renewed, unless Beneficiary approves a smaller amount in writing;
   - b.    Intentionally Deleted;
   - c.    provides fire and extended coverage, including windstorm coverage;
   - d.    protects Beneficiary with a standard mortgage clause;
   - e.    provides flood insurance at any time the property is in a flood hazard area; and,
   - f.    contains such other coverage as Beneficiary may reasonably require;
5. Intentionally Deleted;
6. deliver the insurance policy to Beneficiary and deliver renewals to Beneficiary at least ten days before expiration;
7. keep any buildings occupied as required by the insurance policy; and
8. if this is not a first lien, pay all prior lien notes that Grantor is personally liable to pay and abide by all prior lien instruments.

**Beneficiary's Rights**

1. Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.
2. If the proceeds of the note are used to pay any debt secured by prior liens, Beneficiary is subrogated to all of the rights and liens of the holders of any debt so paid.
3. Beneficiary may apply any proceeds received under the insurance policy either to reduce the note or to repair or replace damaged or destroyed improvements covered by the policy.
4. If Grantor fails to perform any of Grantor's obligations, Beneficiary may perform those obligations and be reimbursed by Grantor on demand at the place where the note is payable for any sums so paid, including attorney's fees, plus interest on those sums from the dates of

MADISON 00038


payment at the rate stated in the note for matured, unpaid amounts. The sum to be reimbursed shall be secured by this deed of trust.

5.  If Grantor defaults on the note or fails to perform any of Grantor's obligations or if default occurs on a prior lien note or other instrument, and the default continues after Beneficiary gives Grantor notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Beneficiary may exercise any one or more of the following remedies:

> a.    declare the unpaid principal balance and earned interest on the note immediately due;
>
> b.    request Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended;
>
> c.    purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited on the note; and
>
> d.    exercise any and all other remedies to which Beneficiary is entitled by law or equity, including without limitation, an action to collect the indebtedness secured by this Deed of Trust.

**Trustee's Duties**

If requested by Beneficiary to foreclose this lien, Trustee shall:

1.  either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

2.  sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and

3.  from the proceeds of the sale, pay, in this order:

> a.    expenses of foreclosure, including a commission to Trustee of 5% of the bid;
>
> b.    to Beneficiary, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;
>
> c.    any amounts required by law to be paid before payment to Grantor; and
>
> d.    to Grantor, any balance.

**General Provisions**

1.  If any of the property is sold under this deed of trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.  Recitals in any Trustee's deed conveying the property will be presumed to be true.

3.  Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.  This lien shall remain superior to liens later created even if the time of payment of all or part of the note is extended or part of the property is released..

5.  If any portion of the note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

MADISON 00039

6. Grantor assigns to Beneficiary all sums payable to or received by Grantor from condemnation of all or part of the property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the property. After deducting any expenses incurred, including attorney's fees, Beneficiary may release any remaining sums to Grantor or apply such sums to reduce the note. Beneficiary shall not be liable for failure to collect or to exercise diligence in collecting any such sums.

7. Grantor assigns to Beneficiary absolutely, not only as collateral, all present and future rent and other income and receipts from the property. Leases are not assigned. Grantor warrants the validity and enforceability of the assignment. Grantor may as Beneficiary's licensee collect rent and other income and receipts as long as Grantor is not in default under the note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the note and performance of the deed of trust, but if the rent and other income and receipts exceed the amount due under the note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the note or performance of this deed of trust, Beneficiary may terminate Grantor's license to collect and then as Grantor's agent may rent the property if it is vacant and collect all rent and other income and receipts. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the property. Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the property. Beneficiary shall apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Beneficiary's rights and remedies and then to Grantor's obligations under the note and this deed of trust in the order determined by Beneficiary. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies. If Grantor becomes a voluntary or involuntary bankrupt, Beneficiary's filing a proof of claim in bankruptcy will be tantamount to the appointment of a receiver under Texas law.

8. Interest on the debt secured by this deed shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

9. When the context requires, singular nouns and pronouns include the plural.

10. The term note includes all sums secured by this deed of trust.

11. This deed of trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

12. If Grantor and Maker are not the same person, the term Grantor shall include Maker.

13. A portion of the collateral includes fixtures, and this Deed of Trust shall be effective as a financing statement filed as a fixture filing from the date of its filing for record in the real property records of the county in which the Property is situated. Information concerning the security interest created hereunder may be obtained from Beneficiary, stated above. The mailing address of the Grantor, as debtor, is as stated above.

14.    In the event of any conflict between the terms and provisions of this Section and any other term or provision of this Deed of Trust and Rider, the terms and provisions of this Section shall govern and control.

MADISON 00040

(a)     Should Beneficiary have elected to accelerate the indebtedness and Debt secured hereby, Beneficiary may initiate foreclosure of the Property by requesting the Trustee to effectuate a non-judicial foreclosure sale. The Trustee of this Deed of Trust and Rider shall then sell, or offer for sale, the Property at public sale to the highest bidder for cash during a three hour period between the hours of ten o'clock a.m. and four o'clock p.m. whose earliest point in time is specified, on the first Tuesday of any month, at the area officially designated for holding such sales at the courthouse of any county in the State of Texas in which any part of the Property is situated, after having given notice of the date, the time period, place and terms of said sale in accordance with the laws of the State of Texas then in force and governing said sales of real property and improvements under powers conferred by deeds of trust. The Property shall be sold by posting, or causing to be posted, at least twenty-one (21) consecutive days prior to the date of said sale, written or printed notice thereof at the courthouse door in each of the counties in which the Property is situated, designating the county where the Property will be sold and designating the date, the time period, the place and the terms of sale. A copy of such notice shall also be filed in the office of the County Clerk in each county of the State of Texas in which any part of the Property is situated at least twenty-one (21) consecutive days before the date of said sale of the Property. Beneficiary shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor Trustee, or by any receiver or public officer. Any Beneficiary purchasing at any such sale shall have the right to credit the secured indebtedness owing to such Beneficiary upon the amount of its bid entered at such sale to the extent necessary to satisfy such bid. Said Trustee may appoint an attorney-in-fact to act in its stead as Trustee to conduct sale as hereinbefore provided. Grantor authorizes and empowers the Trustee to sell the Property, in lots or parcels or as a whole, and to execute and deliver to the purchaser or purchasers thereof good and sufficient deeds of conveyance thereto of the estate of title then existing on the Property and bills of sale with covenants of general warranty. Grantor binds himself to warrant and forever defend the title of such purchaser or purchasers when so made by the Trustee, and agrees to accept proceeds of said sale, if any, which are payable to Grantor as provided herein. In addition to the posting and filing of notices hereinabove provided, and for so long as required by law, no foreclosure under the power of sale herein contained shall be held unless Beneficiary, at least twenty-one (21) days preceding the date of sale and in the manner prescribed by law, shall have served written notice of the proposed sale which designates the County where the Property will be sold and designates the date, time period, the place and the terms of sale by certified mail on Grantor. Service of such a notice by certified mail shall be completed upon deposit of such notice, postage prepaid and properly addressed to each such person or entity at the address for Grantor last provided to Beneficiary in strict accordance with the terms of this Deed of Trust and Rider related to "Notice," in a Post Office of the United States Postal Service or in an official depository under the care and custody of the United States Postal Service. The affidavit of a person knowledgeable of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

(b)     To the extent Section 51.003 of the Texas Property Code, or any amendment thereto or judicial interpretation thereof, requires that the "fair market value" of the Property shall be determined as of the foreclosure date in order to enforce a deficiency against Grantor or any other party liable for the repayment of the indebtedness and Debt

MADISON 00041

secured hereby (subject to the limitations on the enforcement of a deficiency contained in this Deed of Trust and Rider, the Note or any of the Other Security Documents), the term "fair market value" shall include those matters required by law and shall also include the additional factors as follows:

The Property is to be valued "AS IS, WHERE IS" and "WITH ALL FAULTS" and there shall be no assumption of restoration of or refurbishment of the Property after the date of foreclosure.

There shall be an assumption of a prompt resale of the Property for an all cash sales price by the purchaser at the foreclosure so that no extensive holding period should be factored into the determination of "fair market value" of the Property.

An offset to the fair market value of the Property, as determined hereunder, shall be made by deducting from such value the reasonable estimated closing costs relating to the sale of the Property, including, but not limited to, brokerage commissions, title policy expenses, tax prorations, escrow fees, and other common charges which are incurred by a seller of real property similar to the Property.

After consideration of the factors required by law and those required above, an additional discount factor shall be calculated based upon the estimated time it will take to effectuate a sale of the Property so that the "fair market value" as so determined is discounted to be as of the date of the foreclosure of the Property.

[Remainder of Page Intentionally Left Blank]

RE\502601\9044\328166v2

- 6 -

MADISON 00042

This Deed of Trust is continued on the Rider attached hereto and made a part hereof.

SE MARINA WAY PARTNERSHIP, LP

By: SE Marina Way, L.L.C.
    its general partner

By: _____
Name: Tracy Suttles
Title: Manager

PIRATE'S LAKE LTD.

By: Pirate's Lake Management, L.L.C.
    its general partner

By: _____
Name: Tracy Suttles
Title: Manager

7500 BELLAIRE MALL LP

By: 7500 Bellaire Mall Management, Inc.
    its general partner

By: _____
Name: Tracy Suttles
Title: President

REV502609044\328166v2

MADISON 00043

STATE OF TEXAS              )
                           )    ss.:
COUNTY OF HARRIS           )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of SE Marina Way, L.L.C., general partner of SE Marian Way Partnership, LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public

STATE OF TEXAS              )
                           )    ss.:
COUNTY OF HARRIS           )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of Pirate's Lake Management, L.L.C., general partner of Pirate's Lake Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that be executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public

RE\S02609044\328166v2

STATE OF TEXAS           )

                               )  ss.:

COUNTY OF HARRIS     )

        On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of 7500 Bellaire Mall Management, Inc., general partner of 7500 Bellaire Mall LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

<u>After Recording Please Return To</u>:

Madison Realty Capital, L.P.
261 Madison Avenue, 18th Floor
New York, New York 10016
Attention: Julie Breslin

RE\50260\9044\328166v2

MADISON 00045

**THIS RIDER TO DEED OF TRUST** (hereinafter sometimes referred to as the "Rider" and sometimes as the "Mortgage" and together with the Deed of Trust to which this Rider is annexed the "Deed of Trust") made the 29th day of January, 2007, between **SE MARINA WAY PARTNERSHIP, LP**, a Texas limited partnership, **PIRATE'S LAKE, LTD.**, a Texas limited partnership and **7500 BELLAIRE MALL LP**, a Texas limited partnership, each having an address at 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036, Attention: Tracy Suttles (collectively hereinafter, "Mortgagor" and sometimes as "**Trustor**"), **MADISON REALTY CAPITAL, L.P.**, its successors and/or assigns, as their interests may appear, a Delaware limited partnership having offices at 261 Madison Avenue, 18th Floor, New York, New York 10016 (hereinafter, the "**Mortgagee**" and sometimes as "**Beneficiary**") and **JACK O. NORMAN**, having an address at 4245 North Central Expressway, Suite 350, Dallas, Texas 75205 (the "**Trustee**").

# WITNESSETH:

**WHEREAS**, Mortgagor is the fee owner of the real property described in <u>Schedule A</u> attached hereto (hereinafter, collectively, the "**Premises**");

**WHEREAS**, Mortgagor is the maker of that certain note of even date herewith in favor of Mortgagee (hereinafter, the "**Note**") in the principal sum of Ten Million Seven Hundred Fifty Thousand and 00/100 Dollars ($10,750,000.00), together with interest (said principal sum, interest and all other sums which may or shall become due under the Note or under this Mortgage, being hereinafter, collectively, the "**Debt**");

**NOW, THEREFORE**, to secure to Mortgagee (a) repayment of the Debt and all renewals, modifications and extensions thereof; (b) payment of all other sums advanced in accordance with the terms of the Note or this Mortgage in order to protect the security hereof, together with interest thereon, and (c) performance of the agreements of Mortgagor contained herein, it is agreed as follows:

The Mortgagor does hereby mortgage, grant, convey and assign unto Trustee all of the right, title, interest and estate of Mortgagor, now owned, or hereafter acquired, in and to the following property, rights, interests and estates (such property, rights and interests being hereinbefore and hereinafter, collectively, the "**Mortgaged Property**"):

        (a)    the Premises;

        (b)    all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located on the Premises (hereinafter, collectively, the "**Improvements**");

        (c)    all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the

RE\50260\9044\328166v2

MADISON 00046

Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Premises, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(d)     all machinery, equipment, fixtures (including but not limited to all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises and Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, nor or hereafter located upon the Premises and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Premises and the Improvements (hereinafter, collectively, the "**Equipment**"), and the right, title and interest of Mortgagor in and to any of the Equipment which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Mortgaged Property is located (hereinafter, the "**UCC**"), superior in lien to the lien of this Mortgage;

(e)     all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Mortgaged Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of said right), or for a change of grade, or for any other injury to or decrease in the value of the Mortgaged Property;

(f)     all leases and other agreements affecting the use, enjoyment or occupancy of the Premises and the Improvements heretofore now or hereafter entered into (hereinafter, collectively, the "**Leases**") and all rents, issues and profits (including all oil and gas or other mineral royalties and

MADISON 00047

bonuses) from the Premises and the Improvements (hereinafter, collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)    all proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property; and

(h)    the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Mortgagee in the Mortgaged Property.

**Mortgagor represents and warrants to and covenants and agrees with Mortgagee as follows:**

**SECTION 1.  Payment of Debt and Incorporation of Covenants, Conditions and Agreements.**

Mortgagor will pay the Debt at the time and in the manner provided in the Note and in this Mortgage. All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents other than the Note or this Mortgage now or hereafter executed by Mortgagor and/or others and by or in favor of Mortgagee, which wholly or partially secure or guaranty payment of the Note (collectively, the "**Other Security Documents**"), are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.

**SECTION 2.  Application of Payments.**

Unless applicable law provides otherwise, all payments received by Mortgagee from Mortgagor under the Note or this Mortgage shall be applied by Mortgagee in the following order of priority:  (i) amounts payable to Mortgagee by Mortgagor under Section 6 hereof; (ii) late charges payable under the Note; (iii) interest payable on the Note; (iv) principal of the Note; (v) interest payable on advances made pursuant to Section 24 hereof; (vi) principal of advances made pursuant to Section 24 hereof; and (vii) any other sums secured by this Mortgage in such order as Mortgagee, at Mortgagee's option, may determine; provided, however, that Mortgagee may, at Mortgagee's option, apply any sums payable pursuant to Section 24 hereof prior to interest on and principal of the Note, but such application shall not otherwise affect the order of priority of application specified in this Section 2.

RE\50260\9044\328166v2

MADISON 00048



## SECTION 3. Warranty of Title.

Mortgagor warrants that Mortgagor has good title to the Mortgaged Property and has the right to mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign and hypothecate the same and that Mortgagor possesses an unencumbered fee estate in the Premises and the Improvements and that it owns the Mortgaged Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Mortgage. Mortgagor shall forever warrant, defend and preserve such title and the validity and priority of the lien of this Mortgage and shall forever warrant and defend the same to Mortgagee against the claims of all persons whomsoever.

## SECTION 4. Insurance.

(a)  Mortgagor will keep the Mortgaged Property insured against loss or damage by fire, flood (if in flood hazard area) and such other hazards, risks and matters, including, without limitation, business interruption, rental loss, public liability, and boiler damage and liability, as Mortgagee may from time to time require in amounts required by Mortgagee, and shall pay the premiums for such insurance (collectively, the "Insurance Premiums") as the same become due and payable. All policies of insurance (collectively, the "Policies") shall be issued by insurers acceptable to Mortgagee and shall contain all applicable standard mortgagee non-contribution clause naming Mortgagee as the person to which all payments made by such insurance company shall be paid. Mortgagor will assign and delivery the Policies to Mortgagee. Not later than thirty (30) days prior to the expiration date of each of the Policies, Mortgagor will deliver evidence satisfactory to Mortgagee of the renewal of each of the Policies. Prior to or on the date hereof, Mortgagor shall deliver evidence satisfactory to Mortgagee that Mortgagor has paid for the Insurance Premiums covering the period commencing on the date hereof up to and including the Maturity Date, as such term is defined in the Note.

(b)  In the event of loss, Mortgagor shall give immediate written notice to the insurance carrier and to Mortgagee. Mortgagor hereby authorizes and empowers Mortgagee as attorney-in-fact for Mortgagor to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Mortgagee's expenses incurred in the collection of such proceeds (said insurance proceeds, after such deduction of expenses, being hereinafter the "Net Proceeds"); provided, however, that nothing contained in this subsection (b) shall require Mortgagee to incur any expense or take any action hereunder. Mortgagor further authorizes Mortgagee, at Mortgagee's option, either to (i) to hold the Net Proceeds for the account of Mortgagor to be used to reimburse Mortgagor for the cost of reconstruction or repair of the Mortgaged Property (hereinafter, the "Restoration") or (ii) to apply the Net Proceeds to the payment of the sums secured by this Mortgage, whether or not then due, in such priority and proportions as Mortgagee in its discretion shall deem proper, but any such repayment shall not be deemed voluntary prepayment for which a prepayment premium is due.

(c)  If the Net Proceeds are applied to the payment of the sums secured by this Mortgage, any such application of proceeds to principal shall neither extend or postpone the due dates of the monthly installments to be made pursuant to the Note, nor shall such application

MADISON 00049

change the amounts of such installments. If the Mortgaged Property is sold pursuant to Section 23 hereof or if Mortgagee acquires title to the Mortgaged Property, Mortgagee shall have all of the right, title and interest of Mortgagor in and to any insurance policies and unearned premiums thereon and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

(d)    The excess, if any, of the Net Proceeds remaining after payment of the entire Debt as provided herein shall be paid to Mortgagor.

(e)    Anything in this Section to the contrary notwithstanding in the event of a casualty resulting in damage to the Mortgaged Property, Mortgagee shall make the net Proceeds available for Restoration in accordance with the terms and provisions set forth below, provided that:

(i)    the estimated costs and/or expenses for such Restoration shall be less than $500,000.00;

(ii)    Mortgagor delivers to Mortgagee an opinion of an architect designated by Mortgagor and reasonable satisfactory to Mortgagee (the "Supervising Architect"), together with such other documentation as Mortgagee may reasonable request, evidencing to the satisfaction of Mortgagee that the Restoration of the Mortgaged Property may be completed so as to constitute an architecturally whole and economically feasible building at least equal in value and condition to the Mortgaged Property immediately prior to the casualty;

(iii)    no Event of Default has occurred and is continuing hereunder and no default has otherwise occurred under the terms of this Mortgage, the Note, or any of the Other Security Documents which remains uncured beyond the applicable notice and/or grace period;

(iv)    in the event the Net Proceeds are not sufficient in Mortgagee's reasonable opinion to pay in full the Restoration (hereinafter referred to as the "Work"), Mortgagor shall deposit with Mortgagee sufficient funds, if necessary in the reasonable opinion of Mortgagee, such that together with the Net Proceeds, sufficient funds shall be readily available for the Restoration of the Mortgaged Property as nearly as practicable to its value and condition immediately prior to such casualty;

(v)    Mortgagor delivers to Mortgagee complete plans and specifications (the "Work Plans and Specs") for the work to be performed in connection with the Restoration prepared and sealed by an architect reasonably satisfactory to Mortgagee with evidence satisfactory to Mortgagee of the approval of the Work Plans and Specs by all governmental authorities whose approval is required;

(vi)    Mortgagor delivers to Mortgagee, in the event that the Work Plans and Specs are prepared by an architect other than the Supervising Architect, written approval of the Work Plans and Specs by the Supervising Architect;

MADISON 00050

(vii)   Mortgagor delivers to Mortgagee a signed estimate approved in writing by the Supervising Architect, bearing the Supervising Architect's seal, stating the entire cost of completing the Work; and

(viii)   Mortgagor delivers to Mortgagee true copies certified by Mortgagor, or by the Supervising Architect or Mortgagor's general contractor or, if available, the governmental agency having jurisdiction thereof, of all permits and approvals required by law in connection with the commencement and conduct the Work.

(f)    If the Net Proceeds are made available for the Restoration of the Mortgaged Property pursuant to the terms of paragraph (e) above, the costs, if any, to Mortgagee of recovering or paying out such Net Proceeds (including reasonable attorneys' fees and disbursements and reasonable costs incurred by Mortgagee in having the Work inspected and the Work Plans and Specs reviewed by the Supervising Architect) shall be promptly paid to Mortgagee on demand. In the event that the terms and conditions of paragraph (e) above have been satisfied in full, then the Net Proceeds shall be disbursed by Mortgagee as the Work progresses in accordance with customary construction loan advance procedures.

(g)    Upon occurrence of an Event of Default under this Mortgage, or upon the failure by Mortgagor promptly to commence or diligently to continue the work, Mortgagee may apply all or any portion of the Net Proceeds to the payment of the sums secured by this Mortgage, whether or not then due, in such priority and proportions as Mortgagee in its discretion shall deem proper.

(h)    If at any time the Net Proceeds which are to be applied to the Restoration of the Mortgaged Property will be insufficient, in the reasonable judgment of Mortgagee, to pay the entire unpaid cost of the Restoration, Mortgagor shall pay the deficiency, or make provision satisfactory to Mortgagee for the payment thereof, prior to receiving any part of the Net Proceeds. Any balance of the Net Proceeds not required for the Restoration, upon completion of the Work and the reimbursement of Mortgagor in full of the payment of the Work shall, at Mortgagee's option, (i) be retained by Mortgagee and applied to the sums secured by this Mortgage, whether or not then due without premium or penalty, or (ii) be returned to Mortgagor.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR ANY PROVISION OF APPLICABLE LAW, THE PROCEEDS OF INSURANCE POLICIES COMING INTO THE POSSESSION OF MORTGAGEE SHALL NOT BE DEEMED TRUST FUNDS AND MORTGAGEE SHALL BE ENTITLED TO DISPOSE OF SUCH FUNDS AS PROVIDED HEREIN.

SECTION 5. Payment of Taxes, etc.

Mortgagor shall pay all taxes, assessments, water rates, frontage charges and sewer rents, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof (collectively, the "Taxes") and all ground rents, maintenance charges, other governmental impositions and other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Premises, now or

MADISON 00051

hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof (collectively, the **"Other Charges"**) as same become due and payable. Mortgagor will deliver to Mortgagee, promptly upon Mortgagee's request, evidence satisfactory to Mortgagee that the Taxes and Other Charges have been so paid or are not then delinquent. Mortgagor shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Mortgaged Property, and shall promptly pay for all utility services provided to the Mortgaged Property. Mortgagor shall furnish to Mortgagee receipts for the payment of the Taxes, Other Charge and said utility services prior to the date the same shall become delinquent.

## SECTION 6. Escrow Fund.

Mortgagor shall pay to Mortgagee, on the first day of each calendar month for the term of this Mortgage, an amount equal to (a) one-twelfth (1/12) of the amount which would be sufficient to pay the Taxes and the Other Charges which are payable, or estimated by Mortgagee to be payable, during the next ensuing twelve (12) months, and, at the option of Mortgagee, plus (b) one-twelfth (1/12) of the amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (said amounts in (a) and (b) above hereinafter collectively called the **"Escrow Fund"**). The Escrow Fund, together with the payments of interest or principal or both which are due pursuant to the provisions of the Note, shall be added together and shall be paid as an aggregate sum by Mortgagor to Mortgagee. Mortgagor hereby pledges to Mortgagee any and all monies now or hereafter deposited in the Escrow Fund as additional security for the payment of the Debt. Mortgagee will apply the Escrow Fund to payments of Taxes, Other Charges and Insurance Premiums required to be made by Mortgagor pursuant to Sections 4 and 5 hereof. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 4 and 5 hereof, Mortgagee shall, in its discretion, return any excess to Mortgagor or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Mortgagee may deal with the person shown on the records of Mortgagee to be the owner of the Mortgaged Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Mortgagor shall promptly pay to Mortgagee, upon demand, an amount which Mortgagee shall estimate as sufficient to make up the deficiency. Upon the occurrence of an Event of Default (hereinafter defined) Mortgagee may apply any sums then present in the Escrow Fund to the payment of the following items in any order in its sole discretion:

    (i)    Taxes and Other Charges;

    (ii)   Insurance Premiums;

    (iii)  Interest on the unpaid principal balance of the Note;

    (iv)  Amortization of the unpaid principal balance of the Note;

    (v)   All other sums payable pursuant to the Note, this Mortgage, and the Other Security Documents, including without limitation advances made by Mortgagee pursuant to the terms of this Mortgage.

MADISON 00052



Until expended or applied as above provided, any amounts in the Escrow Fund shall constitute additional security for the Debt. The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Mortgagee. No earnings or interest on the Escrow Fund shall be payable to Mortgagor.

### SECTION 7. Condemnation.

(a)     Mortgagor shall promptly notify Mortgagee of any action or proceeding relating to any condemnation or other taking, whether direct or indirect, of the Mortgaged Property or any part thereof, and Mortgagor shall appear in and prosecute any such action or proceeding unless otherwise directed by Mortgagee in writing. Mortgagor authorizes Mortgagee, at Mortgagee's option, as attorney-in-fact for Mortgagor, to commence, appear in and prosecute, in Mortgagee's or Mortgagor's name, any action or proceeding relating to any condemnation or other taking of the Mortgaged Property, whether direct or indirect, and to settle or compromise any claim in connection with such condemnation or other taking. The proceeds of any award, payment or claim for damages, direct or consequential, in connection with any condemnation or other taking, whether direct or indirect, of the Mortgaged Property or any part thereof, or for conveyances in lieu of condemnation, are hereby assigned to and shall be paid to Mortgagee.

(b)     Mortgagor authorizes Mortgagee to apply such awards, payments, proceeds or damages, after the deduction of Mortgagee's expenses incurred in the collection of such amounts, at Mortgagee's option, either (i) to restoration or repair of the Mortgaged Property, or (ii) to payment of the sums secured by this Mortgage, whether or not then due, in the order of application set forth in Section 2 hereof, with the balance, if any, to Mortgagor. Mortgagor agrees to execute such further evidence of assignment of any awards, proceeds, damages or claims arising in connection with such condemnation or taking as Mortgagee shall require.

(c)     Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Mortgagor shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Mortgage, and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Mortgagee, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Mortgagee shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein and in the Note. Mortgagee may apply any such award or payment to the reduction or discharge of the Debt whether or not then due and payable. Any reduction of the Debt pursuant to the terms of this Section 7 shall not be deemed a prepayment of the Debt and no prepayment consideration, if any, shall be due. If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by Mortgagee of such award or payment, Mortgagee shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive said award or payment, or a portion thereof sufficient to pay the Debt.

MADISON 00053

## SECTION 8. Leases and Rents.

(a)     Mortgagor hereby assigns to Mortgagee all Leases now existing or hereafter made of all or any part of the Mortgaged Property, all Rents payable under such Leases, and all security deposits made by tenants in connection with such Leases. Mortgagor hereby grants Mortgagee all of the rights and powers possessed by Mortgagor prior to such assignment, and Mortgagee is hereby granted the right to modify, extend or terminate the Leases and to execute new Leases, in Mortgagee's sole discretion. Mortgagee is hereby granted and assigned by Mortgagor the right to enter the Mortgaged Property for the purpose of enforcing its interest in the Leases and the Rents, this Mortgage constituting a present, absolute assignment of the Leases and the Rents. Nevertheless, subject to the terms of this Section 8, Mortgagee grants to Mortgagor a revocable license to operate and manage the Mortgaged Property and to collect the Rents, provided, however, that Mortgagor shall not modify, extend or terminate any Leases for space in excess of 10,000 square feet or more ("Major Leases"), or execute any new Major Leases without first obtaining Mortgagee's prior written consent, such consent shall not be unreasonably withheld, conditioned or delayed. Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums. Upon or at any time after an Event of Default, the license granted to Mortgagor herein may be revoked by Mortgagee, and Mortgagee may enter upon the Mortgaged Property, and collect, retain and apply the Rents toward payment of the Debt in such priority and proportions as Mortgagee in its discretion shall deem proper and, at Mortgagee's sole discretion, the Rents and profits of the Mortgaged Property shall be deposited and managed in accordance with that certain Cash Management Agreement entered into simultaneously herewith.

(b)     All Leases shall be written on the standard form of lease which standard form of lease shall be presented to Mortgagee for approval. Upon request, Mortgagor shall furnish Mortgagee with executed copies of all Leases. No changes may be made to the Mortgagee-approved standard lease without the prior written consent of Mortgagee, which consent shall not to be unreasonably withheld, conditioned or delayed. In addition, all renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates and shall be arms-length transactions. All proposed Leases shall be subject to the prior approval of the Mortgagee. All Leases shall provide that they are subordinate to this Mortgage and that the lessee agrees to attorn to Mortgagee. Mortgagor (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Mortgagee of all notice of default which Mortgagor shall send or receive thereunder; (iii) shall enforce all of the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents; (vi) shall not alter, modify or change the terms of the Leases without the prior written consent of Mortgagee, or cancel or terminate the Leases or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the Premises or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder; (vii) shall not alter, modify or change the terms of any guaranty of the Leases or cancel or terminate such guaranty without the prior written consent of Mortgagee; (viii) shall not consent to any assignment of or subletting under the Leases not in accordance with their terms, without the prior

RE\50260\9044\328166v2

MADISON 00054

 
written consent of Mortgagee; and (ix) shall execute and deliver at the request of Mortgagee all such further assurances, confirmations and assignments in connection with the Mortgaged Property as Mortgagee shall from time to time require.

## SECTION 9. **Maintenance of Mortgaged Property.**

Mortgagor shall cause the Mortgaged Property to be maintained in a good and safe condition and repair. The Improvements and the Equipment shall not be demolished or altered (except for normal replacement of the Equipment) without the consent of Mortgagee. Mortgagor shall promptly comply with all laws, orders and ordinances affecting the Mortgaged Property or the use thereof. Mortgagor shall promptly repair, replace or rebuild any part of the Mortgaged Property which may be destroyed by any casualty, or become damaged, worn or dilapidated, or which may be affected by any proceeding of the character referred to in Section 7 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Premises. Mortgagor shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Mortgaged Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Mortgaged Property is or shall become a nonconforming use, Mortgagor will not cause or permit such nonconforming use to be discontinued or abandoned without the express written consent of Mortgagee.

## SECTION 10.    **Transfer or Encumbrance of the Mortgaged Property.**

(a)    Mortgagor acknowledges that Mortgagee has examined and relied on the creditworthiness of Mortgagor and experience of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the loan secured hereby, and that Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt. Mortgagor acknowledges that Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property. Mortgagor shall not, without the prior written consent of Mortgagee, which consent may be withheld in Mortgagee's sole discretion, have the right to sell, transfer, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof or permit the Mortgaged Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred.

(b)    A sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer within the meaning of this Section 10 shall be deemed to include (i) an installment sales agreement wherein Mortgagor agrees to sell the Mortgaged Property or any part thereof for a price to be paid in installments; (ii) an agreement by Mortgagor leasing all or a substantial part of the Mortgaged Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgagor's right, title and interest in and to any Leases or any Rents; (iii) if Mortgagor, any Guarantor (hereinafter defined), or any general partner of Mortgagor or Guarantor is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or an interest in any entity

MADISON 00055



directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock by which any of such corporation's stock shall be vested in a party or parties who are not now stockholders; (iv) if Mortgagor, any Guarantor or any general partner of Mortgagor or any Guarantor is a limited or general partnership or joint venture, the change, removal or resignation of a general partner or managing partner or the transfer of the partnership interest of any general partner or managing partner; and (v) if Mortgagor, any Guarantor or any member of Mortgagor or any Guarantor is a limited liability company, the change, removal or resignation of a member or manager or the transfer of an interest of any member or manager.

(c)     Mortgagee reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of this Mortgage as so modified by the proposed transferee, payment of a transfer fee, or such other conditions as Mortgagee shall determine in its sole discretion to be in the interest of Mortgagee. Mortgagee shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Mortgagor's sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property without Mortgagee's consent. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property regardless of whether voluntary or not, or whether or not Mortgagee has consented to any previous sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property.

**SECTION 11.**     **Estoppel Certificates**

(a)     After request by Mortgagee, Mortgagor, within thirty (30) days, shall furnish Mortgagee or those making requests by or on behalf of or through Mortgagee with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note and this Mortgage are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)     After request by Mortgagee, Mortgagor, within thirty (30) days, will furnish Mortgagee with estoppel certificates from any lessees under the Leases as required by their respective Leases.

**SECTION 12.**     **Changes in the Laws Regarding Taxation.**

If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Mortgaged Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Mortgagee's interest in the Mortgaged Property, Mortgagor will pay such tax, with interest and penalties thereof, if any. In the event Mortgagee is advised by counsel chosen by it that the payment of such tax or interest and penalties by Mortgagor would be unlawful or taxable to Mortgagee or unenforceable or provide the basis for a defense of usury, then in any such event, Mortgagee shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

RE\50260\9044\328166v2

MADISON 00056



SECTION 13.        No Credits on Account of the Debt.

Mortgagor will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Mortgaged Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property, or any part thereof, for real estate tax purposes by reason of this Mortgage or the Debt.  In the event such claim, credit or deduction shall be required by law, Mortgagee shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

SECTION 14.        Documentary Stamps.

If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or this Mortgage, or impose any other tax or charge on the same, Mortgagor will pay for the same, with interest and penalties thereon, if any.

SECTION 15.        Usury Laws.

This Mortgage and the Note are subject to the express condition that at no time shall Mortgagor be obligated or required to pay interest on the Debt at a rate which could subject the holder of the Note to either civil or criminal liability as a result of being in excess of the maximum interest rate which Mortgagor is permitted by applicable law to contract or agree to pay.  If by the terms of either this Mortgage or the Note, Mortgagor is at any time required or obligated to pay interest on the Debt at a rate in excess of such maximum rate, the rate of interest under the same shall be deemed to be immediately reduced to such maximum rate and the interest payable shall be computed at such maximum rate and all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Note.

SECTION 16.        Books and Records.

(a)     The Mortgagor (and Guarantors, if any) shall keep proper books, records and accounts with respect to the operation of the Mortgaged Property in accordance with generally accepted accounting principles and shall furnish to the Mortgagee (i) within ninety (90) days after the end of each fiscal year of Mortgagor and at any other time upon Mortgagee's request, financial statements for the operation of the Mortgaged Property, including a balance sheet, a statement of income and expenses of the Mortgaged Property and a statement of changes in financial position, each in reasonable detail and certified by Mortgagor (or a principal of Mortgagor if Mortgagor is not an individual) under penalty of perjury, to be true and complete, and, if Mortgagee shall require audited by an independent certified public accountant; (ii) within thirty (30) days following the date hereof and each thirty (30) days thereafter, monthly financial statements (including a certified rent roll) in form satisfactory to the Mortgagee, which shall disclose in reasonable detail all earnings and expenses with respect to the operation of the Mortgaged Property certified by Mortgagor (or a principal of Mortgagor if Mortgagor is not an individual) under penalty of perjury, to be true and complete.  The financial statement and operating statement; provided monthly shall be the same statement as provided monthly to

MADISON 00057

Morgan Stanley Mortgage Capital, Inc. pursuant to the Morgan Deed of Trust, as such term is defined herein; (iii) together with the foregoing financial statements and at any other time upon Mortgagee's request, a rent schedule for the Mortgaged Property in form acceptable to Mortgagee, certified by Mortgagor (or a principal of Mortgagor if Mortgagor is not an individual) under penalty of perjury, to be true and complete, showing the name of each tenant, the space occupied, the Lease expiration date, the rent payable, the rent paid and any other information requested by Mortgagee; (iv) upon Mortgagee's request, financial statements for any principal of Mortgagor and Guarantor in the form set forth above; (v) upon Mortgagee's request, an accounting of all security deposits held in connection with any Lease of any part of the Mortgaged Property, including the name and identification number of the accounts in which such security deposits are held, name and address of the financial institutions in which such security deposits are held and the name of the person to contact at such financial institutions, along with any authority or release necessary for Mortgagee to obtain information regarding such accounts directly from such financial institutions; and (vi) such other financial information as Mortgagee may request.

(b)    Upon the death of any Guarantor who is an individual, Mortgagor shall give prompt written notice to Mortgagee (i.e., at least within thirty (30) days following his or her death), setting forth the date of death, the state and county where the deceased Guarantor's estate is being administered, and, if then known, the name(s) and address(es) of the executor(s) or administrator(s) appointed to administer the estate of such deceased Guarantor.

SECTION 17.    **Performance of Other Agreements.**

Mortgagor shall observe and perform each and every term to be observed or performed by Mortgagor pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Mortgaged Property.

SECTION 18.    **Further Acts, etc.**

Mortgagor will, at the cost of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers and assurances as Mortgagee shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage. Mortgagor, on demand, will execute and deliver and hereby authorizes Mortgagee to execute in the name of Mortgagor or without the signature of Mortgagor to the extent Mortgagee may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Mortgagee in the Mortgaged Property. Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including without limitation such rights and remedies available to Mortgagee pursuant to this Section 18.

- 13 -

MADISON 00058



## SECTION 19.    Recording of This Mortgage, etc.

Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Mortgagee in, the Mortgaged Property. Mortgagor will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgement of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property, and any instrument of further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do. Mortgagor shall hold harmless and indemnify Mortgagee, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of this Mortgage.

## SECTION 20.    Prepayment.

The Debt may not be prepaid in whole or in part except in accordance with the terms and conditions contained in the Note.

## SECTION 21.    Events of Default.

The Debt shall become immediately due and payable at the option of Mortgagee upon any one or more of the following events (each being an "Event of Default", and, collectively, "Events of Default"):

(a)    if any portion of the Debt is not paid  within five (5) days following the date when the same is due and payable;

(b)    if any of the Taxes or Other Charges are not paid when the same are due and payable;

(c)    if the Policies are not kept in full force and effect, or if the Policies are not assigned and delivered to Mortgagee upon request;

(d)    if after thirty (30) days written notice and opportunity to cure any default, Mortgagor violates or does not comply with any of the provisions of Sections 3, 7, 8, 9, 10, 11, 14, 19, 35 or 36;

(e)    if any representation or warranty of Mortgagor, or of any person guaranteeing payment of the Debt or any portion thereof or performance by Mortgagor of any of the terms of this Mortgage (a "Guarantor"), made herein or in any such guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Mortgagee shall have been false or misleading in any material respect when made;

RE\50260\9044\328166v2

MADISON 00059



(f)     if Mortgagor or any Guarantor shall make an assignment for the benefit of creditors or if Mortgagor shall generally not be paying its debts as they become due;

(g)     if a receiver, liquidator or trustee of Mortgagor or of any Guarantor shall be appointed or if Mortgagor or any Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Mortgagor or any Guarantor or if any proceeding for the dissolution or liquidation of Mortgagor or of any Guarantor shall be instituted; however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Mortgagor or such Guarantor, upon the same not being discharged, stayed or dismissed within sixty (60) days;

(h)     if Mortgagor shall be in monetary default under any other mortgage or security agreement covering any part of the Mortgaged Property whether it be superior or junior in lien to this Mortgage;

(i)     if the Mortgaged Property becomes subject to any mechanic's, materialman's liens or other lien other than a lien for local real estate taxes and assessments not then due and payable and such lien shall remain undischarged of record (by payment, bonding or otherwise) within thirty (30) days;

(j)     if Mortgagor fails to cure promptly any violations of laws or ordinances affecting or which may be interpreted to affect the Mortgaged Property;

(k)     if for more than thirty (30) days after notice from Mortgagee, Mortgagor shall continue to be in default under any other term, covenant or condition of the Note, this Mortgage or the Other Security Documents;

(l)     if Mortgagor causes the premises to be used as collateral for any additional financing not set forth hereunder;

(m)     if any member, shareholder, partner or Guarantor of Mortgagor is convicted in connection with a felony criminal offense;

(n)     if an Event of Default occurs under the Other Mortgage as such term is defined herein other then a default caused by the recording of this Mortgage;

(o)     if Mortgagor withdraws from the Rollover Funds (as such term is defined in the Morgan Deed of Trust, as such term is defined herein) pursuant to Section 6.5 of the Morgan Deed of Trust, without the prior written consent of Mortgagee, which consent shall not be unreasonably withheld; or

(p)     if Mortgagor with or without the consent of Morgan Stanley Mortgage Capital Inc. modifies the terms of Section 6.5 of the Morgan Deed of Trust or with or without consent withdraws funds in a manor other than in strict conformance with the provisions of Section 6.5 of the Morgan Deed of Trust.

MADISON 00060



### SECTION 22.        Remedies of Mortgagee.

Upon the occurrence of any Event of Default, (a) Mortgagor will pay, from the date of that Event of Default, and until the entire Debt is paid in full, whether prior to or subsequent to the entry of a judgment of foreclosure and sale and the satisfaction of any deficiency judgment, interest on the unpaid principal balance of the Note at the rate of Twenty-Four (24%) percent per annum or at the maximum interest rate which Mortgagor may by law pay, whichever is lower, (the "Default Rate"); provided, nevertheless, that if Mortgagor shall fail to repay the Debt on or before the Maturity Date (as defined in the Note), whether by acceleration or otherwise, payment thereof, together with interest thereon calculated at the Default Rate from and after the Maturity Date, shall be made upon not less than ninety (90) days prior written notice by Mortgagor to Mortgagee, or if such payment shall be made earlier than ninety (90) days following the giving of such notice, interest on the principal sum, calculated at the Default Rate, shall continue to accrue (and shall be payable) to and including the date which is ninety (90) days following Mortgagee's receipt of Mortgagor's said notice, and the foregoing shall not be deemed to extend the Maturity Date; and (b) Mortgagee shall have the right to exercise any and all rights and remedies available hereunder and at law and in equity, including the right, when authorized by law, to sell the Mortgaged Property by the exercise of the power of sale hereby granted to Mortgagee and to foreclose the Mortgage by a non-judicial proceeding or in the manner prescribed in the Texas Statutes, as the same may be amended and be in effect upon the occurrence of an Event of Default hereunder, as well as directing the Rents and profits of the Mortgaged Property to be deposited and managed in accordance with the Cash Management Agreement.

### SECTION 23.        Sale of Mortgaged Property; Multiple Collateral

(a)     If the Mortgaged Property consists of two or more distinct parcels and this Mortgage is foreclosed, whether pursuant to the power of sale herein granted to Mortgagee, or otherwise, the Mortgaged Property, or any interest therein, may, at the discretion of Mortgagee, be sold in one or more parcels or in several interests or portions and in any order or manner as the Mortgagee may elect and specify in the notice of sale.

(b)     If the indebtedness secured by this Mortgage is also secured by one or more other mortgages on property consisting of more than one functionally separate and distinct property and an Event of Default occurs under this Mortgage or any such other mortgage which is cross-defaulted with this Mortgage, upon a foreclosure of this Mortgage and such other mortgages, whether pursuant to a power of sale or otherwise, the Mortgaged Property, or any interest therein, and the property encumbered by such other mortgages may, at the discretion of Mortgagee, be sold in the order designated by Mortgagee in the notice of sale.

### SECTION 24.        Right to Cure Defaults.

Upon the occurrence of any Event of Default, or if Mortgagor fails to make any payment or to do any act as herein provided, Mortgagee may, but without any obligation hereunder, make or do the same in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof. Mortgagee is authorized to enter upon the Mortgaged Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its

MADISON 00061



interest in the Mortgaged Property or to foreclose the Mortgage or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest, shall constitute a portion of the Debt and shall be due and payable to Mortgagee upon demand. All such costs and expenses incurred by Mortgagee in remedying such Event of Default or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from the date that such cost or expense was incurred by Mortgagee to the date of payment to Mortgagee, as provided in Section 22 hereof. All such costs and expenses incurred by Mortgagee together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Mortgage and the Other Security Documents and shall be immediately due and payable upon demand by Mortgagee therefor.

**SECTION 25.**     **Late Payment Charge.**

If any portion of the Debt is not paid when due, Mortgagor shall pay to Mortgagee upon demand an amount equal to ten percent (10%) of such unpaid portion of the Debt, to defray the expense incurred by Mortgagee in handling and processing such delinquent payment and to compensate Mortgagee for the loss of the use of such delinquent payment, and such amount shall be secured by this Mortgage and the Other Security Documents.

**SECTION 26.**     **Prepayment After Event of Default.**

If following the occurrence of any Event of Default, Mortgagor shall tender payment of an amount sufficient to satisfy the Debt in whole or in part at any time prior to a foreclosure sale of the Mortgaged Property, and if at the time of such tender prepayment of the principal balance of the Note is not permitted by the Note, Mortgagor shall, in addition to the entire Debt, also pay to Mortgagee a sum equal to interest which would have accrued on the principal balance of the Note at the interest rate set forth in the Note from the date of such tender to the earlier of (i) the Maturity Date as defined in the Note, or (ii) the first day of the period during which prepayment of the principal balance of the Note would have been permitted together with a prepayment consideration equal to the prepayment consideration which would have been payable as of the first day of the period during which prepayment would have been permitted. If at the time of such tender prepayment of the principal balance of the Note is permitted, such tender by Mortgagor shall be deemed to be a voluntary prepayment of the principal balance of the Note, and Mortgagor shall, in addition to the entire Debt, also pay to Mortgagee the applicable prepayment consideration specified in the Note and this Mortgage.

**SECTION 27.**     **Reasonable Use and Occupancy.**

In addition to the rights which Mortgagee may have herein, upon the occurrence of any Event of Default, Mortgagee, at its option, may require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Mortgaged Property as may be occupied by Mortgagor or may require Mortgagor to vacate and surrender possession of the Mortgaged Property to Mortgagee or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise.

- 17 -

MADISON 00062



**SECTION 28.**    <u>Right of Entry.</u>

Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at all times.

**SECTION 29.**    <u>Appointment of Receiver.</u>

Mortgagee, upon the occurrence of an Event of Default or in any action to foreclose this Mortgage or in any non-judicial foreclosure proceeding commenced pursuant to Texas Statutes or upon the actual or threatened waste to any part of the Mortgaged Property, shall be entitled to the appointment of a receiver without notice and without regard to the value of the Mortgaged Property as security for the Debt, or the solvency or insolvency of any person liable for the payment of the Debt.

**SECTION 30.**    <u>Security Agreement.</u>

This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the UCC. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property. Mortgagor, by executing and delivering this Mortgage, has granted and hereby grants to Mortgagee, as security for the Debt, a security interest in the Mortgaged Property to the full extent that the Mortgaged Property may be subject to the UCC (said portion of the Mortgaged Property so subject to the UCC being called in this Section 30 the "**Collateral**"). If an Event of Default shall occur, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee, Mortgagor shall at its expense assemble the Collateral and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Mortgagor shall pay to Mortgagee on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Mortgagee in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral sent to Mortgagor in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its discretion shall deem proper.

Mortgagor hereby gives to Mortgagee a continuing lien on, security interest in and right of set-off against all moneys, securities and other property of Mortgagor and the proceeds thereof, now on deposit or now or hereafter delivered, remaining with or in transit in any manner to Mortgagee, its correspondents, participants or its agents from or for Mortgagor, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into possession of Mortgagee in any way, and also, any balance of any individual deposit account and credits of Mortgagor with, and any and all claims of Mortgagor against Mortgagee, at any time

MADISON 00063




existing, as collateral security for the payment of the Debt and all of the other obligations of the Mortgagor under this Mortgage, including fees, contracted with or acquired by Mortgagee, whether joint, several, absolute, contingent, secured, matured or unmatured (for the purposes of this Section 30, collectively, the "**Liabilities**"), hereby authorizing Mortgagee at any time or times, without prior notice, to apply such balances, credits or claims, or any part thereof, to the Liabilities in such amounts as it may select, whether contingent, unmatured or otherwise, and whether any collateral security therefor is deemed adequate or not. The collateral security described herein shall be in addition to any collateral security described in any separate agreement executed in connection with this Mortgage.

SECTION 31.    **Actions and Proceedings.**

Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its discretion, decides should be brought to protect is interest in the Mortgaged Property. Mortgagee shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

SECTION 32.    **Waiver of Counterclaim.**

Mortgagor hereby waives the right to assert a counterclaim in any action or proceeding brought against it by Mortgagee, and waives trial by jury in any action or proceeding brought by either party hereto against the other or in any counterclaim asserted by Mortgagee against Mortgagor, or in any matters whatsoever arising out of or in any way connected with this Mortgage, the Note, any of the Other Security Documents or the Debt.

SECTION 33.    **Marshalling and Other Matters.**

Mortgagor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein. Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Mortgage on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Mortgage and on behalf of all persons to the extent permitted by applicable law.

SECTION 34.    **Recovery of Sums Required To Be Paid.**

Mortgagee shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Mortgagor existing at the time such earlier action was commenced.

MADISON 00064



## SECTION 35.    <u>Hazardous Materials.</u>

Mortgagor represents and warrants that, to the best of Mortgagor's knowledge, after due inquiry and investigation, (a) there are no "Hazardous Materials" (as such quoted term is hereinafter defined) on the Mortgaged Property, and (b) no owner or occupant nor any prior owner or occupant of the Mortgaged Property has received any notice or advice from any governmental agency or any source whatsoever with respect to Hazardous Materials on, from or affecting the Mortgaged Property. Mortgagor covenants that the Mortgaged Property shall be kept free of Hazardous Materials, and neither Mortgagor nor any occupant of the Mortgaged Property shall use, transport, store, dispose of or in any manner deal with Hazardous Materials on the Mortgaged Property. Mortgagor shall comply with, and ensure compliance by all occupants of the Mortgaged Property with, all applicable federal, state and local laws, ordinances, rules and regulations, and shall keep the Mortgaged Property free and clear of any liens imposed pursuant to such laws, ordinances, rules and regulations. In the event that Mortgagor receives any notice or advice from any governmental agency or any source whatsoever with respect to Hazardous Materials on, from or affecting the Mortgaged Property, Mortgagor shall immediately notify Mortgagee. Mortgagor shall conduct and complete all investigations, studies, sampling, and testing, and all remedial actions necessary to clean up and remove all Hazardous Materials from the Mortgaged Property in accordance with all applicable federal, state and local laws, ordinances, rules and regulations. The term "**Hazardous Materials**" as used in this Mortgage shall include, without limitation, asbestos, gasoline, petroleum products, explosives, radioactive materials, polychlorinated biphenyls or related or similar materials, or any other substance or material defined as a hazardous or toxic substance or material by any federal, state or local law, ordinance, rule or regulation. The obligations and liabilities of Mortgagor under this Section 35 shall survive any entry of a judgment of foreclosure or the delivery of a deed in lieu of foreclosure of this Mortgage.

## SECTION 36.    <u>Indemnification.</u>

Mortgagor shall protect, defend, indemnify and save harmless Mortgagee from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation reasonable attorneys' fees and expenses), imposed upon or incurred by or asserted against Mortgagee by reason of (a) ownership of this Mortgage, the Mortgaged Property or any interest therein or receipt of any Rents; (b) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) any use, nonuse or condition in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any failure on the part of Mortgagor to perform or comply with any of the terms of this Mortgage; (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any part thereof; (f) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Mortgage, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Mortgage is made; (g) any claim for brokerage fees or other consideration from any broker in connection with the loan secured by this Mortgage, except to the extent, if any,

MADISON 00065



Mortgagee may have agreed pursuant to a separate agreement to compensate the broker engaged by Mortgagor; (h) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Materials, from, or affecting the Mortgaged Property or any other property; (i) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials; (j) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Materials; or (k) any violation of laws, orders, regulations, requirements, or demands of government authorities, which are based upon or in any way related to such Hazardous Materials including, without limitation, the costs and expenses of any remedial action, attorney and consultant fees, investigation and laboratory fees, court costs, and litigation expenses. Any amounts payable to Mortgagee by reason of the application of this Section 36 shall become immediately due and shall bear interest at the Default Rate from the date loss or damage is sustained by Mortgagee until paid. The obligations of Mortgagor under this Section 36 shall survive any termination, satisfaction, assignment, entry of judgment of foreclosure or delivery of a deed in lieu of foreclosure of this Mortgage.

**SECTION 37.**     **Notices.**

Except for any notice required under applicable law to be given in another manner, (a) any notice to Mortgagor, the Mortgagor's successors or assigns provided for in this Mortgage or in the Note or pursuant to the Texas Statutes in a proceeding to foreclose this Mortgage by power of sale shall be given in writing by mailing such notice by certified mail, return receipt requested, or by sending such notice by a recognized overnight courier with postage, freight and any other charges paid, with a receipt therefor, addressed to Mortgagor at Mortgagor's address stated herein or at such other address as Mortgagor may designate by notice to Mortgagee as provided herein, and (b) any notice to Mortgagee shall be given in writing by mailing such notice certified mail, return receipt requested, or by sending such notice by a recognized overnight courier, with postage, freight and other charges paid, with a receipt therefor, addressed to Mortgagee at Mortgagee's address stated herein or to such other address as Mortgagee may designate by notice to Mortgagor as provided herein, with a copy of same given in the manner herein provided to Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attn.: Michael E. Lefkowitz, Esq. Except for any notice deemed under applicable law to have been given at a different time, any notice provided for in this Mortgage shall be deemed to have been given to Mortgagor or Mortgagee on the earlier of (a) the second day after such notice is mailed or deposited with a courier in a manner designated herein or (b) the day such notice is actually received.

**SECTION 38.**     **Authority.**

(a)     Mortgagor (and the undersigned representative of Mortgagor, if any) has full power, authority and legal right to execute this Mortgage, and to mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, hypothecate and assign the Mortgaged Property pursuant to the terms hereof and to keep and observe all of the terms of this Mortgage on Mortgagor's part to be performed.

RE\50260\9044\328166v2

MADISON 00066



(b)    Mortgagor represents and warrants that Mortgagor is not a "foreign person" within the meaning of 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

### SECTION 39.    Consent to Jurisdiction.

Mortgagor, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, (a) submits to personal jurisdiction in the State of New York, or at Mortgagee's election Harris or Galveston Counties, Texas, over any suit, action or proceeding by any person arising from or relating to the Note or this Mortgage, (b) agrees that any such action, suit or proceeding may be brought in any State or Federal Court of competent jurisdiction sitting in New York County, New York, or at Mortgagee's election Harris or Galveston Counties, Texas, (c) submits to the jurisdiction of such courts, and (d) to the fullest extent permitted by law, agrees that Mortgagor will not bring any action, suit or proceeding in any other forum (but nothing herein shall affect the right of the holder of the Note to bring any action, suit or proceeding in any other forum). Mortgagor further consents and agrees to service of any summons, complaint or other legal process in any such suit, action or proceeding by registered or certified U.S. Mail, postage prepaid, to Mortgagor at the address set forth on page 1 hereof, and consents and agrees that such service shall constitute in every respect valid and effective service (but nothing herein shall affect the validity or effectiveness of process served in any other manner permitted by law).

### SECTION 40.    Participation.

Mortgagor acknowledges that Mortgagee may sell and assign participation interests in this Mortgage to one or more domestic or foreign banks, insurance companies, pension funds, trusts or other institutional lenders or other persons, parties or investors (including, but not limited to, grantor trusts, owner trusts, special purpose corporations, REMICs, real estate investment trusts or other similar or comparable investment vehicles as may be selected by Mortgagee in its sole and absolute discretion) on terms and conditions satisfactory to Mortgagee in its sole and absolute discretion. Mortgagor grants to Mortgagee, and shall cause each Guarantor and other person or party associated or connected with this Mortgage or the Collateral therefore to grant to Mortgagee the right to distribute on a confidential basis financial and other information concerning Mortgagor, each such Guarantor and other person or party and the property encumbered by this Mortgage and any other pertinent information with respect to this Mortgage to any party who has purchased a participation interest in this Mortgage or who has expressed an interest in purchasing a participation interest in this Mortgage.

### SECTION 41.    Waiver of Notice.

Mortgagor shall not be entitled to any notices of any nature whatsoever from Mortgagee except with respect to matters for which this Mortgage specifically and expressly provides for the giving of notice by Mortgagee to Mortgagor and except with respect to matters for which Mortgagee is required by applicable law to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Mortgagee with respect to any matter for which this Mortgage does not specifically and expressly provide for the giving of notice by Mortgagee to Mortgagor.

MADISON 00067

 

**SECTION 42.**      <u>Remedies of Mortgagor.</u>

In the event that a claim or adjudication is made that Mortgagee has acted unreasonably or unreasonably delayed acting in any case where by law or under the Note, this Mortgage or the Other Security Documents, it has an obligation to act reasonably or promptly, Mortgagee shall not be liable for any monetary damages, and Mortgagor's remedies shall be limited to injunctive relief or declaratory judgment. Under no circumstances shall Mortgagee and/or any of its parents, affiliates, subsidiaries or other related parties and/or any of their respective officers, directors, shareholders, agents, and/or employees (all of the foregoing being collectively referred to as the "**Mortgagee Parties**") have any personal liability in connection with the Note, this Mortgage and/or any of the other Security Documents or anything, matter or circumstance related thereto.

**SECTION 43.**      <u>Sole Discretion of Mortgagee.</u>

Wherever pursuant to this Mortgage, Mortgagee exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Mortgagee, the decision of Mortgagee to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Mortgagee and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

**SECTION 44.**      <u>Non-Waiver.</u>

The failure of Mortgagee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Mortgage. Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of (a) the failure of Mortgagee to comply with any request of Mortgagor or Guarantors to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note or the Other Security Documents, (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or of any person liable for the Debt or any portion thereof, or (c) any agreement or stipulation by Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Mortgage, or the Other Security Documents. Mortgagee may resort for the payment of the Debt to any other security held by Mortgagee in such order and manner as Mortgagee, in its discretion, may elect. Mortgagee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mortgagee thereafter to foreclose this Mortgage. The rights of Mortgagee under this Mortgage shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Mortgagee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**SECTION 45.**      <u>Intentionally Omitted.</u>

**SECTION 46.**      <u>No Oral Change.</u>

This Mortgage, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the

RE\50260\9044\328166v2

- 23 -

part of Mortgagor or Mortgagee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

SECTION 47.      **Liability.**

If Mortgagor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Mortgage shall be binding upon and inure to the benefit of Mortgagor and Mortgagee and their respective successors and assigns forever.

SECTION 48.      **Inapplicable Provisions.**

If any term, covenant or condition of the Note or this Mortgage is held to be invalid, illegal or unenforceable in any respect, the Note and this Mortgage shall be construed without such provision.

SECTION 49.      **Headings, etc.**

The headings and captions of various Sections of this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

SECTION 50.      **Duplicate Originals.**

This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

SECTION 51.      **Definitions.**

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in singular or plural form and the word "Mortgagor" shall mean "each Mortgagor and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein", the word "Mortgagee" shall mean "Mortgagee and any subsequent holder of the Note", the word "person" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, and any other entity, and the words "Mortgaged Property" shall include any portion of the Mortgaged Property and any interest therein. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

SECTION 52.      **Intentionally Omitted.**

SECTION 53.      **Intentionally Omitted.**

MADISON 00069

**SECTION 54.**    <u>Construction.</u>

This Mortgage shall be governed by and construed in accordance with the laws of the State of New York, and/or the State of Texas, at the Mortgagee's sole discretion] and the applicable laws of the United States of America.

**SECTION 55.**    <u>Joint and Several Obligation.</u>

Notwithstanding anything to the contrary, the representations, warranties, covenants and/or agreements made by Mortgagor (should the Mortgagor consist of one or more individuals or entities), herein and/or in any of the other Security Documents and the liability of the Mortgagor hereunder or thereunder, is joint and several.

**SECTION 56.**    <u>Purpose of Loan.</u>

The Mortgagor represents to Mortgagee that the loan evidenced by the Note and secured by this Mortgage ("Loan") is for business or commercial purposes only and not for personal, family, consumer or household purposes. Mortgagor acknowledges that Mortgagee has made the Loan to Mortgagor in reliance upon the above representation by Mortgagor. The above representation by Mortgagor will survive the closing and repayment of the Loan.

**SECTION 57.**    <u>Felony Criminal Offense.</u>

The Mortgagor represents that no member, shareholder, partner or Guarantor of Mortgagor has ever been convicted of a felony criminal offense.

**SECTION 58.**    <u>Patriot Act.</u>

Mortgagor represents and warrants that they are not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity, or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity, or nation. Mortgagor agrees to defend, indemnify, and hold harmless the Mortgagee from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorneys' fees and costs) arising from or related to any breach of the foregoing representation and warranty.

**SECTION 59.**    <u>Cross-Default.</u>

This Mortgage shall be and is hereby cross-defaulted as follows:

(a)      Simultaneously herewith related entities to Mortgagor, entered into a deed of trust encumbering certain real property more particularly set forth on Schedule A therein (the "Other Mortgage") which Other Mortgage also secures the Note secured by this Mortgage.

MADISON 00070

(b)    A Default or an Event of Default under the Note, this Mortgage or the Other Security Documents described herein shall also constitute, a Default or an Event of Default under the Other Mortgage.

(c)    A Default or an Event of Default under the Other Mortgage shall also constitute a Default or an Event of Default under the Note, this Mortgage or the Other Security Documents described herein.

**SECTION 60.**    **Superior Mortgages.**

This mortgage is subject and subordinate only to that certain (i) deed of trust dated June 23, 2006, filed for record under Clerk's File No. 2006043108 of the Real Property Records of Galveston County, Texas, as same was assigned under Clerk's File No. 2006057155 of the Real Property Records of Galveston County, Texas on the premises owned by Pirate's Lake, Ltd., with a current outstanding principal balance in the amount of $10,000,000.00 and (ii) deed of trust dated January 20, 2005, filed for record on January 20, 2005, under Harris County Clerk's File No. Y206675, on the premises owned by 7500 Bellaire Mall LP, with a current outstanding principal balance in the amount of $30,815,052.39 (the "Morgan Deed of Trust").

**SECTION 61.**    **Conflict.**

To the extent that the provisions of this Rider are enforceable pursuant to applicable law, in the event of any conflict or inconsistency between the provisions of this Rider and any of the provisions of the printed form of Deed of Trust to which this Rider is annexed, such conflict shall be resolved in every instance in favor of the provisions of this Rider.

**SECTION 62.**    **Right of First Offer on Financing.**

From and after the date hereof through and including the Maturity Date (as such term is defined in the Note), if Mortgagee intends to place a deed of trust upon the premises owned by 7500 Bellaire Mall LP or its successors and/or assigns (the "Mall Property"), other then any deed of trust that exists as of the date hereof, Mortgagor upon receipt of a term sheet or written loan offer from a conventional mortgage lender (the "New Loan Offer") shall provide Mortgagee the right to provide the financing outlined on the New Loan Offer through financing arranged by or through Mortgagee. Mortgagee shall have forty-eight (48) hours from receipt of the written New Loan Offer to agree in writing to provide or arrange for the financing outlined in the New Loan Offer. If Mortgagee fails to timely respond, then same shall be deemed a denial by Mortgagee to provide such financing on the terms outlined in the New Loan Offer. If Mortgagee timely responds and agrees to the same terms, conditions, requirements and timeframe set forth in the New Loan Offer, Mortgagee must finance the Mall Property by or through Mortgagee on such terms. The provisions of this Section 62 shall expire upon full repayment of the Principal Balance (as such term is defined in the Note) in whole only, along with interest, additional interest, and any other sums due under the Note, this Mortgage or the Other Security Documents (as such term is defined in the Note). Should Mortgagor fail to comply with the provisions of this Section 62, Mortgagee shall in addition to the other remedies set forth herein, have the right to maintain an action for breach of contract and damages.

MADISON 00071



**IN WITNESS WHEREOF,** Mortgagor has executed this Mortgage the day and year first above written.

SE MARINA WAY PARTNERSHIP, LP

By: SE Marina Way, L.L.C.
   its general partner

By: _____
   Name: Tracy Suttles
   Title:  Manager

PIRATE'S LAKE LTD.

By: Pirate's Lake Management, L.L.C.
   its general partner

By: _____
   Name: Tracy Suttles
   Title:   Manager

7500 BELLAIRE MALL LP

By: 7500 Bellaire Mall Management, Inc.
   its general partner

By: _____
   Name: Tracy Suttles
   Title:   President

RE\50260\9044\328166v2

MADISON 00072

STATE OF TEXAS    )
          )  ss.:
COUNTY OF HARRIS   )

    On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of SE Marina Way, L.L.C., general partner of SE Marian Way Partnership, LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



                     Notary Public

STATE OF TEXAS    )
          )  ss.:
COUNTY OF HARRIS   )

    On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of Pirate's Lake Management, L.L.C., general partner of Pirate's Lake Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



                     Notary Public

RE\5026\9044\328166v2



STATE OF TEXAS )

COUNTY OF HARRIS )  ss.:
)

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of 7500 Bellaire Mall Management, Inc., general partner of 7500 Bellaire Mall LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

_____
Notary Public

RE\50260\9044\328166v2

MADISON 00074



# SCHEDULE A

DESCRIPTION OF RESERVE "A-1", OF MARINA ON THE LAKE SUBDIVISION, A SUBDIVISION IN GALVESTON COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 18, PAGE 77 OF THE MAP RECORDS IN THE OFFICE OF THE COUNTY CLERK OF GALVESTON COUNTY, TEXAS; SAVE AND EXCEPT FROM SAID RESERVE "A-1" THAT PART OF RESERVE "A-1" RE-PLATTED AS MARINA DEL SOL BY MAP OR PLAT RECORDED IN VOLUME 18, PAGE 168, OF THE MAP RECORDS IN SAID COUNTY CLERKS OFFICE, THE PROPERTY HEREIN DESCRIBED (BEING THE PORTION OF RESERVE "A-1" WHICH WAS NOT RE-PLATTED AS MARINA DEL SOL) IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at a 1/2" iron rod found in the Southerly right-of-way line of Twin Oaks Boulevard (based on a 90.00 feet wide right of way, said iron rod also being the Northwesterly corner of Lot 1, Reserve "H" of Marina Del Sol subdivision, as recorded in Volume 18, Page 168, in the Office of the County Clerk of Galveston County, Texas;

THENCE S18°54'06"E, along the Westerly line of said Lot 1, a distance of 232.22 feet to an "X" found in concrete for corner said "X" also being the Southwesterly corner of said Lot 1;

THENCE N72°11'28"E, along the Southerly line of Lots 1 thru 8 of said RESERVE "H", a distance of 677.25 feet to a 3/8" iron rod found for corner, said iron rod being the Southeasterly corner of Lot 8 of said Reserve "H", and lying in the Westerly line of Lot 9, of Reserve "G" of said Marina Del Sol subdivision,

THENCE S33°41'00"E, along the Southwesterly line of Lots 10, 11 and 12 of said Reserve "G", a distance of 320.00 feet to a 1/2" iron rod found for corner, said iron rod being the Southwesterly corner of said Lot 12;

THENCE N83°08'00"E, along the Southerly line of said Lot 12, a distance of 84.00 feet to a 1/2" iron rod found for corner in said the Southerly line of Reserve "A" of said Marina Del Sol subdivision,

THENCE, along the Southerly line of said Reserve "A", the following calls, S77°17'29"E, a distance of 36.60 feet to a 1/2" iron rod found for corner; N77°28'32"E, a distance of 41.66 feet to a found "X" for corner; N63°59'16"E, a distance of 38.97 feet to a fence post for corner, and point being the most Easterly corner of said Reserve "A-1";

THENCE S00°01'56"E, along the most Easterly line of said Reserve "A-1", a distance of 307.64 feet to a point for corner in the Northerly line of Reserve "F" of said Marina Del Sol subdivision,

THENCE N75°42'18"W, along the Northerly line of said Reserve "F", a distance of 19.98 feet to a found 1/2" iron rod found for corner,

MADISON 00075


THENCE S81°5'659"W, continuing along the Northerly line of said Reserve "F", a distance of 129.61 feet to a found 1/2" iron rod for corner;

THENCE S68°0'507"W, continuing along said Northerly line, a distance of 50.94 feet to a point for corner;

THENCE S07°4'500"E, a distance of 47.62 feet to a nail found as a piling for corner in the interior North line of said Reserve "F";

THENCE S72°1'128"W, along the interior North line of said Reserve "F", the North line of Reserve "E" of Marina Del Sol subdivision, and the interior North line of Reserve "F", Phase I of Marina On The Lake Subdivision, a distance of 764.89 feet to a point for corner;

THENCE N27°4'553"W, a distance of 31.39 feet to a found 5/8" iron rod for corner, said corner being the most Northerly corner of said Reserve "F";

THENCE, along the Northerly and Northwesterly line of said RESERVE "F", the following bearings and distances: S60°09'00"W, a distance of 52.01 feet to a 5/8" iron rod found for corner, S35°30'00"W, a distance of 63.00 feet to a 1/2" iron rod found for corner, S11°43'00"W, a distance of 89.00 feet to a 1/2" iron rod found for corner, S45°02'00"W, a distance of 37.43 feet to a 1/2" iron rod found for corner in the Easterly line of Twin Oaks Subdivision,

THENCE N18°5'528"W, along the Easterly line of said Twin Oaks Subdivision, a distance of 358.57 feet to a 5/8" iron rod found for corner, said iron rod also being the Southwesterly corner of Reserve "C" of said Marina Del Sol subdivision,

THENCE N79°3'100"E, along the Southerly line of said Reserve "C", a distance of 33.19 feet to a 1/2" iron rod found for corner,

THENCE S55°00'00"E, continuing along the Southerly line of said RESERVE "C", a distance of 35.00 feet to a 5/8" iron rod found for corner, said iron rod being the Northwesterly corner of RESERVE "B" of Marina Del Sol subdivision;

THENCE S20°33'00"E, along the Westerly line of said Reserve "B", a distance of 106.95 feet to a 5/8" iron rod found for corner, said iron rod being the Southwesterly corner of said Reserve "B",

THENCE N79°56'00"E, along the Southerly line of said Reserve "B", a distance of 121.31 feet to a found "X" being the Southeasterly corner of said Reserve "B";

THENCE N11°53'30"W, along the Easterly line of said Reserve "B", a distance of 64.98 feet to a 5/8" iron rod found for corner;

THENCE N20°58'36"E, continuing along the Easterly line of said RESERVE "B", a distance of 79.55 feet to a point for corner, said iron rod being the Northeasterly corner of said Reserve "B", and the Southeasterly corner of Reserve "C" of said Marina Del Sol subdivision,



THENCE N18°54'08"W, along the Easterly line of said Reserve "C" and Reserve "D" of said Marina Del Sol subdivision, a distance of 633.11 feet to an "X" found in concrete for a point of curvature;

THENCE, along a curve to the left, having a radius of 25.00 feet, a central angle of 120°01'30", an arc length of 52.37 feet, a chord bearing of N78°54'53"W and a chord distance of 43.31 feet to a 3/8" iron rod found for corner in the Northerly line of said Reserve "D", same being the Southerly right-of-way line of said Twin Oaks Boulevard;

THENCE, along the Southerly right-of-way line of said Twin Oaks Boulevard, being a non-tangent curve to the right, having a radius of 123.99 feet, a central angle of 37°37'56", an arc length of 81.43 feet, a chord bearing of N59°53'11"E and a chord distance of 79.96 feet to an "X" found in concrete for a point of tangency;

THENCE N78°42'00"E, continuing along the Southerly right-of-way line of said Twin Oaks Boulevard, a distance of 34.36 feet to the Place Of Beginning.

MADISON 00077

# SCHEDULE A

FIELD NOTES of a 46.750 acre tract of land situated in the Trimble & Lindsey Survey, Section 3, Galveston Island, Galveston County, Texas; said 46.750 acre tract of land being out of and a part of Lots 45, 46, 57, 60, 67, 76, 77, and 80 of said Trimble & Lindsey Survey; and also being out of and a part of Restricted Reserve 'B' of the Partial Replat of Pirates' Beach Section 1, a subdivision located in Galveston County, Texas, according to the plat or map thereof as recorded in Volume 17, Page 161 of the Plat Records of Galveston County, Texas; said 46.750 acre tract of land being more particularly described by metes and bounds as follows:

NOTE: BEARINGS EASED ON SOUTH RIGHT-OF-WAY LINE OF STEWART ROAD. BEARING BEING N 63° 38' 30" E.

BEGINNING at a found one inch iron pipe for the most Easterly Southeast corner of this tract of land; said point being the Northeast corner of a tract of land conveyed to Texas Diversifications, LLC, dated December 29, 1996 and recorded at Film Code No. 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 of the Official Public Records of Real Property of Galveston County, Texas; said point also being in the Westerly right-of-way line of Buccaneer Boulevard as described at Film Code No. 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 of the Official Public Records of Real Property of Galveston County, Texas.

THENCE S 64° 58' 30" W with the most Easterly South line of this tract of land and the North line of said Texas Diversifications, LLC, tract of land a distance of 394.65 feet to a found one inch iron pipe for an interior corner of this tract of land.

THENCE S. 25° 20' 48" E with an interior line of this tract of land and the West line of said Texas Diversifications, LLC, tract of land, a distance of 243.09 feet to a found one inch iron pipe for the most Southerly Southeast corner of said Texas Diversifications, LLC, tract of land; said point being in the Northerly right-of-way line of San Luis Pass Road (a.k.a. F.M. 3005, 200 R.O.W.).

THENCE S 65° 03' 00" W with the South line of this tract of land and the Northerly right-of-way line of said San Luis Pass Road a distance of 809.88 feet to a set pin and cap stamped "Coastal Surveying" for the beginning of a curve to the left, concave Southeasterly.

THENCE in a Southwesterly direction with the South line of this tract of land, the Northerly right-of-way line of said San Luis Pass Road and said curve to the left having a central angle of 07° 39' 48" , a radius of 2964.33 feet, a length of 396.48 feet and a chord bearing and distance of S 61° 13' 06" W, 396.18 feet to a set pin with cap for the end of this curve; said point being the Southeast corner of a tract of land conveyed to Galveston Harbour Properties, Inc., dated April 20, 2000 and recorded at Film Code No. 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 of the Official Public Records of Real Property of Galveston County, Texas; from this corner a found pin with cap stamped "RC Mercer" bears S 33° 47' 06" E a distance of 1.49 feet.

THENCE N 62° 42' 38" W with an interior line of this tact of land and the East line of said Galveston Harbour Properties, Inc., a distance of 143.03 feet to a found pin with cap stamped "RC Mercer" for an angle point of this tract of land and the Northeast corner of said Galveston Harbour Properties, Inc., tract of land.

THENCE S 66° 41' 45" W with the interior line of this tact of land and the North line of said Galveston Harbour Properties, Inc., tract of land a distance of 464.21 feet to an angle point of this tact of land and an angle point of said Galveston Harbour Properties, Inc., tract of land.

MADISON 00078

THENCE S 47° 57' 22" W with the interior line of this tract of land and the North line of said Galveston Harbour Properties, Inc., tract of land a distance of 265.40 feet to a found pin with cap stamped "RC Mercer" for the most Southerly Southwest corner of this tract of land, and the Northwest corner of said Galveston Harbour Properties, Inc., tract of land; said point being the beginning of a non-tangent curve to the right, concave Northeasterly and also being in the West line of Restricted Reserve 'B' of said Pirates' Beach Section 1; said point also being in the Easterly right-of-way line of Marina Boulevard (R.O.W. width varies).

THENCE in a Northwesterly direction with the West line of this tact of land, the West line of said Reserve 'B', the Easterly right-of-way line of said Marina Boulevard and said non-tangent curve to the right having a central angle of 09° 42' 00" ,a radius of 2960.00 feet, a length of 501.25 feet, and a chord bearing and distance of N 71° 17' 45" W, 500.66 feet to a set pin with cap for the end of this curve.

THENCE N 66° 26' 35" W with the West line of this tact of land, the West line of said Reserve 'B' and the Easterly right-of-way line of said Marina Boulevard a distance of 230.00 feet to a set pin with cap stamped "Coastal Surveying" for the most Westerly point of this tract of land, the angle point of said Reserve 'B' and the point of intersection of said Marina Boulevard and Pirates Beach Circle (60 R.O.W.).

THENCE N 23° 33' 25" E with the West line of this tact of land, the West line of said Reserve 'B' and the East right-of-way line of said Pirates Beach Circle a distance of 94.35 feet to a found one inch iron pipe (bent) for the beginning of a curve to the left, concave Northwesterly.

THENCE in a Northerly direction with the West line of this tract of land, the West line of said Reserve 'B', the East right-of-way line of said Pirates Beach Circle and said curve to the left having a central angle of 48°33'25", a radius of 230.00 feet, a length of 194.92 feet, and a chord bearing and distance of N 00°43'18" W, 189.14' to a found pin with cap stamped "Coastal Surveying" for the end of this curve.

THENCE N 25° 00' 00" W with the West line of this tract of land, the West line of said Reserve 'B' and said East right-of-way line of said Pirates Beach Circle a distance of 38.11 feet to a found pin with cap stamped "Coastal Surveying" for the Northwest corner of this tract of land

THENCE N 63° 36' 30" E with the North line of this tract of land a distance of 344.37 feet to a found pin with cap stamped "Coastal Surveying" for an angle point of this tract of land.

THENCE S 26° 23' 30" E with the North line of this tract of land a distance of 12.09 feet to a found pin with cap stamped "Coastal Surveying" for an angle point of this tract of land.

THENCE N 63° 36' 30" E with the North line of this tract of land a distance of 130.17 feet to a found pin with cap stamped "Coastal Surveying" for an angle point of this tract of land.

THENCE N 26° 23' 30" W With the North line of this tract of land a distance of 12.09 feet to a palm tree on corner for an angle point of this tract of land.

THENCE N 63°36'30" E with the North line of this tract of land a distance of 1911.68 feet to a found pin with cap stamped "Coastal Surveying" for the Northeast corner of this tract of land and also being the beginning of a non-tangent curve to the left, concave Northeasterly; said point being in the Westerly right-of-way line of said Buccaneer Boulevard.



THENCE in a Southeasterly direction with the East line of this tract of land, the Westerly right-of-way line of said Buccaneer Boulevard and said non-tangent curve to the left having a central angle of 32° 46' 02", a radius of 338.71 feet, a length of 193.71 feet and a chord bearing and distance of S 53° 26' 41" E, 191.06 feet to a found 5/8 inch iron rod for the end of this curve.

THENCE S 69° 36' 50" E with the East line of this tract of land and the Westerly right-of-way line of said Buccaneer Boulevard a distance of 292.46 feet to a found 5/8 inch iron rod for the beginning of a curve to the right, concave Southwesterly.

THENCE in a Southeasterly direction with the East line at this tract at land, the Westerly right-at-way line of said Buccaneer Boulevard and said curve to the right having a central angle of 44° 26' 52", a radius of 299.87 feet, a length of 232.62 feet and a chord bearing and distance of S 47° 33' 47" E, 226.83 feet to a found 5/8 inch iron rod for the end of this curve.

THENCE S 25° 24' 00" E with the East line of this tract of land and the Westerly right-of-way line of said Buccaneer Boulevard a distance of 42.00 feet to the PLACE OF BEGINNING; containing within said boundaries a calculated area of 46.750 acres of land; SUBJECT TO a 60 foot ingress and egress easement (3.810 acre easement) situated in the Trimble & Lindsey Survey, Section 3, Galveston Island, Galveston County, Texas; said 3.810 acre easement being out of and a part of Lots 45,48,57,60, 67, 78, 77, and 80 of said Trimble & Lindsey Survey; and also being out of and a part of Restricted Reserve 'B' of the Partial Replat of Pirates' Beach Section 1, a subdivision located in Galveston County, Texas, according to the plat or map thereof as recorded in Volume 17, Page 161 of the Plat Records of Galveston County, Texas; said 3.810 acre easement being more particularly described by metes and bounds as follows:

NOTE: BEARINGS BASED ON SOUTH RIGHT-OF-WAY LINE OF STEWART ROAD BEARING BEING N 63° 36' 30" E.

COMMENCING at the Northwest corner of said Reserve 'B' the same being the intersection of Pirates Beach Circle (60' R.O.W.) and Stewart Road (R.O.W. width varies)

THENCE S 25° 00' 00" E with the West line of said Reserve 'B' and the East right-of-way line of said Pirates Beach Circle a distance of 325.10 feet to the Northwest corner of this easement and being the PLACE OF BEGINNING.

THENCE N 63° 36' 30" E with the North line of this easement a distance of 1106.29 feet to the beginning of a non-tangent curve to the right, concave Easterly.

THENCE in a Northerly direction with said non-tangent curve to the right having a central angle of 54° 29' 27", a radius of 230.00 feet, a length of 218.14 feet and a chord bearing and distance of N 00° 46'43" E, 210.05 feet to the beginning of a reverse curve to the left, concave Westerly.

THENCE in a Northerly direction with said reverse curve to the left having a central angle of 54° 20' 27", a radius of 170.00 feet, a length of 161.23 feet and a chord bearing and distance of N 00° 46' 43" E, 155.26 feet to the most Northerly Northwest corner of this easement; said point being in the South right-of-way line of said Stewart Road.

THENCE N 63° 36' 30" E with the North line of this easement and the South right-of-way line of said Stewart Road a distance of 60.00 feet to the most Northerly Northeast corner of this easement and being the beginning of a non-tangent curve to the right, concave Westerly.

THENCE in a Southerly direction with said non-tangent curve to the right having a central angle of 54°20'27", a radius of 230.00 feet, a length of 218.14 feet and a chord bearing and distance of S 00°46'43" W, 210.05 feet to the beginning of a reverse curve to the left, concave Easterly.

THENCE in a Southerly direction with said reverse curve to the left having a central angle of 54° 20' 27", a radius of 170.00 feet, a length of 161.23 feet and a chord bearing and distance of S 00° 46' 43" W, 155.26 feet to the end of this curve.

THENCE N 63° 36' 30" E with the North line of this easement a distance of 1214.94 feet to the Northeast corner of this easement; said point being the beginning of a nontangent curve to the left, concave Easterly and being in the Westerly right-of-way line of Buccaneer Boulevard (R.O.W. width varies) as described at Film Code No. 001-170942 of the Official Public Records of Real Property of Galveston County, Texas

THENCE in a Southeasterly direction with the East line of this easement, the Westerly right-of-way line of said Buccaneer Boulevard and said non-tangent curve to the left having a central angle of 10° 20' 37", a radius of 338.71 feet, a length of 61.15 feet and a chord bearing and distance of S 37° 06' 19" E, 61.96 feet to tithe Southeast corner of this easement.

THENCE S 63° 36' 30" W with the South line of this easement a distance of 2394.04 feet to the Southwest corner of this easement said point being in the West line of said Reserve 'B' and the East right-of-way line of said Pirates Beach Circle.

THENCE N 25° 00' 00" W with the West line of this easement, the West line of said Reserve 'B' and the East right-of-way line of said Pirates Beach Circle a distance of 60.02 feet to the PLACE OF BEGINNING; containing within said boundaries a calculated area of 3.810 acres of land.

# SCHEDULE A

## DESCRIPTION OF A
### 36.747 GROSS (36.316 NET ACRES) IN THE
### J. B. PIER SURVEY A-1103 AND
### C. Mc KINZIE SURVEY A-560
### HARRIS COUNTY, TEXAS

Description of a 36.747 acre (1,600,708 square feet) of land being out of a called 43.2759 acre tract, described in a deed to 7500 SB Ltd., recorded under Harris County Clerk's File Number W 151656 of the Official Public Records of Real Property Harris County, Texas (H.C.O.P.R.R.P.), Less and Except a 0.4315 acre tract recorded under Harris County Clerk's File Numbers T 466973 and U 271827 and being a portion of Block 24 of Sharpstown Industrial Park, Section 12, a subdivision as shown on the plat thereof recorded in Volume 68 Page 37 of the Map Records of Harris County, Texas, situated in the J.B. Pier Survey Abstract No. 1103 and the C. Mc Kinzie Survey A-560, Harris County, Texas. Said 36.747 acre tract being more particularly described by metes and bounds as follows:

COMMENCING at a 5/8 inch iron rod found for the west corner of a called 0.770 acre tract, described in a to Motiva Enterprises LLC, recorded under Harris County Clerk's File Number T 327800 (H.C.O.P.R.R.P.), and the common corner of said 43.2759 acre tract, and being in the northeasterly right-of way line of Bellaire Boulevard (150' right-of-way);

THENCE, North 45 degrees 15 minutes 48 seconds East, departing said right-of-way and with the west line of said 0.770 acre tract and the common line of said 43.2759 acre tract, a distance of 240.95 feet to a 5/8 inch iron rod with cap stamped Carter & Burgess found for the southeast corner and POINT OF BEGINNING of the herein described tract;

THENCE, North 44 degrees 30 minutes 36 seconds West, a distance of 0.88 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for the beginning of a curve to the left;

THENCE, southwesterly, with said curve to the left having a radius of 1.50 feet, a central angle of 101 degrees 15 minutes 54 seconds, a chord bearing of South 88 degrees 19 minutes 40 seconds West, a chord distance of 2.32 feet, and an arc length of 2.66 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner of reverse curvature;

THENCE, southwesterly, with said curve to the right having a radius of 82.30 feet, a central angle of 35 degrees 08 minutes 04 seconds, a chord bearing of South 61 degrees 12 minutes 43 seconds West, a chord distance of 49.68 feet, and an arc length of 50.47 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner of compound curvature;

THENCE, northwesterly, with said curve to the right having a radius of 126.61 feet, a central angle of 32 degrees 20 minutes 11 seconds, a chord bearing of North 81 degrees 53 minutes 48 seconds West, a chord distance of 70.51 feet, and an arc length of 71.46 feet to a nail with shiner stamped Carter & Burgess found for corner;



THENCE, North 71 degrees 46 minutes 51 seconds West, a distance of 345.14 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for the beginning of a curve to the left;

THENCE, southwesterly, with said curve to the left having a radius of 14.71 feet, a central angle of 92 degrees 07 minutes 55 seconds, a chord bearing of South 51 degrees 47 minutes 11 seconds West, a chord distance of 21.19 feet, and an arc length of 23.66 feet to an x-cut found in concrete for corner;

THENCE, South 00 degrees 04 minutes 38 seconds East, a distance of 154.50 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner and being in the northeasterly right-of-way line of Bellaire Boulevard and the common line of said 43.2759 acre tract and the beginning of a curve to the left;

THENCE, northwesterly, with the northeasterly right-of-way line of Bellaire Boulevard and the common line of said 43.2759 acre tract and said curve to the left having a radius of 3,085.00 feet, a central angle of 01 degrees 33 minutes 16 seconds, a chord bearing of North 75 degrees 10 minutes 42 seconds West, a chord distance of 83.69 feet, and an arc length of 83.70 feet a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner;

THENCE, North 05 degrees 03 minutes 23 seconds East, a distance of 22.42 feet to a pk-nail with shiner stamped Carter & Burgess found for corner;

THENCE, North 00 degrees 15 minutes 26 seconds West, a distance of 134.54 feet to a pk-nail with shiner stamped Carter & Burgess found for corner and the beginning of a curve to the left;

THENCE, northwesterly, with said curve to the left having a radius of 13.18 feet, a central angle of 69 degrees 37 minutes 35 seconds, a chord bearing of North 37 degrees 35 minutes 20 seconds West, a chord distance of 15.05 feet, and an arc length of 16.02 feet to a pk-nail with shiner stamped Carter & Burgess found for corner;

THENCE, North 80 degrees 08 minutes 57 seconds West, a distance of 279.82 feet to a pk-nail with shiner stamped Carter & Burgess found for corner;

THENCE, North 89 degrees 53 minutes 48 seconds West, a distance of 204.17 feet to a pk-nail with shiner stamped Carter & Burgess found for corner and the beginning of a curve to the left;

THENCE, southwesterly, with said curve to the left having a radius of 9.99 feet, a central angle of 71 degrees 15 minutes 42 seconds, a chord bearing of South 43 degrees 00 minutes 34 seconds West, a chord distance of 11.63 feet, and an arc length of 12.42 feet to a pk-nail with shiner stamped Carter & Burgess found for corner;

THENCE, South 00 degrees 06 minutes 02 seconds East, a distance of 126.69 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner and being in the northeasterly right-of-way line of Bellaire Boulevard and the common line of said 43.2759 acre tract and the beginning of a curve to the left;

MADISON 00083



THENCE, northwesterly, with the northeasterly right-of-way line of Bellaire Boulevard and the common line of said 43.2759 acre tract and said curve to the left having a radius of 3,085.00 feet, a central angle of 01 degrees 16 minutes 27 seconds, a chord bearing of North 85 degrees 56 minutes 11 seconds West, a chord distance of 68.60 feet, and an arc length of 68.60 feet to a pk-nail with shiner stamped Carter & Burgess found for corner;

THENCE, North 12 degrees 13 minutes 21 seconds East, a distance of 5.10 feet to an x-cut found in concrete for corner;

THENCE, North 07 degrees 46 minutes 19 seconds East, a distance of 49.70 feet to an x-cut found in concrete for corner;

THENCE, North 03 degrees 32 minutes 57 seconds East, a distance of 65.91 feet to a pk-nail with shiner stamped Carter & Burgess found for the beginning of a curve to the left;

THENCE, northwesterly, with said curve to the left having a radius of 10.11 feet, a central angle of 89 degrees 46 minutes 39 seconds, a chord bearing of North 42 degrees 27 minutes 03 seconds West, a chord distance of 14.27 feet, and an arc length of 15.84 feet to a pk-nail with shiner stamped Carter & Burgess found for corner;

THENCE, South 89 degrees 59 minutes 22 seconds West, a distance of 87.95 feet to a pk-nail with shiner stamped Carter & Burgess found for the most west southwesterly corner of the herein described tract and being in the easterly line of a called 11.9299 acre tract described in a deed to Burlington Coat Factory Realty of Bellaire, INC., recorded under Harris County Clerk's File Number V 365918 (H.C.O.P.R.R.P), and being the common line of said 43.2759 acre tract;

THENCE, with the east line of said 11.9299 acre tract and the common line of said 43.2759 acre tract, the following forty-one (41) courses and distances;

1. THENCE, North 00 degrees 00 minutes 00 seconds West, a distance of 478.76 feet to a found 5/8 inch iron rod;

2. THENCE, North 45 degrees 00 minutes 00 seconds East, a distance of 80.72 feet to a point for corner;

3. THENCE, South 90 degrees 00 minutes 00 seconds East, a distance of 78.85 feet to a point for corner;

4. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 4.58 feet to a point for corner;

5. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;

6. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.00 feet to a point for corner;

MADISON 00084

7. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

8. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 12.42 feet to a point for corner;

9. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;

10. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.00 feet to a point for corner;

11. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

12. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 22.08 feet to a point for corner;

13. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;

14. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.84 feet to a point for corner;

15. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

16. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 13.58 feet to a point for corner;

17. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;

18. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.00 feet to a point for corner;

19. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

20. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 83.00 feet to a point for corner;

21. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;


22. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.00 feet to a point for corner;

23. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

24. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 13.25 feet to a point for corner;

25. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;

26. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.84 feet to a point for corner;

27. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

28. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 22.25 feet to a point for corner;

29. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;

30. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.00 feet to a point for corner;

31. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

32. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 16.58 feet to a point for corner;

33. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 0.55 feet to a point for corner;

34. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 1.00 feet to a point for corner;

35. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 0.55 feet to a point for corner;

36. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 0.58 feet to a point for corner;

37. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 5.95 feet to a point for corner;

38. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 25.17 feet to a point for corner;

39. THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 50.52 feet to a point for corner;

40. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 30.83 feet to a point for corner;

41. THENCE, North 45 degrees 00 minutes 00 seconds West, a distance of 98.52 feet to a pk-nail found for corner;

THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 109.05 feet to a pk-nail found for corner;

THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 449.80 feet to an x-cut in concrete found in the west right-of-way line of Marinette Drive (60.35' right-of-way) described in a deed, in Volume 7582, Page 443 of the Deed Records of Harris County, Texas and being the common line of said 43.2759 acre tract;

THENCE, North 00 degrees 00 minutes 00 seconds East, with said east right-of-way Line and common line of said 43.2759 acre tract, a distance of 440.69 feet to an x-cut in concrete found for the southeast corner of the intersection of Marinette Drive and Clarewood Drive (60 foot right-of-way) and being the common corner of said 43.2759 acre tract, from which a found 3/8-inch iron rod bears South 77 degrees 51 minutes 34 seconds East, a distance of 2.29 feet;

THENCE, North 90 degrees 00 minutes 00 seconds East, with said south right-of-way line and the common line of said 43.2759 acre tract, a distance of 677.45 feet to a 5/8-inch iron rod found for the northwest corner of a called 9.9067 acre tract as described in a deed to GPM Houston Properties LTD, recorded under Harris County Clerk's File Number U 652795 (H.C.O.P.R.R.P);

THENCE, South 00 degrees 00 minutes 00 seconds West, departing said south right-of-way line and with the west line of said 9.9067 acre tract and the common line of said 43.2759 acre tract, a distance of 409.30 feet to a pk-nail found for the southwest corner of said 9.9067 and common corner of said 43.2759 acre tract;

THENCE, with the southerly line said 9.9067 acre tract and the common line of said 43.2759 acre tract, the following twelve (12) courses and distances;

1. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 37.34 feet to an x-cut in concrete found for corner;

MADISON 00087



2.  THENCE, South 65 degrees 00 minutes 00 seconds East, a distance of 85.00 feet to a point for corner;

3.  THENCE, South 00 degrees 00 minutes 00 seconds East, a distance of 75.00 feet to a point for corner;

4.  THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 74.00 feet to a point for corner;

5.  THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 14.33 feet to a point for corner;

6.  THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 28.00 feet to a point for corner;

7.  THENCE, South 00 degrees 00 minutes 00 seconds East, a distance of 14.33 feet to a point for corner;

8.  THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 313.00 feet to an x-cut in concrete found for corner;

9.  THENCE, South 00 degrees 00 minutes 00 seconds East, a distance of 50.00 feet to an x-cut in concrete found for corner;

10. THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 200.00 feet to a pk-nail found for corner;

11. THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 50.00 feet to an x-cut in concrete found for corner;

12. THENCE, South 90 degrees 00 minutes 00 seconds East, a distance of 45.00 feet to an x-cut in concrete found for the southeast corner of said 9.0967 acre tract and the common corner of said 43.2759 acre tract and being in the west line of a called 9.9999 acre tract of land as described in a deed to The May Department Stores Company, recorded under Harris County Clerk's File Number M 992618 (H.C.O.P.R.R.P);

THENCE, South 00 degrees 00 minutes 00 seconds East, with the east line of said 9.9999 acre tract and the common line of said 43.2759 acre tract, a distance of 347.19 feet to a point for corner;

THENCE, with the common line said 9.9067 acre tract and said 43.2759 acre tract, the following seven (7) courses and distances;

1.  THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 10.00 feet;

2.  THENCE, South 00 degrees 00 minutes 00 seconds East, a distance of 60.00 feet;

MADISON 00088

3.  THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 71.10 feet;

4.  THENCE, South 00 degrees 00 minutes 00 seconds East, a distance of 24.00 feet;

5.  THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 394.40 feet to a pk-nail found for corner;

6.  THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 283.33 feet to a pk-nail found for corner;

7.  THENCE, South 44 degrees 44 minutes 12 seconds East, a distance of 433.57 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner;

THENCE, South 45 degrees 16 minutes 46 seconds West, a distance of 392.54 feet to a pk-nail with shiner stamped Carter & Burgess found for the beginning of a curve to the left;

THENCE, southwesterly, with said curve to the left having a radius of 6.98 feet, a central angle of 84 degrees 53 minutes 27 seconds, a chord bearing of South 02 degrees 38 minutes 52 seconds West, a chord distance of 9.42 feet, and an arc length of 10.34 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner;

THENCE, South 44 degrees 21 minutes 13 seconds East, a distance of 153.80 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner;

THENCE, South 54 degrees 30 minutes 38 seconds East, a distance of 4.02 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner and being in the northwesterly right-of-way line of State Highway 59 (Southwest Freeway 300' right-of-way) and being the common line of said 43.2759 acre tract;

THENCE, South 45 degrees 15 minutes 48 seconds West, with said northwesterly right-of-way line and the common line of said 43.2759 acre tract, a distance of 40.33 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for the beginning of a curve to the left;

THENCE, northwesterly, departing said right-of-way line and with said curve to the left having a radius of 39.53 feet, a central angle of 29 degrees 28 minutes 00 seconds, a chord bearing of North 19 degrees 43 minutes 23 seconds West, a chord distance of 20.11 feet, and an arc length of 20.33 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner;

THENCE, North 44 degrees 15 minutes 46 seconds West, a distance of 138.22 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for the beginning of a curve to the left;

THENCE, northwesterly, with said curve to the left having a radius of 6.01 feet, a central angle of 87 degrees 05 minutes 37 seconds, a chord bearing of North 81 degrees 02 minutes 13 seconds West, a chord distance of 8.29 feet, and an arc length of 9.14 feet to a point for corner;

MADISON 00089

THENCE, South 46 degrees 06 minutes 35 seconds West, a distance of 58.74 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner;

THENCE, South 45 degrees 14 minutes 25 seconds West, a distance of 306.68 feet to a 5/8-inch iron rod with cap stamped Carter & Burgess found for corner and the beginning of a curve to the left;

THENCE, southwesterly, with said curve to the left having a radius of 5.00 feet, a central angle of 29 degrees 11 minutes 05 seconds, a chord bearing of South 24 [illegible] West, a chord distance of 5.59 feet, and an arc length of 6.13 feet to [illegible] with cap stamped Carter & Burgess found for corner;

THENCE, South 45 degrees 15 minutes 48 seconds West, a distance of 41.59 feet to the POINT OF BEGINNING and containing 36.747 gross acres of land.

### LESS AND EXCEPT THE FOLLOWING DESCRIBED TRACT

COMMENCING at a 5/8 inch iron rod found for the west corner of a said 0.770 acre tract, and the common corner of said 43.2759 acre tract, and being in the northeasterly right-of-way line of Bellaire Boulevard;

THENCE, North 21 degrees 24 minutes 15 seconds West, 721.95 feet to the southeast corner of a building and a called 0.4315 acre tract described in a deed to Smith FLP, LTD., recorded under Harris County File Numbers T 466973 and U 271827 and to the POINT OF BEGINNING;

THENCE, North 90 degrees 00 minutes 00 seconds West, a distance of 192.00 feet to a point for corner;

THENCE, North 00 degrees 00 minutes 00 seconds East, with the west side of said building a distance of 57.00 feet to a point from which the northwest corner of said building bears South 21 degrees 40 minutes 36 seconds East, a distance of 0.32 feet;

THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 30.00 feet;

THENCE, North 00 degrees 00 minutes 00 seconds East, a distance of 55.50 feet;

THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 134.54 feet;

THENCE, South 00 degrees 00 minutes 00 seconds East, a distance of 36.84 feet;

THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 20.67 feet;

THENCE, South 00 degrees 00 minutes 00 seconds East, a distance of 18.66 feet;

MADISON 00090



THENCE, North 90 degrees 00 minutes 00 seconds East, a distance of 6.79 feet to point from which the northeast corner of said building bears South 19 degrees 05 minutes 09 seconds West a distance of 0.31 feet;

THENCE, South 00 degrees 00 minutes 00 seconds West, a distance of 57.00 feet to the POINT OF BEGINNING of the herein described 0.4315 acre tract resulting in and overall described area of 36.316 net acres.

Bearings are referenced to the plat of Sharpstown Industrial Park, Section 12, as recorded in Volume 68, Page 37, of the Harris County Map Records.

This description was prepared in conjunction with a survey drawing by Carter & Burgess, Inc. dated July 14, 2004 and revised on October 5, 2004.

MADISON 00091

# EXHIBIT D

## PLEDGE AND SECURITY AGREEMENT (PARTNERSHIP INTERESTS)

**THIS PLEDGE AND SECURITY AGREEMENT (PARTNERSHIP INTERESTS)** (this "Agreement") is made as of 29th day of January, 2007, by **TRACY SUTTLES**, an individual residing at 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036 ("Pledgor"), in favor of **MADISON REALTY CAPITAL, L.P.**, its successors and/or assigns, as their interests may appear, having an address at 261 Madison Avenue, 18th Floor, New York, New York 10016 ("Pledgee" or "Lender").

### WITNESSETH:

**WHEREAS**, Pledgor owns a partnership interest (the "Pledged Interest"), in **SE MARINA WAY PARTNERSHIP, LP**, a Texas limited partnership (the "Borrower"), pursuant to the terms of that certain Agreement of Limited Partnership of Borrower dated as of Janauary 29, 2005, as amended by that certain First Amendment to Agreement of Limited Partnership dated January 29, 2007 (as the same from time to time may further be amended or otherwise modified in accordance with this Agreement, hereinafter referred to as the "Partnership Agreement").

**WHEREAS**, Pledgee requires as a condition to entering the Note, Mortgage and Other Security Documents (each, as defined in that certain Mortgage Note dated the date hereof between Borrower and Lender) that Pledgor pledge and grant to Pledgee a security interest in and to all of Pledgor's right, title and interest in and to the Pledged Interest pursuant to the terms and conditions hereof,

**NOW, THEREFORE**, in consideration of the foregoing, and in order to induce the Lender to enter into the Note, Mortgage and Other Security Documents and to induce Lender to lend Borrower the funds contemplated therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor does hereby covenant and agree with, and represent and warrant to, Pledgee, as follows:

1.    **Definitions.** Unless the context otherwise requires, capitalized terms used but not otherwise defined herein shall have the respective meanings provided therefor in the Note, Mortgage or Other Security Documents, and the following terms shall have the following meanings:

"Business Day" has the meaning given such term in the Note.

"Code" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

"Current Percentage Interest" shall have the meaning set forth in Section 4(b) hereof.

"Event of Default" shall have the meaning set forth in Section 8 hereof

"Indemnified Parties" shall have the meaning set forth in Section 18 hereof.

RE\50260\9044\328166v2

MADISON 00218

"IRC" means the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Lien" means any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, deposit arrangement, preference, priority, security interest, or any other encumbrance or charge of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement or similar instrument under the Code or comparable law of any jurisdiction, domestic or foreign, and mechanics', materialmen's and other similar liens and encumbrances.

"Obligations" means all liabilities and obligations of the Borrower to the Lender under the Note, Mortgage and Other Security Documents and all related documents, all interest accrued thereon, any fees due Lender thereunder or hereunder, any expenses incurred by Lender thereunder or hereunder and any and all other liabilities and obligations of the Borrower to the Lender, howsoever created, arising or evidenced, and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, direct or indirect, absolute or contingent, and whether several, joint or joint and several.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pledged Interest" shall have the meaning set forth in the recitals hereof.

"Pledgor's Collateral" shall have the meaning set forth in Section 2 hereof.

"Transfer" shall have the meaning set forth in Section 4(f) hereof.

2.    Grant of Security in Pledgor's Partnership Interest.

(a)    As security for the full and punctual payment of the Obligations when due and payable (whether upon stated maturity, by acceleration or otherwise), Pledgor hereby grants and pledges a continuing lien on and security interest in, and, as a part of such grant and pledge, hereby transfers and assigns to Pledgee as collateral security, all of the following (collectively, the "Pledgor's Collateral") whether now owned or hereafter acquired, now existing or hereafter arising and wherever located: Pledgor's Pledged Interest and all of Pledgor's right, title and interest in and to Borrower, including, without limitation: (i) all of Pledgor's interest in the capital of Borrower and Pledgor's interest in all profits and distributions to which Pledgor shall at any time be entitled in respect of the Pledged Interest; (ii) all of Pledgor's right, title and interest to the assets of Borrower including, without limitation, real property, profits, revenues, operating accounts, account receivables, fixtures, chattels and articles of personal property, (iii) all other payments, if any, due or to become due to Pledgor in respect of the Pledged Interest under or arising out of the Partnership Agreement, whether as contractual obligations, damages, insurance proceeds, condemnation awards or otherwise; (iv) all of Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or

MADISON 00219

arising out of the Partnership Agreement or the ownership of the Pledged Interest pursuant thereto; (v) all present and future claims, if any, of Pledgor against Borrower under or arising out of the Partnership Agreement for monies loaned or advanced, for services rendered or otherwise; (vi) all of Pledgor's rights, if any, in Borrower pursuant to the Partnership Agreement or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of the Pledgor relating to the Pledged Interest, including any power to terminate, cancel or modify the Partnership Agreement, to execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Interest and Borrower, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of Borrower, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and (vii) to the extent not otherwise included, all proceeds of any or all of the foregoing.

(b)     Nothing contained in the foregoing provisions of Section 2(a) shall be deemed or construed to be a limitation on, or waiver by Pledgee of, any of Pledgee's other rights or remedies hereunder or under the Note, Mortgage or Other Security Documents.

3.    Powers of Pledgor Prior to an Event of Default.  Prior to the occurrence of an Event of Default, Pledgor shall be entitled to receive and retain all distributions with respect to the Pledgor's Collateral. Notwithstanding anything contained herein to the contrary, unless an Event of Default shall have occurred and then be continuing, Pledgor shall be entitled to exercise (but only in a manner not inconsistent with the terms hereof or Note, Mortgage or Other Security Documents) the voting, consent, administration, management and other powers, rights and remedies of Pledgor under the Partnership Agreement or otherwise with respect to Pledgor's Collateral.

4.    Representations, Warranties and Covenants of Pledgor.  Pledgor hereby covenants with and represents and warrants to Pledgee as follows:

(a)     The execution and delivery by Pledgor of this Agreement, Pledgor's performance of its obligations hereunder and the creation of the security interests and liens provided for in this Agreement have been duly authorized by all requisite action on the part of Pledgor, including the consent of any Person where required, and will not violate any provision of law, any order of any court or other governmental authority, the Partnership Agreement, or any indenture, agreement or other instrument to which Pledgor or Borrower is a party, or by which Pledgor or Borrower is bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default thereunder, or except as may be provided by this Agreement or Note, Mortgage or Other Security Documents, result in the creation or imposition of any Lien of any nature whatsoever upon any of the property or assets of Pledgor pursuant to, any such indenture, agreement or instrument. Pledgor is not required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any governmental authority or other agency in connection with or as a condition to the execution, delivery or performance of this Agreement.

(b)     Pledgor, as a partner of the Borrower, owns the percentage partnership interest (each such percentage Interest referred to herein as a "Current Percentage Interest") set

MADISON 00220

forth on <u>Exhibit A</u> hereto in and to Borrower pursuant to the terms of the Partnership Agreement, and will at all times hereinafter during the term of this Agreement continue to hold its Current Percentage Interest in Borrower, except as otherwise permitted under the Note, Mortgage or Other Security Documents. Pledgor does not have outstanding any options or rights or other agreements to sell or otherwise transfer all or any portion of the Pledgor's Current Percentage Interest in Borrower.

(c)     Pledgor will defend Pledgee's right, title and interest in and to the Pledgor's Collateral pledged by it pursuant hereto and in which it has granted a security interest pursuant hereto against the claims and demands of all other Persons.

(d)     Pledgor is the legal and beneficial owner of and has good title to the Pledgor's Collateral in which it has granted a security interest pursuant hereto, free and clear of all Liens, claims or security interest of every nature whatsoever, except the security interests created pursuant to this Agreement or expressly agreed to in the Note, Mortgage or Other Security Documents, and has the unqualified right to pledge and grant a security interest in the same as herein provided without the consent of any other Person other than any such consent that has been obtained in writing.

(e)     The Pledged Interest was validly acquired by Pledgor, is fully paid, no sums are currently due in respect thereof and is duly and validly pledged hereunder.

(f)     Except as permitted under the Note, Mortgage or Other Security Documents, Pledgor agrees that Pledgor will not sell, assign, transfer or otherwise dispose of, or mortgage, encumber, assign, pledge or grant a security interest in, the Pledged Interest or any of the Pledgor's Collateral or any interest therein, or suffer or permit any of the foregoing to occur (any of the foregoing is hereinafter sometimes hereinafter referred to as a "<u>Transfer</u>"). Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and such Transfer shall be void and of no force and effect, and upon demand of Pledgee shall forthwith be canceled or satisfied by an appropriate instrument in writing.

(g)     The principal place of business and chief executive office of Pledgor, and the place where Pledgor's records concerning the Pledgor's Collateral are kept, is set forth the preamble of this Agreement. Pledgor will not change such principal place of business or chief executive office or domicile or residence, as the case may be, or remove such records unless Pledgor shall provide Pledgee with written notice thereof within thirty (30) days after such change (but in any event, within the period required pursuant to the Code) and there shall have been taken such action, satisfactory to Pledgee, as may be necessary to maintain the security interest of Pledgee hereunder at all times fully perfected and in full force and effect. Pledgor shall not change its name unless Pledgor shall have given Pledgee written notice thereof within thirty (30) days after the name change (but in any event, within the period required pursuant to the Code) and shall have taken such action, satisfactory to Pledgee, as may be necessary to maintain the security interest of Pledgee in the Pledgor's Collateral granted hereunder at all times fully perfected and in full force and effect.

(h)     Giving effect to the aforesaid grant and assignment to Pledgee, Pledgee has, as of the date of this Agreement, and as to Pledgor's Collateral acquired from time to time

MADISON 00221

after the date hereof, shall have, a valid, perfected and continuing first lien upon and security interest in the Pledgor's Collateral.

(i)    There are no financing statements under the Code covering any or all of the Pledgor's Collateral. Pledgor will not, without the prior written consent of Pledgee, execute and, until payment in full of all of the Obligations there will not ever be on file in any public office, any financing statement or statements covering any or all of the Pledgor Collateral, except financing statements filed or to be filed in favor of Pledgee.

(j)    The Partnership Agreement and this Agreement have been duly executed and delivered by Pledgor and constitute the legal, valid and binding obligations of Pledgor, enforceable in accordance with their respective terms, subject to equitable principles and the laws generally affecting creditors' rights. Pledgor is not in default under or with respect to, nor has any Pledgor received any notice alleging any default that remains uncured under or with respect to, any of Pledgor's obligations under the Partnership Agreement.

(k)    The Partnership Agreement delivered to Pledgee is a true, correct and complete copy of the Partnership Agreement in effect on the date hereof and has not as of the date hereof been modified or amended.

(l)    Pledgor shall not pursue or take any action which may, directly, or indirectly, cause a dissolution or liquidation of any property Borrower now owns or has an interest in or owns or has an interest hereafter.

(m)    Pledgor shall not withdraw as a partner of Borrower or file or pursue or take any action which may, directly or indirectly, cause a dissolution or liquidation of Borrower or seek a partition of any property of Borrower.

(n)    Pledgor will not (i) terminate or agree to terminate the Partnership Agreement, or (ii) amend or modify or agree to amend or modify the Partnership Agreement in contravention of the terms and conditions of this Agreement without Lender's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

(o)    None of the Pledgor's Collateral is, as of the date of this Agreement, nor shall any of Pledgor's Collateral which arises from time to time after the date hereof be, evidenced by any instrument, note or chattel paper, except such as have been or will be endorsed, assigned or pledged and delivered to Pledgee by Pledgor simultaneously with the creation thereof.

(p)    Pledgor shall, at its sole cost and expense, keep and observe, perform and discharge, duly and punctually, all and singular the obligations, terms, conditions, representations and warranties of the Partnership Agreement on the part of Pledgor to be kept, observed, performed and discharged. Pledgor shall hold Pledgee harmless and indemnify Pledgee from and against any liability, loss, claim, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) that Pledgee may incur or sustain by reason of the failure on Pledgor's part to so perform and observe the Partnership Agreement or to satisfy, perform and observe such conditions thereunder.

MADISON 00222

5.    Negative Covenants Concerning Borrower.  Pledgor covenants and agrees that as a partner of Borrower it will not exercise any of the rights under the Partnership Agreement, including, without limitation, any consent rights thereunder, or otherwise so as to cause or allow the Borrower to violate any of the covenants contained in the Note, Mortgage or Other Security Documents or other related documents and shall affirmatively exercise all of the rights of Pledgor to cause compliance with the Note, Mortgage and Other Security Documents.

6.    Distributions.

(a)    Except as otherwise provided in Subsection (d) below and subject to the terms of the Note, Mortgage and Other Security Documents, unless an Event of Default shall have occurred and be continuing, Pledgor at any time may receive and retain all distributions with respect to its interest in the capital or profits or other cash distributions (but specifically excluding liquidating or similar distributions) with respect to the Pledgor's Collateral.

(b)    Upon the occurrence and continuance of any Event of Default, if notwithstanding any prohibition herein or in Note, Mortgage or Other Security Documents, Pledgor shall at any time receive any cash distributions with respect to the Pledged Interest or otherwise pursuant to the Partnership Agreement, all such amounts received by Pledgor shall, immediately upon receipt, be remitted to Pledgee for application to the Obligations in accordance with the Note, Mortgage and Other Security Documents. In the event a non-cash distribution shall be paid or made to Pledgor following the occurrence and during the continuation of any Event of Default, Pledgor shall receive the same in trust for the sole purpose of forthwith delivering the same in kind (appropriately endorsed) to Pledgee, to be added to the Pledgor's Collateral hereunder.

(c)    If Pledgor shall become entitled to receive or shall receive from Borrower, any instrument or certificate evidencing the Pledged Interest, as an addition to, in substitution of, or in exchange for, such Pledged Interest or any part thereof, after and during the continuance of an Event of Default, Pledgor shall hold the same as the agent and in trust for Pledgee, and shall deliver it forthwith to Pledgee in the exact form received, with Pledgor's endorsement or assignment or other instrument as Pledgee may deem appropriate, to be held by Pledgee, subject to the terms hereof, as further Pledgor's Collateral for the Obligations.

(d)    To the extent Pledgor receives any cash distributions in contravention hereof or of the other Credit Documents, Pledgor shall take all necessary actions to cause such distributions to be remitted directly to Pledgee for application to the Obligations to the extent payment thereof is required under the Note, Mortgage or Other Security Documents.

7.    Application of Pledgor's Collateral.  All proceeds of any of Pledgor's Collateral (including, without limitation, any proceeds from the sale of all or any portion of the Pledged Interest, and all distributions, liquidating and otherwise, received by Pledgee in respect of the Pledged Interest) now or at any time hereafter received or retained by Pledgee pursuant to the provisions of this Agreement (including, without limitation, the provisions of Section 9 hereof) shall, after the occurrence and during the continuation of an Event of Default be applied by Pledgee to the Obligations.

REA50260\9044\328166v2

MADISON 00223

8.    Events of Default.  The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Agreement (provided that no Event of Default shall be deemed to exist hereunder until Pledgor has been given five (5) days written notice and opportunity to cure any event which would otherwise constitute an Event of Default):

(a)    The occurrence of an "Event of Default," as such term is defined in the Note, Mortgage and Other Security Documents;

(b)    Any representation or warranty made or given by Pledgor under this Agreement was false or misleading in any material respect when made or deemed made;

(c)    Pledgor's failure to pay any fees, costs or other amounts as and when required to be paid under this Agreement within five (5) days after demand by Pledgee.

(d)    Except with respect to (i) the payment of money and (ii) the matters herein before and hereafter specified in this Section 8, if Pledgor shall default in the observance or performance of any covenant or agreement contained in this Agreement for ten (10) days after the giving by the Pledgee to Pledgor of notice thereof (provided, however, if such default cannot reasonably be cured within such ten (10) day period, then Pledgor shall have such additional time as is reasonable under the circumstances, so long as Pledgor commences such cure within the initial ten (10) day period and diligently and in good faith pursues such cure to completion, provided that in no event shall such additional time period exceed 60 days).

(e)    Any Transfer made by Pledgor in violation of the provisions of Section 4(f) hereof or any breach or violation by any Pledgor of the provisions of Sections 4(n), 4(o) or 5, any of which shall be an immediate Event of Default hereunder without notice or opportunity to cure.

9.    Remedies.  If an Event of Default shall occur and be continuing:

(a)    Pledgee, without obligation to resort to any other security, right or remedy granted under any other agreement or instrument, shall have the right to, in addition to all rights, powers and remedies of a secured party pursuant to the Code, at any time and from time to time, (i) cause any portion or all of the Pledged Interest to be registered in or transferred into the name of Pledgee or into the name of a nominee or nominees, or designee or designees, of Pledgee; and/or (ii) sell, resell, assign and deliver, in its sole discretion, any or all of the Pledgor's Collateral or any other collateral security for the Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash, upon credit or for future delivery, and in connection therewith Pledgee may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Pledgor's Collateral are being purchased for investment only, Pledgor hereby waiving and releasing any and all equity or right of redemption with respect to the Pledgor's Collateral. If all or any of the Pledgor's Collateral is sold by Pledgee upon credit or for future delivery, Pledgee shall not be liable for the failure of the purchaser to purchase or pay for the same, and, in the event of any such failure, Pledgee may resell such Pledgor's Collateral. It is expressly agreed that Pledgee may exercise its rights with respect to less than all of the Pledgor's Collateral, leaving unexercised its rights with respect to the remainder of the Pledgor's Collateral; provided,

MADISON 00224

however, that such partial exercise shall in no way restrict or jeopardize Pledgee's right to exercise its rights with respect to all or any other portion of the Pledgor's Collateral at a later time or times.

(b)    Pledgee may exercise, either by itself or by its nominee or designee, in the name of any Pledgor, the rights, powers and remedies granted to Pledgee in Section 2 hereof in respect of the Partnership Agreement, the Pledged Interest, Borrower and the other Pledgor's Collateral. Such rights and remedies shall include, without limitation, the right to exercise all voting, consent, managerial and other rights relating to the Pledged Interests, whether in Pledgor's name or otherwise, and the right to exercise any or all of the Pledgor' rights, if any, to dissolve Borrower and either continue the business of Borrower or sell or dispose of all or any part of its assets.

(c)    Pledgor hereby irrevocably, in the name of Pledgor, authorizes and empowers Pledgee and assigns and transfers unto Pledgee, and constitutes and appoints Pledgee its true and lawful attorney-in-fact, and as its agent, irrevocably, with full power of substitution for it and in its name during the continuation of an Event of Default, (i) to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor under the Partnership Agreement, including any power to subordinate, terminate, cancel or modify the Partnership Agreement, or to give any notices, or to take any action resulting in such subordination, termination, cancellation or modification, and (ii) in order to more fully vest in Pledgee the rights and remedies provided for herein, to exercise all of the rights, remedies and powers granted to Pledgee in this Agreement, and Pledgor further authorizes and empowers Pledgee, as its attorney-in-fact, and as its agent, irrevocably, with full power of substitution for it and in its name, to (A) give any authorization, to furnish any information, to make any demands, to execute any instruments and to take any and all other action on behalf of and in the name of Pledgor which in the opinion of Pledgee may be necessary or appropriate to be given, furnished, made, exercised or taken under the Partnership Agreement in order to comply therewith, to perform the conditions thereof or to prevent or remedy any default by Pledgor thereunder or to enforce any of Pledgor's rights thereunder, and (B) proceed from time to time in Pledgor's name in any statutory or nonstatutory proceeding affecting any Pledgor's Collateral, and Pledgee or its nominee may (I) execute and file proof of claims for the full amount of any Pledgor's Collateral and vote such claims for the full amount thereof (II) vote for or against proposal or resolution, (III) vote for a trustee or trustees or for a receiver or receivers or for a committee of creditors and/or (IV) vote for the acceptance or rejection of any proposed arrangement, plan or reorganization, composition or extension, and Pledgee or its nominee may receive any payment of distribution and give acquittance therefor and may exchange or release Pledgor's Collateral; and (V) endorse any draft or other instrument for the payment of money, execute releases and negotiate settlements with respect to the Pledgor's Collateral or in any way related thereto. Nothing contained in the foregoing provisions of this Section 9 shall be deemed or construed to be a limitation on, or waiver by Pledgee of, any of the Pledgee's other rights or remedies hereunder or under Note, Mortgage or Other Security Documents. Pledgee shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing. The foregoing powers-of-attorney are irrevocable and coupled with an interest, and any similar or dissimilar powers heretofore given by Pledgor in respect of the Pledged Interest to any other person is hereby revoked. The powers-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms thereof.

- 8 -

RE\50260\9044\328166v2

MADISON 00225

(d)    Pledgee may at such time and from time to time thereafter during the continuation of an Event of Default, without notice to, or assent by, any Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Obligations, in the name of Pledgor or in the name of Pledgee, notify any other party to the Partnership Agreement, if applicable, to make payment and performance directly to Pledgee; extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor, under the Partnership Agreement; file any claims, commence, maintain or discontinue any actions, suits or other proceeding deemed by Pledgee necessary or advisable for the purpose of collecting upon or enforcing the Partnership Agreement; and execute any instrument and do all other things deemed necessary and proper by Pledgee to protect and preserve and realize upon the Pledgor's Collateral and the other rights contemplated hereby.

(e)    Pledgee may at such time and during the continuation of an Event of Default without notice to or assent by Pledgor require that any and distributions, dividends, interest and other payments payable to Pledgor with respect to the Pledged Interest be paid to Pledgee.

(f)    Pursuant to the powers-of-attorney provided for in clause (c) above, Pledgee may take any action and exercise and execute any instrument which it may deem necessary or advisable to accomplish the purposes hereof. Without limiting the generality of the foregoing, after the occurrence and during the continuation of an Event of Default, Pledgee shall have the right and power to receive, endorse and collect all checks and other orders for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Pledgor's Collateral or any part thereof, and for and in the name, place and stead of Pledgor, to execute endorsements, assignments or other instruments of conveyance or transfer in respect of any or all of the Pledged Interest or any other property which is or may become a part of the Pledgor's Collateral hereunder.

(g)    Pledgee may exercise any or all of the rights and remedies of a secured party under the Code.

(h)    Without limiting any other provision of this Agreement, and without waiving or releasing any Pledgor from any obligation or Event of Default, Pledgee shall have the right, but not the obligation, to perform any act or take any appropriate action, as it, in its judgment, may deem necessary to cure such Event of Default or cause any term, covenant, condition or obligation under this Agreement or the Partnership Agreement to be performed or observed by or on behalf of Pledgor to protect the security of the Pledgor's Collateral or this Agreement. All reasonable amounts advanced by or on behalf of Pledgee in exercising its rights under this section (including, but not limited to, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate under the Note from the date of each such advance, shall be payable by Pledgor to Pledgee upon demand and shall be secured by this Agreement.

10.    <u>Sale of Pledgor's Collateral</u>.    To the extent permitted by applicable law, no demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Pledgor's Collateral, except that Pledgee shall give Pledgor at least ten (10) Business Days prior written

- 9 -

MADISON 00226

notice of the time and place of any public sale or of the time and the place where any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable, all other demands, advertisements and notices being hereby waived. To the extent permitted by law, Pledgee shall not be obligated to make any sale of the Pledgor's Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given, and Pledgee may with notice or publication adjourn any public or private sale, and such sale may, with further notice, be made at the time and place to which the same was so adjourned. Upon each private sale of the Pledgor's Collateral of a type customarily sold in a recognized market and upon each public sale, Pledgee (or its nominee or designee) may purchase any or all of the Pledgor's Collateral being sold, free and clear of and discharged from any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released by Pledgor to the extent permitted by law, and may make payment therefor by credit against any of the obligations in lieu of cash or any other obligations. In the case of all sales of the Pledgor's Collateral, public or private, Pledgor will pay all reasonable costs and expenses of every kind for sale or delivery, including, without limitation, brokers and reasonable attorneys' fees and disbursements and any tax imposed thereon. However, the proceeds of sale of Pledgor's Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of sale, Pledgee shall apply any remainder to the payment of the Obligations in such order and priority as Pledgee may determine.

11.    Securities Act of 1933, Etc.  Pledgor recognizes that the Pledged Interest will not be effectively registered under the Securities Act of 1933. Pledgee, in its sole and absolute discretion, is hereby authorized to sell the Pledged Interest or any part thereof by private sale in such manner and under such circumstances as Pledgee may reasonably deem necessary or advisable in order that such sale may legally be effected without registration. Pledgor acknowledges that private sales so made may be at prices and on other terms less favorable to the seller than if such Pledged Interest was sold at public sales, and agrees that Pledgee has no obligation to delay the sale of any such Pledged Interest for such period of time necessary to permit the issuer of such Pledged Interest, even if such issuer would agree, to register such Pledged Interest for public sale under such applicable securities laws. Pledgor agrees that private sales made under the foregoing circumstances shall not, because so made, be deemed to have been made in a commercially unreasonable manner.

12.    Receipt of Sale Proceeds.  Upon any sale of the Pledgor's Collateral, or any portion thereof, by Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of Pledgee or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Pledgor's Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Pledgee or such officer or be answerable in any way for the misapplication or non-application thereof

13.    Waivers; Modifications.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or Note, Mortgage or Other Security Documents, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in writing signed by the party against whose enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

RFA\026\09044\328166v2

- 10 -

MADISON 00227

14.   Remedies Cumulative.  The rights, powers and remedies of Pledgee under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Pledgee may have against Pledgor pursuant to this Agreement or Note, Mortgage or Other Security Documents, or existing at law or in equity or otherwise. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver by Pledgee of one Event of Default shall not be construed to be a waiver of any subsequent Event of Default or to impair any remedy, right or power consequent thereon.

15.   Notices.  Any and all notices given in connection with this Agreement shall be in writing and shall be hand delivered or sent by Federal Express or other reputable courier service, or by registered or certified mail, return receipt requested, and shall be deemed given when received or receipt is refused at the following addresses:

If to Lender/Pledgee:

Madison Realty Capital, L.P.
261 Madison Avenue, 18th Floor
New York, New York 10016
Attention: Julie Breslin

with a copy to:

Rosenberg & Estis, P.C.
733 Third Avenue
New York, NY 10017
Attention:  Michael E. Lefkowitz, Esq.

If to Pledgor:

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

with a copy to:

David A. Hannah
Attorney-at-Law
9639 Judalon Lane
Houston, Texas 77063

Each party may designate a change of address by notice to the other parties, given at least fifteen (15) days before such change of address is to become effective.

16.   Successors and Assigns.  This Agreement and all representations, warranties and covenants of Pledgor made herein shall be binding upon and inure to the benefit of Pledgor and

- 11 -

RE\026\9044\328166v2

its successors and assigns. This Agreement shall be binding upon and shall inure to the benefit of Pledgee and its successors and assigns.

17. <u>Pledgee Not Bound</u>.

(a)     Nothing herein shall be construed to make Pledgee liable as a partner of Borrower, and Pledgee, by virtue of this Agreement or otherwise, shall not have any of the duties, obligations or liabilities as a partner of Borrower. The parties hereto expressly agree that this Agreement shall not be construed as creating a partnership or joint venture between Pledgee and Pledgor.

(b)     The mere execution and delivery of this Agreement shall not be deemed to be evidence of any intention of Pledgee to become a constituent partner of Borrower or a partner of any Pledgor or otherwise be deemed to be a co-venturer with respect to any Pledgor or Borrower; <u>provided</u>, <u>however</u>, that Pledgee may, in Pledgee's sole discretion, during the occurrence and continuance of an Event of Default elect to become a constituent partner in Borrower. Pledgee shall assume none of the duties, obligations or liabilities of a partner of Borrower or any Pledgor unless and until Pledgee actually becomes a constituent partner of Borrower.

(c)     Pledgee shall not be obligated to perform or discharge any obligation of Pledgor as a result of the collateral assignment hereby effected.

(d)     The acceptance of Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate Pledgee to appear in or defend any action or proceeding relating to the Pledgor's Collateral, or to take any action hereunder or thereunder, or to expend any money or incur any expense or perform or discharge any obligation, duty or liability under or with respect to the Pledgor's Collateral.

18. <u>Acts of Pledgee</u>. All Pledgor's Collateral at any time delivered to Pledgee pursuant hereto shall be held by Pledgee subject to the terms, covenants and conditions herein set forth. Neither Pledgee nor any of Pledgee's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Pledgor's Collateral, except for such party's or parties' own gross negligence or willful misconduct. Pledgee shall be entitled to rely in good faith upon any writing or other document, telegram or telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and, with respect to any legal matter, Pledgee may (but shall not be obligated to) rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder. Pledgor hereby agrees to and does hereby indemnify, defend and hold harmless Pledgee and any of Pledgee's directors, officers, agents, employees (collectively, the "<u>Indemnified Parties</u>") from and against any and all claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties and all damages, liabilities, losses, costs and expenses which Pledgee may incur or suffer if it becomes, or is alleged to have become, a partner of Borrower by reason of the operation of this Agreement or Pledgee's exercise of the rights, remedies or powers under or in accordance with the terms hereof or otherwise) and to reimburse, within five (5) business days after written demand therefor, Pledgee for all costs and expenses, including, without limitation, attorneys' fees arising out of or resulting from this Agreement or the exercise by Pledgee of any

- 12 -

MADISON 00229



lawful right or remedy granted to it hereunder, such as operating, selling or disposing of any Pledgor's property, including, without limitation, the Pledged Interest (or any portion thereof), together with interest on such sums at the Default Rate, from the date such expenses were paid by Pledgee to the date of payment to Pledgee of such sums. In any action to enforce this Agreement, the provisions of this Section 18 shall, to the extent permitted by law, prevail notwithstanding any provision of applicable law respecting the recovery of costs, disbursements and allowances to the contrary.

19.    Custody of Pledgor's Collateral; Notice of Exercise of Remedies.  Pledgee shall not have any duty as to the collection or protection of the Pledgor's Collateral or any income thereon or payments with respect thereto, or as to the preservation of any rights pertaining thereto except with respect to any Pledgor's Collateral actually in its possession. Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Pledgee of any rights or powers which it may have or to which it may be entitled with respect to the Pledgor's Collateral.

20.    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

21.    Further Assurances.  Pledgor agrees to do such further acts and things and to execute and deliver to Pledgee such additional conveyances, assignments, agreements and instruments as Pledgee from time to time may require or deem advisable to carry into effect this Agreement or to further assure and confirm unto Pledgee the rights, powers and remedies intended to be granted hereunder or under Note, Mortgage or Other Security Documents; provided, however, that no such further acts and things and conveyances, assignments, agreements and instruments shall increase Pledgor's obligations or shall decrease Pledgor's rights under this Agreement or under the Note, Mortgage or Other Security Documents or increase Pledgee's rights beyond those intended to be granted hereunder or under the Note, Mortgage or Other Security Documents. Pledgor hereby agrees to sign and deliver to Pledgee financing statements, in form acceptable to Pledgee, as Pledgee may from time to time request or as are necessary in the opinion of Pledgee to establish and maintain a valid and perfected security interest in the Pledgor's Collateral and to promptly pay any filing fees relative thereto. Pledgor also authorizes Pledgee, to the extent permitted by law, to file such financing statements (and continuation statements with respect thereto) without the signature of Pledgor and further authorizes Pledgee, to the extent permitted by law, to file a photographic or other reproduction of this Agreement or of a financing statement in lieu of a financing statement.

22.    Headings/Recitals.  The article and/or section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. The recitals are hereby incorporated in this Agreement as if fully set forth herein.

RE\50260\9044\328166v2

MADISON 00230

23.　Governing Law.　This Agreement shall be governed by and construed and enforced in all respects in accordance with the laws of the State of New York without regard to principles of conflict of laws.

24.　Miscellaneous.

(a)　In enforcing any rights hereunder or under the Note, Mortgage or Other Security Documents, Pledgee shall not be required to resort to any particular security, right or remedy through foreclosure or otherwise or to proceed in any particular order or priority, or otherwise act or refrain from acting, and, to the extent permitted by law, Pledgor hereby waiving and releasing any right to a marshaling of assets or a sale in inverse order of alienation.

(b)　Whenever any payment or performance of any Obligation shall be due on a day which is not a Business Day, such payment or performance shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of interest and of the time period within which such payment may be made or performance rendered without an Event of Default occurring hereunder.

[SIGNATURE PAGE FOLLOWS]

- 14 -

MADISON 00231

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of the date first above written.

PLEDGOR:

_____
Tracy Suttles

STATE OF TEXAS      )
                    )   ss.:
COUNTY OF HARRIS    )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

- 15 -

RF:\50260\9044\328166v2

## EXHIBIT A

### SE Marina Way Partnership, LP

| Partner | Partnership Interest |
|---|---|
| Tracy Suttles | 99% |

RE\50260\9044\328166v2

MADISON 00233

## JOINDER BY BORROWER

The undersigned, being the limited liability company whose partnership interests are the subject of the Pledge and Security Agreement (Partnership Interests) of even date herewith hereby acknowledges, agrees and consents to the terms of said Pledge and Security Agreement as of the 2nd day of November, 2006.

SE MARINA WAY PARTNERSHIP, LP

By: SE Marina Way, L.L.C.

By: _____

Name: Tracy Suttles
Title:  Manager

STATE OF TEXAS        )
                                          )   ss.:
COUNTY OF HARRIS   )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of SE Marina Way, L.L.C., general partner of SE Marina Way Partnership, LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

RF:\50260\9044\328166v2

MADISON 00234

# EXHIBIT E

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Madison Realty Capital, L.P.
261 Madison Avenue, 18th Floor
New York, New York 10016
Attention: Julie Breslin

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME **Tracy Suttles** | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS **7500 Bellaire Boulevard, Suite 201** | CITY **Houston** | STATE **TX** | POSTAL CODE **77036** | COUNTRY **USA** |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names ☐ NONE

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b) ☐ NONE

| 3a. ORGANIZATION'S NAME **Madison Realty Capital, L.P.** | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS **261 Madison Avenue, 18th Floor** | CITY **New York** | STATE **NY** | POSTAL CODE **10016** | COUNTRY **USA** |

4. This FINANCING STATEMENT covers the following collateral:

All Debtor's right, title and interest in SE Marina Way Partnership, LP, a Texas limited partnership and all right, title and interest in and to that certain Agreement of Limited Partnership of the partnership dated as of January 29, 2005, as amended by that certain First Amendment to Agreement of Limited Partnership dated January __, 2007 pursuant to a pledge and security agreement executed simultaneously herewith.

| 5. ALTERNATIVE DESIGNATION (if applicable) | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.     Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

TX-SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)     International Association of Commercial Administrators (IACA)

MADISON 00279

# EXHIBIT F

## PLEDGE AND SECURITY AGREEMENT (MEMBERSHIP INTERESTS)

**THIS PLEDGE AND SECURITY AGREEMENT (MEMBERSHIP INTERESTS)** (this "<u>Agreement</u>") is made as of 29th day of January, 2007, by **TRACY SUTTLES**, an individual residing at at 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036 ("<u>Pledgor</u>"), in favor of **MADISON REALT CAPITAL, L.P.**, its successors and/or assigns, as their interests may appear, having an address at 261 Madison Avenue, 18th Floor, New York, New York ("<u>Pledgee</u>" or "<u>Lender</u>").

W I T N E S S E T H :

**WHEREAS,** Pledgor owns a membership interest (the "<u>Pledged Interest</u>"), in **SE MARINA WAY, L.L.C.**, a Texas limited liability company (the "<u>Company</u>"), general partner of **SE WAY PARTNERSHIP, LP** (the "<u>Borrower</u>"), pursuant to the terms of that certain Regulations Agreement of the Company dated as of January 29, 2005 (as the same from time to time may further be amended or otherwise modified in accordance with this Agreement, hereinafter referred to as the "<u>Operating Agreement</u>").

**WHEREAS,** Pledgee requires as a condition to entering the Note, Mortgage and Other Security Documents (each, as defined in that certain Note dated the date hereof between Borrower and Lender) that Pledgor pledge and grant to Pledgee a security interest in and to all of Pledgor's right, title and interest in and to the Pledged Interest pursuant to the terms and conditions hereof.

**NOW, THEREFORE,** in consideration of the foregoing, and in order to induce the Lender to enter into the Note, Mortgage and Other Security Documents and to induce Lender to lend Borrower the funds contemplated therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor does hereby covenant and agree with, and represent and warrant to, Pledgee, as follows:

1.    <u>Definitions</u>.  Unless the context otherwise requires, capitalized terms used but not otherwise defined herein shall have the respective meanings provided therefor in the Note, Mortgage or Other Security Documents, and the following terms shall have the following meanings:

"<u>Business Day</u>" has the meaning given such term in the Note.

"<u>Code</u>" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

"<u>Current Percentage Interest</u>" shall have the meaning set forth in Section 4(b) hereof.

"<u>Event of Default</u>" shall have the meaning set forth in Section 8 hereof

"<u>Indemnified Parties</u>" shall have the meaning set forth in Section 18 hereof.

RF\50260\9044\328166v2

MADISON 00200

"IRC" means the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Lien" means any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, deposit arrangement, preference, priority, security interest, or any other encumbrance or charge of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement or similar instrument under the Code or comparable law of any jurisdiction, domestic or foreign, and mechanics', materialmen's and other similar liens and encumbrances.

"Obligations" means all liabilities and obligations of the Borrower to the Lender under the Note, Mortgage and Other Security Documents and all related documents, all interest accrued thereon, any fees due Lender thereunder or hereunder, any expenses incurred by Lender thereunder or hereunder and any and all other liabilities and obligations of the Borrower to the Lender, howsoever created, arising or evidenced, and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, direct or indirect, absolute or contingent, and whether several, joint or joint and several.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pledged Interest" shall have the meaning set forth in the recitals hereof.

"Pledgor's Collateral" shall have the meaning set forth in Section 2 hereof.

"Transfer" shall have the meaning set forth in Section 4(f) hereof.

2.     Grant of Security in Pledgor's Membership Interest.

(a)     As security for the full and punctual payment of the Obligations when due and payable (whether upon stated maturity, by acceleration or otherwise), Pledgor hereby grants and pledges a continuing lien on and security interest in, and, as a part of such grant and pledge, hereby transfers and assigns to Pledgee as collateral security, all of the following (collectively, the "Pledgor's Collateral") whether now owned or hereafter acquired, now existing or hereafter arising and wherever located:  Pledgor's Pledged Interest and all of Pledgor's right, title and interest in and to the Company, including, without limitation:  (i) all of Pledgor's interest in the capital of Borrower and Pledgor's interest in all profits and distributions to which Pledgor shall at any time be entitled in respect of the Pledged Interest; (ii) all of Pledgor's right, title and interest to the assets of Borrower including, without limitation, real property, profits, revenues, operating accounts, account receivables, fixtures, chattels and articles of personal property, (iii) all other payments, if any, due or to become due to Pledgor in respect of the Pledged Interest under or arising out of the Operating Agreement, whether as contractual obligations, damages, insurance proceeds, condemnation awards or otherwise; (iv) all of Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or

RE\50260\9044\328166v2

MADISON 00201

arising out of the Operating Agreement or the ownership of the Pledged Interest pursuant thereto; (v) all present and future claims, if any, of Pledgor against the Company under or arising out of the Operating Agreement for monies loaned or advanced, for services rendered or otherwise; (vi) all of Pledgor's rights, if any, in the Company pursuant to the Operating Agreement or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of the Pledgor relating to the Pledged Interest, including any power to terminate, cancel or modify the Operating Agreement, to execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Interest and the Company, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of the Company, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and (vii) to the extent not otherwise included, all proceeds of any or all of the foregoing.

(b)    Nothing contained in the foregoing provisions of Section 2(a) shall be deemed or construed to be a limitation on, or waiver by Pledgee of, any of Pledgee's other rights or remedies hereunder or under the Note, Mortgage or Other Security Documents.

3.    <u>Powers of Pledgor Prior to an Event of Default</u>.   Prior to the occurrence of an Event of Default, Pledgor shall be entitled to receive and retain all distributions with respect to the Pledgor's Collateral. Notwithstanding anything contained herein to the contrary, unless an Event of Default shall have occurred and then be continuing, Pledgor shall be entitled to exercise (but only in a manner not inconsistent with the terms hereof or Note, Mortgage or Other Security Documents) the voting, consent, administration, management and other powers, rights and remedies of Pledgor under the Operating Agreement or otherwise with respect to Pledgor's Collateral.

4.    <u>Representations, Warranties and Covenants of Pledgor</u>.   Pledgor hereby covenants with and represents and warrants to Pledgee as follows:

(a)    The execution and delivery by Pledgor of this Agreement, Pledgor's performance of its obligations hereunder and the creation of the security interests and liens provided for in this Agreement have been duly authorized by all requisite action on the part of Pledgor, including the consent of any Person where required, and will not violate any provision of law, any order of any court or other governmental authority, the Operating Agreement, or any indenture, agreement or other instrument to which Pledgor or the Company is a party, or by which Pledgor or the Company is bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default thereunder, or except as may be provided by this Agreement or Note, Mortgage or Other Security Documents, result in the creation or imposition of any Lien of any nature whatsoever upon any of the property or assets of Pledgor pursuant to, any such indenture, agreement or instrument. Pledgor is not required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any governmental authority or other agency in connection with or as a condition to the execution, delivery or performance of this Agreement.

(b)    Pledgor, as a member of the Company, owns the percentage membership interest (each such percentage Interest referred to herein as a "<u>Current Percentage Interest</u>") set

- 3 -

MADISON 00202

forth on Exhibit A hereto in and to the Company pursuant to the terms of the Operating Agreement, and will at all times hereinafter during the term of this Agreement continue to hold its Current Percentage Interest in the Company, except as otherwise permitted under the Note, Mortgage or Other Security Documents. Pledgor does not have outstanding any options or rights or other agreements to sell or otherwise transfer all or any portion of the Pledgor's Current Percentage Interest in the Company.

(c)    Pledgor will defend Pledgee's right, title and interest in and to the Pledgor's Collateral pledged by it pursuant hereto and in which it has granted a security interest pursuant hereto against the claims and demands of all other Persons.

(d)    Pledgor is the legal and beneficial owner of and has good title to the Pledgor's Collateral in which it has granted a security interest pursuant hereto, free and clear of all Liens, claims or security interest of every nature whatsoever, except the security interests created pursuant to this Agreement or expressly agreed to in the Note, Mortgage or Other Security Documents, and has the unqualified right to pledge and grant a security interest in the same as herein provided without the consent of any other Person other than any such consent that has been obtained in writing.

(e)    The Pledged Interest was validly acquired by Pledgor, is fully paid, no sums are currently due in respect thereof and is duly and validly pledged hereunder.

(f)    Except as permitted under the Note, Mortgage or Other Security Documents, Pledgor agrees that Pledgor will not sell, assign, transfer or otherwise dispose of, or mortgage, encumber, assign, pledge or grant a security interest in, the Pledged Interest or any of the Pledgor's Collateral or any interest therein, or suffer or permit any of the foregoing to occur (any of the foregoing is hereinafter sometimes hereinafter referred to as a "Transfer"). Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and such Transfer shall be void and of no force and effect, and upon demand of Pledgee shall forthwith be canceled or satisfied by an appropriate instrument in writing.

(g)    The principal place of business and chief executive office of Pledgor, and the place where Pledgor's records concerning the Pledgor's Collateral are kept, is set forth the preamble of this Agreement. Pledgor will not change such principal place of business or chief executive office or domicile or residence, as the case may be, or remove such records unless Pledgor shall provide Pledgee with written notice thereof within thirty (30) days after such change (but in any event, within the period required pursuant to the Code) and there shall have been taken such action, satisfactory to Pledgee, as may be necessary to maintain the security interest of Pledgee hereunder at all times fully perfected and in full force and effect. Pledgor shall not change its name unless Pledgor shall have given Pledgee written notice thereof within thirty (30) days after the name change (but in any event, within the period required pursuant to the Code) and shall have taken such action, satisfactory to Pledgee, as may be necessary to maintain the security interest of Pledgee in the Pledgor's Collateral granted hereunder at all times fully perfected and in full force and effect.

(h)    Giving effect to the aforesaid grant and assignment to Pledgee, Pledgee has, as of the date of this Agreement, and as to Pledgor's Collateral acquired from time to time

- 4 -

REV5026\09044\328166v2

after the date hereof, shall have, a valid, perfected and continuing first lien upon and security interest in the Pledgor's Collateral.

(i)    There are no financing statements under the Code covering any or all of the Pledgor's Collateral. Pledgor will not, without the prior written consent of Pledgee, execute and, until payment in full of all of the Obligations there will not ever be on file in any public office, any financing statement or statements covering any or all of the Pledgor Collateral, except financing statements filed or to be filed in favor of Pledgee.

(j)    The Operating Agreement and this Agreement have been duly executed and delivered by Pledgor and constitute the legal, valid and binding obligations of Pledgor, enforceable in accordance with their respective terms, subject to equitable principles and the laws generally affecting creditors' rights. Pledgor is not in default under or with respect to, nor has any Pledgor received any notice alleging any default that remains uncured under or with respect to, any of Pledgor's obligations under the Operating Agreement.

(k)    The Operating Agreement delivered to Pledgee is a true, correct and complete copy of the Operating Agreement in effect on the date hereof and has not as of the date hereof been modified or amended.

(l)    Pledgor shall not pursue or take any action which may, directly, or indirectly, cause a dissolution or liquidation of any property the Company now owns or has an interest in or owns or has an interest hereafter.

(m)    Pledgor shall not withdraw as a member of the Company or file or pursue or take any action which may, directly or indirectly, cause a dissolution or liquidation of the Company or seek a partition of any property of the Company.

(n)    Pledgor will not (i) terminate or agree to terminate the Operating Agreement, or (ii) amend or modify or agree to amend or modify the Operating Agreement in contravention of the terms and conditions of this Agreement without Lender's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

(o)    None of the Pledgor's Collateral is, as of the date of this Agreement, nor shall any of Pledgor's Collateral which arises from time to time after the date hereof be, evidenced by any instrument, note or chattel paper, except such as have been or will be endorsed, assigned or pledged and delivered to Pledgee by Pledgor simultaneously with the creation thereof.

(p)    Pledgor shall, at its sole cost and expense, keep and observe, perform and discharge, duly and punctually, all and singular the obligations, terms, conditions, representations and warranties of the Operating Agreement on the part of Pledgor to be kept, observed, performed and discharged. Pledgor shall hold Pledgee harmless and indemnify Pledgee from and against any liability, loss, claim, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) that Pledgee may incur or sustain by reason of the failure on Pledgor's part to so perform and observe the Operating Agreement or to satisfy, perform and observe such conditions thereunder.

MADISON 00204

5. <u>Negative Covenants Concerning the Company</u>. Pledgor covenants and agrees that as a member of the Company it will not exercise any of the rights under the Operating Agreement, including, without limitation, any consent rights thereunder, or otherwise so as to cause or allow the Company to violate any of the covenants contained in the Note, Mortgage or Other Security Documents or other related documents and shall affirmatively exercise all of the rights of Pledgor to cause compliance with the Note, Mortgage and Other Security Documents.

6. <u>Distributions</u>.

(a) Except as otherwise provided in Subsection (d) below and subject to the terms of the Note, Mortgage and Other Security Documents, unless an Event of Default shall have occurred and be continuing, Pledgor at any time may receive and retain all distributions with respect to its interest in the capital or profits or other cash distributions (but specifically excluding liquidating or similar distributions) with respect to the Pledgor's Collateral.

(b) Upon the occurrence and continuance of any Event of Default, if notwithstanding any prohibition herein or in Note, Mortgage or Other Security Documents, Pledgor shall at any time receive any cash distributions with respect to the Pledged Interest or otherwise pursuant to the Operating Agreement, all such amounts received by Pledgor shall, immediately upon receipt, be remitted to Pledgee for application to the Obligations in accordance with the Note, Mortgage and Other Security Documents. In the event a non-cash distribution shall be paid or made to Pledgor following the occurrence and during the continuation of any Event of Default, Pledgor shall receive the same in trust for the sole purpose of forthwith delivering the same in kind (appropriately endorsed) to Pledgee, to be added to the Pledgor's Collateral hereunder.

(c) If Pledgor shall become entitled to receive or shall receive from the Company, any instrument or certificate evidencing the Pledged Interest, as an addition to, in substitution of, or in exchange for, such Pledged Interest or any part thereof, after and during the continuance of an Event of Default, Pledgor shall hold the same as the agent and in trust for Pledgee, and shall deliver it forthwith to Pledgee in the exact form received, with Pledgor's endorsement or assignment or other instrument as Pledgee may deem appropriate, to be held by Pledgee, subject to the terms hereof, as further Pledgor's Collateral for the Obligations.

(d) To the extent Pledgor receives any cash distributions in contravention hereof or of the other Credit Documents, Pledgor shall take all necessary actions to cause such distributions to be remitted directly to Pledgee for application to the Obligations to the extent payment thereof is required under the Note, Mortgage or Other Security Documents.

7. <u>Application of Pledgor's Collateral</u>. All proceeds of any of Pledgor's Collateral (including, without limitation, any proceeds from the sale of all or any portion of the Pledged Interest, and all distributions, liquidating and otherwise, received by Pledgee in respect of the Pledged Interest) now or at any time hereafter received or retained by Pledgee pursuant to the provisions of this Agreement (including, without limitation, the provisions of Section 9 hereof) shall, after the occurrence and during the continuation of an Event of Default be applied by Pledgee to the Obligations.

- 6 -

P E:\502609044\328166v2

MADISON 00205

8.    <u>Events of Default</u>.  The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>" under this Agreement (provided that no Event of Default shall be deemed to exist hereunder until Pledgor has been given five (5) days written notice and opportunity to cure any event which would otherwise constitute an Event of Default):

(a)    The occurrence of an "Event of Default," as such term is defined in the Note, Mortgage and Other Security Documents;

(b)    Any representation or warranty made or given by Pledgor under this Agreement was false or misleading in any material respect when made or deemed made;

(c)    Pledgor's failure to pay any fees, costs or other amounts as and when required to be paid under this Agreement within five (5) days after demand by Pledgee.

(d)    Except with respect to (i) the payment of money and (ii) the matters herein before and hereafter specified in this Section 8, if Pledgor shall default in the observance or performance of any covenant or agreement contained in this Agreement for ten (10) days after the giving by the Pledgee to Pledgor of notice thereof (<u>provided</u>, <u>however</u>, if such default cannot reasonably be cured within such ten (10) day period, then Pledgor shall have such additional time as is reasonable under the circumstances, so long as Pledgor commences such cure within the initial ten (10) day period and diligently and in good faith pursues such cure to completion, provided that in no event shall such additional time period exceed 60 days).

(e)    Any Transfer made by Pledgor in violation of the provisions of Section 4(f) hereof or any breach or violation by any Pledgor of the provisions of Sections 4(n), 4(o) or 5, any of which shall be an immediate Event of Default hereunder without notice or opportunity to cure.

9.    <u>Remedies</u>.  If an Event of Default shall occur and be continuing:

(a)    Pledgee, without obligation to resort to any other security, right or remedy granted under any other agreement or instrument, shall have the right to, in addition to all rights, powers and remedies of a secured party pursuant to the Code, at any time and from time to time, (i) cause any portion or all of the Pledged Interest to be registered in or transferred into the name of Pledgee or into the name of a nominee or nominees, or designee or designees, of Pledgee; and/or (ii) sell, resell, assign and deliver, in its sole discretion, any or all of the Pledgor's Collateral or any other collateral security for the Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash, upon credit or for future delivery, and in connection therewith Pledgee may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Pledgor's Collateral are being purchased for investment only, Pledgor hereby waiving and releasing any and all equity or right of redemption with respect to the Pledgor's Collateral. If all or any of the Pledgor's Collateral is sold by Pledgee upon credit or for future delivery, Pledgee shall not be liable for the failure of the purchaser to purchase or pay for the same, and, in the event of any such failure, Pledgee may resell such Pledgor's Collateral. It is expressly agreed that Pledgee may exercise its rights with respect to less than all of the Pledgor's Collateral, leaving unexercised its rights with respect to the remainder of the Pledgor's Collateral; <u>provided</u>,

RE\50260\9044\328166v2

MADISON 00206

however, that such partial exercise shall in no way restrict or jeopardize Pledgee's right to exercise its rights with respect to all or any other portion of the Pledgor's Collateral at a later time or times.

(b)    Pledgee may exercise, either by itself or by its nominee or designee, in the name of any Pledgor, the rights, powers and remedies granted to Pledgee in Section 2 hereof in respect of the Operating Agreement, the Pledged Interest, the Company and the other Pledgor's Collateral. Such rights and remedies shall include, without limitation, the right to exercise all voting, consent, managerial and other rights relating to the Pledged Interests, whether in Pledgor's name or otherwise, and the right to exercise any or all of the Pledgor' rights, if any, to dissolve the Company and either continue the business of the Company or sell or dispose of all or any part of its assets.

(c)    Pledgor hereby irrevocably, in the name of Pledgor, authorizes and empowers Pledgee and assigns and transfers unto Pledgee, and constitutes and appoints Pledgee its true and lawful attorney-in-fact, and as its agent, irrevocably, with full power of substitution for it and in its name during the continuation of an Event of Default, (i) to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor under the Operating Agreement, including any power to subordinate, terminate, cancel or modify the Operating Agreement, or to give any notices, or to take any action resulting in such subordination, termination, cancellation or modification, and (ii) in order to more fully vest in Pledgee the rights and remedies provided for herein, to exercise all of the rights, remedies and powers granted to Pledgee in this Agreement, and Pledgor further authorizes and empowers Pledgee, as its attorney-in-fact, and as its agent, irrevocably, with full power of substitution for it and in its name, to (A) give any authorization, to furnish any information, to make any demands, to execute any instruments and to take any and all other action on behalf of and in the name of Pledgor which in the opinion of Pledgee may be necessary or appropriate to be given, furnished, made, exercised or taken under the Operating Agreement in order to comply therewith, to perform the conditions thereof or to prevent or remedy any default by Pledgor thereunder or to enforce any of Pledgor's rights thereunder, and (B) proceed from time to time in Pledgor's name in any statutory or nonstatutory proceeding affecting any Pledgor's Collateral, and Pledgee or its nominee may (I) execute and file proof of claims for the full amount of any Pledgor's Collateral and vote such claims for the full amount thereof (II) vote for or against proposal or resolution, (III) vote for a trustee or trustees or for a receiver or receivers or for a committee of creditors and/or (IV) vote for the acceptance or rejection of any proposed arrangement, plan or reorganization, composition or extension, and Pledgee or its nominee may receive any payment of distribution and give acquittance therefor and may exchange or release Pledgor's Collateral; and (V) endorse any draft or other instrument for the payment of money, execute releases and negotiate settlements with respect to the Pledgor's Collateral or in any way related thereto. Nothing contained in the foregoing provisions of this Section 9 shall be deemed or construed to be a limitation on, or waiver by Pledgee of, any of the Pledgee's other rights or remedies hereunder or under Note, Mortgage or Other Security Documents. Pledgee shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing. The foregoing powers-of-attorney are irrevocable and coupled with an interest, and any similar or dissimilar powers heretofore given by Pledgor in respect of the Pledged Interest to any other person is hereby revoked. The powers-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms thereof.

- 8 -

MADISON 00207

(d)    Pledgee may at such time and from time to time thereafter during the continuation of an Event of Default, without notice to, or assent by, any Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Obligations, in the name of Pledgor or in the name of Pledgee, notify any other party to the Operating Agreement, if applicable, to make payment and performance directly to Pledgee; extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor, under the Operating Agreement; file any claims, commence, maintain or discontinue any actions, suits or other proceeding deemed by Pledgee necessary or advisable for the purpose of collecting upon or enforcing the Operating Agreement; and execute any instrument and do all other things deemed necessary and proper by Pledgee to protect and preserve and realize upon the Pledgor's Collateral and the other rights contemplated hereby.

(e)    Pledgee may at such time and during the continuation of an Event of Default without notice to or assent by Pledgor require that any and distributions, dividends, interest and other payments payable to Pledgor with respect to the Pledged Interest be paid to Pledgee.

(f)    Pursuant to the powers-of-attorney provided for in clause (c) above, Pledgee may take any action and exercise and execute any instrument which it may deem necessary or advisable to accomplish the purposes hereof. Without limiting the generality of the foregoing, after the occurrence and during the continuation of an Event of Default, Pledgee shall have the right and power to receive, endorse and collect all checks and other orders for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Pledgor's Collateral or any part thereof, and for and in the name, place and stead of Pledgor, to execute endorsements, assignments or other instruments of conveyance or transfer in respect of any or all of the Pledged Interest or any other property which is or may become a part of the Pledgor's Collateral hereunder.

(g)    Pledgee may exercise any or all of the rights and remedies of a secured party under the Code.

(h)    Without limiting any other provision of this Agreement, and without waiving or releasing any Pledgor from any obligation or Event of Default, Pledgee shall have the right, but not the obligation, to perform any act or take any appropriate action, as it, in its judgment, may deem necessary to cure such Event of Default or cause any term, covenant, condition or obligation under this Agreement or the Operating Agreement to be performed or observed by or on behalf of Pledgor to protect the security of the Pledgor's Collateral or this Agreement. All reasonable amounts advanced by or on behalf of Pledgee in exercising its rights under this section (including, but not limited to, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate under the Note from the date of each such advance, shall be payable by Pledgor to Pledgee upon demand and shall be secured by this Agreement.

10.    <u>Sale of Pledgor's Collateral</u>.  To the extent permitted by applicable law, no demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Pledgor's Collateral, except that Pledgee shall give Pledgor at least ten (10) Business Days prior written

- 9 -

MADISON 00208

notice of the time and place of any public sale or of the time and the place where any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable, all other demands, advertisements and notices being hereby waived. To the extent permitted by law, Pledgee shall not be obligated to make any sale of the Pledgor's Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given, and Pledgee may with notice or publication adjourn any public or private sale, and such sale may, with further notice, be made at the time and place to which the same was so adjourned. Upon each private sale of the Pledgor's Collateral of a type customarily sold in a recognized market and upon each public sale, Pledgee (or its nominee or designee) may purchase any or all of the Pledgor's Collateral being sold, free and clear of and discharged from any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released by Pledgor to the extent permitted by law, and may make payment therefor by credit against any of the obligations in lieu of cash or any other obligations. In the case of all sales of the Pledgor's Collateral, public or private, Pledgor will pay all reasonable costs and expenses of every kind for sale or delivery, including, without limitation, brokers and reasonable attorneys' fees and disbursements and any tax imposed thereon. However, the proceeds of sale of Pledgor's Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of sale, Pledgee shall apply any remainder to the payment of the Obligations in such order and priority as Pledgee may determine.

11.    Securities Act of 1933, Etc. Pledgor recognizes that the Pledged Interest will not be effectively registered under the Securities Act of 1933. Pledgee, in its sole and absolute discretion, is hereby authorized to sell the Pledged Interest or any part thereof by private sale in such manner and under such circumstances as Pledgee may reasonably deem necessary or advisable in order that such sale may legally be effected without registration. Pledgor acknowledges that private sales so made may be at prices and on other terms less favorable to the seller than if such Pledged Interest was sold at public sales, and agrees that Pledgee has no obligation to delay the sale of any such Pledged Interest for such period of time necessary to permit the issuer of such Pledged Interest, even if such issuer would agree, to register such Pledged Interest for public sale under such applicable securities laws. Pledgor agrees that private sales made under the foregoing circumstances shall not, because so made, be deemed to have been made in a commercially unreasonable manner.

12.    Receipt of Sale Proceeds. Upon any sale of the Pledgor's Collateral, or any portion thereof, by Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of Pledgee or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Pledgor's Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Pledgee or such officer or be answerable in any way for the misapplication or non-application thereof

13.    Waivers; Modifications. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or Note, Mortgage or Other Security Documents, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in writing signed by the party against whose enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

REV5026009044\328166v2

MADISON 00209

14.   Remedies Cumulative.  The rights, powers and remedies of Pledgee under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Pledgee may have against Pledgor pursuant to this Agreement or Note, Mortgage or Other Security Documents, or existing at law or in equity or otherwise. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver by Pledgee of one Event of Default shall not be construed to be a waiver of any subsequent Event of Default or to impair any remedy, right or power consequent thereon.

15.   Notices.  Any and all notices given in connection with this Agreement shall be in writing and shall be hand delivered or sent by Federal Express or other reputable courier service, or by registered or certified mail, return receipt requested, and shall be deemed given when received or receipt is refused at the following addresses:

If to Lender/Pledgee:

Madison Realty Capital, L.P.
261 Madison Avenue, 18th Floor
New York, New York 10016
Attention: Julie Breslin

with a copy to:

Rosenberg & Estis, P.C.
733 Third Avenue
New York, NY 10017
Attention:  Michael E. Lefkowitz, Esq.

If to Pledgor:

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

with a copy to:

David A. Hannah
Attorney-at-Law
9639 Judalon Lane
Houston, Texas 77063

Each party may designate a change of address by notice to the other parties, given at least fifteen (15) days before such change of address is to become effective.

16.   Successors and Assigns.  This Agreement and all representations, warranties and covenants of Pledgor made herein shall be binding upon and inure to the benefit of Pledgor and

- 11 -

MADISON 00210

its successors and assigns. This Agreement shall be binding upon and shall inure to the benefit of Pledgee and its successors and assigns.

17.    Pledgee Not Bound.

(a)    Nothing herein shall be construed to make Pledgee liable as a member of the Company, and Pledgee, by virtue of this Agreement or otherwise, shall not have any of the duties, obligations or liabilities as a member of the Company. The parties hereto expressly agree that this Agreement shall not be construed as creating a membership or joint venture between Pledgee and Pledgor.

(b)    The mere execution and delivery of this Agreement shall not be deemed to be evidence of any intention of Pledgee to become a constituent member of the Company or a member of any Pledgor or otherwise be deemed to be a co-venturer with respect to any Pledgor or the Company; provided, however, that Pledgee may, in Pledgee's sole discretion, during the occurrence and continuance of an Event of Default elect to become a constituent member in the Company. Pledgee shall assume none of the duties, obligations or liabilities of a member of the Company or any Pledgor unless and until Pledgee actually becomes a constituent member of the Company.

(c)    Pledgee shall not be obligated to perform or discharge any obligation of Pledgor as a result of the collateral assignment hereby effected.

(d)    The acceptance of Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate Pledgee to appear in or defend any action or proceeding relating to the Pledgor's Collateral, or to take any action hereunder or thereunder, or to expend any money or incur any expense or perform or discharge any obligation, duty or liability under or with respect to the Pledgor's Collateral.

18.    Acts of Pledgee.    All Pledgor's Collateral at any time delivered to Pledgee pursuant hereto shall be held by Pledgee subject to the terms, covenants and conditions herein set forth. Neither Pledgee nor any of Pledgee's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Pledgor's Collateral, except for such party's or parties' own gross negligence or willful misconduct. Pledgee shall be entitled to rely in good faith upon any writing or other document, telegram or telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and, with respect to any legal matter, Pledgee may (but shall not be obligated to) rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder. Pledgor hereby agrees to and does hereby indemnify, defend and hold harmless Pledgee and any of Pledgee's directors, officers, agents, employees (collectively, the "Indemnified Parties") from and against any and all claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties and all damages, liabilities, losses, costs and expenses which Pledgee may incur or suffer if it becomes, or is alleged to have become, a member of the Company by reason of the operation of this Agreement or Pledgee's exercise of the rights, remedies or powers under or in accordance with the terms hereof or otherwise) and to reimburse, within five (5) business days after written demand therefor, Pledgee for all costs and expenses, including, without limitation, attorneys' fees arising out of or resulting from this Agreement or the exercise by

- 12 -

RF\50260\9044\328166v2

Pledgee of any lawful right or remedy granted to it hereunder, such as operating, selling or disposing of any Pledgor's property, including, without limitation, the Pledged Interest (or any portion thereof), together with interest on such sums at the Default Rate, from the date such expenses were paid by Pledgee to the date of payment to Pledgee of such sums. In any action to enforce this Agreement, the provisions of this Section 18 shall, to the extent permitted by law, prevail notwithstanding any provision of applicable law respecting the recovery of costs, disbursements and allowances to the contrary.

19.     Custody of Pledgor's Collateral: Notice of Exercise of Remedies.  Pledgee shall not have any duty as to the collection or protection of the Pledgor's Collateral or any income thereon or payments with respect thereto, or as to the preservation of any rights pertaining thereto except with respect to any Pledgor's Collateral actually in its possession. Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Pledgee of any rights or powers which it may have or to which it may be entitled with respect to the Pledgor's Collateral.

20.     Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

21.     Further Assurances.  Pledgor agrees to do such further acts and things and to execute and deliver to Pledgee such additional conveyances, assignments, agreements and instruments as Pledgee from time to time may require or deem advisable to carry into effect this Agreement or to further assure and confirm unto Pledgee the rights, powers and remedies intended to be granted hereunder or under Note, Mortgage or Other Security Documents; provided, however, that no such further acts and things and conveyances, assignments, agreements and instruments shall increase Pledgor's obligations or shall decrease Pledgor's rights under this Agreement or under the Note, Mortgage or Other Security Documents or increase Pledgee's rights beyond those intended to be granted hereunder or under the Note, Mortgage or Other Security Documents. Pledgor hereby agrees to sign and deliver to Pledgee financing statements, in form acceptable to Pledgee, as Pledgee may from time to time request or as are necessary in the opinion of Pledgee to establish and maintain a valid and perfected security interest in the Pledgor's Collateral and to promptly pay any filing fees relative thereto. Pledgor also authorizes Pledgee, to the extent permitted by law, to file such financing statements (and continuation statements with respect thereto) without the signature of Pledgor and further authorizes Pledgee, to the extent permitted by law, to file a photographic or other reproduction of this Agreement or of a financing statement in lieu of a financing statement.

22.     Headings/Recitals.  The article and/or section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. The recitals are hereby incorporated in this Agreement as if fully set forth herein.

RE\50260\9044\328166v2

MADISON 00212

23. <u>Governing Law</u>. This Agreement shall be governed by and construed and enforced in all respects in accordance with the laws of the State of New York without regard to principles of conflict of laws.

24. <u>Miscellaneous</u>.

(a)    In enforcing any rights hereunder or under the Note, Mortgage or Other Security Documents, Pledgee shall not be required to resort to any particular security, right or remedy through foreclosure or otherwise or to proceed in any particular order or priority, or otherwise act or refrain from acting, and, to the extent permitted by law, Pledgor hereby waiving and releasing any right to a marshaling of assets or a sale in inverse order of alienation.

(b)    Whenever any payment or performance of any Obligation shall be due on a day which is not a Business Day, such payment or performance shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of interest and of the time period within which such payment may be made or performance rendered without an Event of Default occurring hereunder.

[SIGNATURE PAGE FOLLOWS]

RE\50260\9044\328166v2

MADISON 00213

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of the date first above written.

PLEDGOR:

_____
Tracy Suttles

STATE OF TEXAS    )
                  ) ss.:
COUNTY OF HARRIS  )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

BRAD EDWARD PORTER
Notary Public, State of Texas
My Commission Expires
February 21, 2010

_____
Notary Public

RL\502\60\9044\328166v2

MADISON 00214



# EXHIBIT A

## SE Marina Way, L.L.C.

| Member | Membership Interest |
|--------|---------------------|
| Tracy Suttles | 100% |

R E:\50260\9044\328166v2

MADISON 00215



## JOINDER BY COMPANY

The undersigned, being the limited liability company whose membership interests are the subject of the Pledge and Security Agreement (Membership Interests) of even date herewith hereby acknowledges, agrees and consents to the terms of said Pledge and Security Agreement as of the 29th day of January, 2007.

SE Marina Way, L.L.C.

By: _____
    Name: Tracy Suttles
    Title:  Manager and Sole Member

STATE OF TEXAS      )
                    )  ss.:
COUNTY OF HARRIS    )

On the 29th day of January, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager and sole member of SE Marina Way, L.L.C., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

> BRAD EDWARD PORTER
> Notary Public, State of Texas
> My Commission Expires
> February 21, 2010

RLI\5026\9044\328166v2

MADISON 00216

# EXHIBIT G

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Madison Realty Capital, L.P.
261 Madison Avenue, 18th Floor
New York, New York 10016
Attention: Julie Breslin

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **SE Marina Way Partnership, LP** | | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **7500 Bellaire Boulevard, Suite 201** | **Houston** | | **TX** | **77036** | **USA** |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION **Ltd. Partnership** | 1f. JURISDICTION OF ORGANIZATION **Texas** | | 1g. ORGANIZATIONAL ID #, if any |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names    ☐ NONE

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | | 2g. ORGANIZATIONAL ID #, if any |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)    ☐ NONE

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **Madison Realty Capital, L.P.** | | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **261 Madison Avenue, 18th Floor** | **New York** | | **NY** | **10016** | **USA** |

4. This FINANCING STATEMENT covers the following collateral:

All those types of property described on Schedule B attached hereto and by this reference made a part hereof.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

**TX-SOS**

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)    International Association of Commercial Administrators (IACA)

MADISON 00242

# UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME

OR | **SE Marina Way Partnership, LP**

9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX

10. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME

OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any

12. | ADDITIONAL SECURED PARTY'S or | ASSIGNOR S/P'S NAME - insert only one name (12a or 12b) | NONE

12a. ORGANIZATION'S NAME

OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

13. This FINANCING STATEMENT covers [ ] timber to be cut or [ ] as-extracted collateral, or is filed as a [ ] fixture filing.

14. Description of real estate:

16. Additional collateral description:

**See Schedule A**

**County: Galveston**

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.

Debtor is a [ ] Trust or [ ] Trustee acting with respect to property held in trust or [ ] Decedent's Estate

18. Check only if applicable and check only one box.

[ ] Debtor is a TRANSMITTING UTILITY

[ ] Filed in connection with a Manufactured-Home Transaction — effective 30 years

[ ] Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)    International Association of Commercial Administrators (IACA)

MADISON 00243

## SCHEDULE B

### TO UCC FINANCING STATEMENT BETWEEN SE MARINA WAY PARTNERSHIP, LP, AS DEBTOR, AND MADISON REALTY CAPITAL, L.P., ITS SUCCESSORS AND/OR ASSIGNS, AS THEIR INTERESTS MAY APPEAR, AS SECURED PARTY

The following described land, interests in land, estates, easements, rights, appurtenances, buildings, improvements, fixtures, furniture and appliances and other personal property (hereinafter all of the foregoing are sometimes collectively referred to as the "Mortgaged Property"; as used herein, the term "Borrower" shall mean "Debtor" and the term "Lender" shall mean "Secured Party", and any other terms not herein defined shall have the definitions set forth in that certain Deed of Trust and Security Agreement (the "Instrument") from Debtor to or for the benefit of Secured Party conveying the Premises):

(a)    that tract or parcel of land more particularly described in **Schedule A** attached to the within Financing Statement and by this reference made a part hereof (the "Premises");

(b)    all buildings and other structures and improvements now or hereafter located on the Premises (the "Improvements");

(c)    all of the estate, right, title, claim or demand of any nature whatsoever of Borrower, either in law or in equity, in possession or expectancy, in and to the Premises and Improvements or any part thereof;

(d)    all easements, rights-of-way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, and appurtenances, reversion or reversions, remainder or remainders of any nature whatsoever, in any way belonging, relating or pertaining to the Premises (including, without limitation, any and all development rights, air rights or similar or comparable rights of any nature whatsoever now or hereafter appurtenant to the Premises or now or hereafter transferred to the Premises) and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Premises to the center line thereof;

(e)    all machinery, apparatus, equipment, fittings, fixtures and other property of every kind and nature whatsoever and all additions thereto and renewals and replacements thereof, and all substitutions therefor now owned or hereafter acquired by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon or in, or attached to, any portion of the Premises and Improvements, or appurtenances thereto, and used or usable in connection with the present or future operation and occupancy of the Premises and Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises and Improvements (collectively, the "Equipment") (other than fixtures, equipment, machinery or other property of tenants under any lease of or rental agreement for space in the premises and Improvements), including the interest of Borrower in all of the

RE:\02600\9044\328076v1

MADISON 00244

aforesaid which are subject to lease agreements or other service contracts (but excluding the interest of the lessor or owner of such items), and including all extensions, additions, improvements, betterments, after-acquired property, renewals, replacements and substitutions, or proceeds from a sale of any of the foregoing, and the right, title and interest. of Borrower in and to any of the Equipment which may be subject to any security agreements (as defined in the Uniform Commercial Code of the State in which the Premises and Improvements are located; the "Uniform Commercial Code"), superior in lien to the lien of the Instrument and all proceeds and products of any of the above, and all inventory, accounts, chattel paper, documents, equipment, fixtures, farm products, consumer goods and general intangibles constituting proceeds acquired with cash proceeds of any of the property described hereinabove, all of which are hereby declared and shall be deemed to be fixtures and accessions to, and a part of, the Premises and Improvements as between the parties hereto and all persons claiming by, through or under them, and which shall be deemed to be a portion of the security for the indebtedness herein described and to be secured by the Instrument;

(f)     subject to the terms and conditions of the Instrument, all awards or payments, including interest thereon, and the right to receive the same, which may be made with respect to the Premises, Improvements and Equipment, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of said right), for a change in grade or for any other injury to or decrease in the value of the Premises and Improvements and the reasonable attorneys' fees, costs and disbursements incurred by Lender in connection with the collection of such award or payment;

(g)     the interest of the owner of the Mortgaged Property in and to all leases and other agreements affecting the use or occupancy of the Premises and Improvements or any part thereof now or hereafter entered into (including any such agreements entered into after filing by or against Borrower of a petition for relief under 11 U.S.C Section 101 et seq. (the "Bankruptcy Code"), as the same may be amended from time to time) (the "Leases") and absolutely presently the right to receive and apply the income, rents, issues, cash collateral, revenues, royalties, benefits and profits of the Premises and Improvements from time to time accruing, including, without limitation, all payments under Leases or tenancies, proceeds of insurance, additional rents, lease termination fees, tenant security deposits and escrow funds paid or accruing before or after the filing by or against Borrower of a petition for relief under the Bankruptcy Code (the "Rents") to the payment of the Debt; reserving only the right, power and authority given to Borrower as a licensee to collect and apply the same prior to the occurrence of a Default under the Instrument and so long as the same are not subjected to garnishment, levy, attachment or lien;

(h)     subject to the terms and conditions of the Instrument, all proceeds of and any unearned premiums on any insurance policies covering the Premises and Improvements (whether or not such policies are specifically required hereunder and/or the requirement for such policies had been theretofore waived or deferred by Lender), including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Premises and improvements;

(i)     the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Premises and Improvements and to

MADISON 00245

commence any action or proceeding to protect the interest of Lender in the Premises and Improvements; and

(j)     all refunds, rebates or credits in connection with the reduction of Taxes (hereinafter defined) as a result of tax certiorari or any applications or proceedings for deduction;

(k)     all trade names, trademarks, service marks, logos, copyrights, goodwill, books and records and other general intangibles specific to or used in connection with the operation of the Mortgaged Property; and

(l)     all and singular the rights, members and appurtenances whatsoever, in any way belonging, relating or appertaining to any of the Premises and Improvements hereinabove mentioned or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Borrower.

MADISON 00246

# SCHEDULE A

DESCRIPTION OF RESERVE "A-1", OF MARINA ON THE LAKE SUBDIVISION, A SUBDIVISION IN GALVESTON COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 18, PAGE 77 OF THE MAP RECORDS IN THE OFFICE OF THE COUNTY CLERK OF GALVESTON COUNTY, TEXAS; SAVE AND EXCEPT FROM SAID RESERVE "A-1" THAT PART OF RESERVE "A-1" RE-PLATTED AS MARINA DEL SOL BY MAP OR PLAT RECORDED IN VOLUME 18, PAGE 160, OF THE MAP RECORDS IN SAID COUNTY CLERKS OFFICE, THE PROPERTY HEREIN DESCRIBED (BEING THE PORTION OF RESERVE "A-1" WHICH WAS NOT RE-PLATTED AS MARINA DEL SOL) IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at a 1/2" iron rod found in the Southerly right-of-way line of Twin Oaks Boulevard (based on a 90.00 foot wide right of way, said iron rod also being the Northwesterly corner of Lot 1, Reserve "H" of Marina Del Sol subdivision, as recorded in Volume 18, Page 160, in the Office of the County Clerk of Galveston County, Texas;

THENCE S18°54'06"E, along the Westerly line of said Lot 1, a distance of 232.22 feet to an "X" found in concrete for corner said "X" also being the Southwesterly corner of said Lot 1;

THENCE N72°11'28"E, along the Southerly line of Lots 1 thru 8 of said RESERVE "H", a distance of 677.25 feet to a 3/8" iron rod found for corner, said iron rod being the Southeasterly corner of Lot 8 of said Reserve "H", and lying in the Westerly line of Lot 9, of Reserve "G" of said Marina Del Sol subdivision,

THENCE S33°41'00"E, along the Southwesterly line of Lots 10, 11 and 12 of said Reserve "G", a distance of 320.00 feet to a 1/2" iron rod found for corner, said iron rod being the Southwesterly corner of said Lot 12;

THENCE N83°08'00"E, along the Southerly line of said Lot 12, a distance of 84.00 feet to a 1/2" iron rod found for corner in said the Southerly line of Reserve "A" of said Marina Del Sol subdivision,

THENCE, along the Southerly line of said Reserve "A", the following calls. S77°17'29"E, a distance of 36.60 feet to a 1/2" iron rod found for corner; N77°28'32"E, a distance of 41.66 feet to a found "X" for corner; N63°59'16"E, a distance of 30.97 feet to a fence post for corner, said point being the most Easterly corner of said Reserve "A-1";

THENCE S00°01'56"E, along the most Easterly line of said Reserve "A-1", a distance of 307.64 feet to a point for corner in the Northerly line of Reserve "F" of said Marina Del Sol subdivision,

THENCE N75°42'18"W, along the Northerly line of said Reserve "F", a distance of 19.98 feet to a found 1/2" iron rod found for corner,

MADISON 00247


THENCE S81°5'6'59"W, continuing along the Northerly line of said Reserve "F", a distance of 129.61 feet to a found 1/2" iron rod for corner;

THENCE S68°0'5'07"W, continuing along said Northerly line, a distance of 50.94 feet to a point for corner;

THENCE S07°4'5'00"E, a distance of 47.62 feet to a nail found in a piling for corner in the interior North line of said Reserve "F",

THENCE S72°1'1'28"W, along the interior North line of said Reserve "F", the North line of Reserve "E" of Marina Del Sol subdivision, and the interior North line of Reserve "T", Phase I of Marina On The Lake Subdivision, a distance of 764.89 feet to a point for corner;

THENCE N27°4'5'53"W, a distance of 31.39 feet to a found 5/8" iron rod for corner, said corner being the most Northerly corner of said Reserve "T",

THENCE, along the Northerly and Northwesterly line of said RESERVE "T", the following bearings and distances: S60°09'00"W, a distance of 52.01 feet to a 5/8" iron rod found for corner, S35°30'00"W, a distance of 63.00 feet to a 1/2" iron rod found for corner, S11°43'00"W, a distance of 89.00 feet to a 1/2" iron rod found for corner, S45°02'00"W, a distance of 37.43 feet to a 1/2" iron rod found for corner in the Easterly line of Twin Oaks Subdivision,

THENCE N18°55'28"W, along the Easterly line of said Twin Oaks Subdivision, a distance of 358.57 feet to a 5/8" iron rod found for corner, said iron rod also being the Southwesterly corner of Reserve "C" of said Marina Del Sol subdivision,

THENCE N79°31'00"E, along the Southerly line of said Reserve "C", a distance of 33.19 feet to a 1/2" iron rod found for corner,

THENCE S55°00'00"E, continuing along the Southerly line of said RESERVE "C", a distance of 35.00 feet to a 5/8" iron rod found for corner, said iron rod being the Northwesterly corner of RESERVE "B" of Marina Del Sol subdivision;

THENCE S20°33'00"E, along the Westerly line of said Reserve "B", a distance of 106.95 feet to a 3/8" iron rod found for corner, said iron rod being the Southwesterly corner of said Reserve "B",

THENCE N79°56'00"E, along the Southerly line of said Reserve "B", a distance of 121.31 feet to a found "X" being the Southeasterly corner of said Reserve "B",

THENCE N11°53'30"W, along the Easterly line of said Reserve "B", a distance of 64.98 feet to a 5/8" iron rod found for corner,

THENCE N20°58'36"E, continuing along the Easterly line of said RESERVE "B", a distance of 79.55 feet to a point for corner, said iron rod being the Northeasterly corner of said Reserve "B", and the Southeasterly corner of Reserve "C" of said Marina Del Sol subdivision,



THENCE N18°54'08"W, along the Easterly line of said Reserve "C" and Reserve "D" of said Marina Del Sol subdivision, a distance of 633 11 feet to an "X" found in concrete for a point of curvature;

THENCE, along a curve to the left, having a radius of 25.00 feet, a central angle of 120°01'30", an arc length of 52 37 feet, a chord bearing of N78°54'53"W and a chord distance of 43 31 feet to a 3/8" iron rod found for corner in the Northerly line of said Reserve "D", same being the Southerly right-of-way line of said Twin Oaks Boulevard,

THENCE, along the Southerly right-of-way line of said Twin Oaks Boulevard, being a non-tangent curve to the right, having a radius of 123.99 feet, a central angle of 37°37'56", an arc length of 81.43 feet, a chord bearing of N59°53'11"E and a chord distance of 79.98 feet to an "X" found in concrete for a point of tangency;

THENCE N78°42'00"E, continuing along the Southerly right-of-way line of said Twin Oaks Boulevard, a distance of 34.36 feet to the Place Of Beginning.

MADISON 00249

# EXHIBIT H

# CASH MANAGEMENT AGREEMENT

THIS CASH MANAGEMENT AGREEMENT (this "Agreement") dated as of January 29, 2007 by and among **SE MARINA WAY PARTNERSHIP, LP**, a Texas limited partnership (the "Borrower"), **TRACY SUTTLES**, (the "Manager") and **MADISON REALTY CAPITAL, L.P.**, a Delaware limited partnership, its successors and/or assigns, as their interests may appear (the "Lender").

## WITNESSETH

WHEREAS, the Lender is providing financing (the "Loan") to the Borrower, secured by a Deed of Trust ("Mortgage"), Assignment of Leases and Rents and Other Security Documents (as defined in the Mortgage) dated of even date herewith (as same may hereafter be amended, consolidated, modified or severed from time to time, collectively the "Security Instruments") by the Borrower in favor of the Lender, encumbering the property or properties owned by the Borrower and described in the Security Instruments (the "Property");

WHEREAS, at any time during a Sweep Period (as defined below), the Lender may deliver to the Borrower's bank or banks (the "Clearing Bank") maintaining the operating account or accounts of the Borrower (the "Property Account") a Clearing Bank Instruction Letter in the form attached as <u>Exhibit A</u> hereto (together with any modifications, amendments or replacements thereof, the "Instruction Letter"), which provides that all Rents (as defined in the Security Instruments) be deposited in the account named therein (upon delivery of the Instruction Letter, a "Clearing Account") and swept periodically into the accounts established hereunder;

NOW THEREFORE, in consideration of the mutual premises contained herein and for Ten Dollars ($10.00) and other good and valuable consideration the sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Defined Terms.

    a)    Capitalized terms used and not defined herein shall have the respective meanings given to such terms in the Note or, if not defined therein, the Security Instruments, except that the following capitalized terms shall have the respective meanings set forth below:

"Account Proceeds" shall mean any and all Rents and other revenue in connection with any Property that is deposited by any Clearing Bank, the Borrower, the Manager or otherwise into the Cash Collateral Account from time to time.

"Business Day" shall mean any day other than a Saturday, Sunday or any day on which commercial banks in the State in which either the Property or the Deposit Bank is located are authorized or required to be closed.

"Cash Collateral Account" shall mean, collectively, (i) the Subaccounts (as defined in Section 2(b)(i) hereof) and (ii) the Escrow Fund.

"Certificates" means the securities issued in connection with a securitization of the Loan.

RE:50260\9044\328166v2

"Deposit Bank" shall mean the bank or banks selected by the Lender to maintain the Cash Collateral Account.

"Eligible Account": Either (i) an account or accounts maintained with an Eligible Bank or (ii) a Trust Account. Eligible Accounts may bear interest.

"Eligible Bank" shall mean a bank that insures the deposits hereunder through the Federal Deposit Insurance Corporation.

"Escrow Fund" shall mean those funds set forth in Section 6 of the Mortgage, which shall be deposited and held in an account at the Deposit Bank upon an Event of Default by Borrower.

"Mortgage Satisfaction Event" shall mean either (a) the satisfaction in full of the Obligations, or (b) the defeasance of the entire outstanding principal balance of the Note in accordance with the terms thereof.

"Note" shall mean that certain Note of even date herewith, made by the Borrower in favor of the Lender and evidencing the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Obligations" shall mean any and all debt, liabilities and obligations of the Borrower to the Lender pursuant to or in connection with the Loan, including without limiting the generality of the foregoing, the indebtedness evidenced by the Note and any and all debt, liabilities and obligations of the Borrower under the Security Instruments.

"Permitted Investments" shall mean any investment suitable for the investment of escrows and reserves established under mortgage loans in Lender's reasonable discretion.

"Person" shall mean any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national, federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Servicer" shall mean a servicer or account administrator of the Lender, if any, designated by and acting for the benefit of the Lender.

"Sweep Period" shall mean the following: the period of time commencing on the occurrence of an Event of Default (as defined in the Security Instruments, provided that no Event of Default shall be deemed to have occurred hereunder until Lender has given borrower ten (10) days written notice and opportunity to cure any event which would otherwise be a default) and ending on the occurrence of a Mortgage Satisfaction Event.

"Trust Account" shall mean a segregated trust account maintained by a corporate trust department of a federal depository institution or a state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(B) which has corporate trust powers and is acting in its fiduciary capacity.

RE:50260\9044\328166v2

MADISON 00166

b)      The meanings given to capitalized terms defined herein shall be equally applicable in both singular and plural forms of such terms.

2.      Establishment of the Cash Collateral Account.

a)      At any time during the continuance of a Sweep Period, the Lender shall have the right, at its option, to establish and maintain the Cash Collateral Account at the Deposit Bank as one or more separate deposit accounts (which may be a Trust Account(s)), which shall be entitled "[LENDER] as Mortgagee of [BORROWER] Cash Collateral Account". The Lender shall have the right to cause Deposit Bank to entitle the Cash Collateral Account with such other designation as the Lender may select in its reasonable discretion. The Lender shall cause the Deposit Bank to deposit into the Cash Collateral Account all Revenues (as defined in the related Instruction Letter) from the Property and any other amounts transferred to the Deposit Bank from the Clearing Bank pursuant to the terms of each Instruction Letter. The Cash Collateral Account shall be an Eligible Account. Borrower acknowledges that the Deposit Bank may be affiliated with the Lender and/or the Servicer.

b)      The Cash Collateral Account shall be assigned the federal tax identification number of the Borrower.

(i)      The Cash Collateral Account may contain subaccounts maintained on a ledger-entry basis ("the "Subaccounts"). The Subaccounts may consist of a monthly debt service subaccount, Escrow Fund subaccounts, Borrower remainder subaccounts and/or related reserve accounts previously established under the Security Instruments. Amounts allocated to the Subaccounts shall be disbursed in accordance with the terms of the Security Instruments, the Note and the Disbursement Instructions (as defined below).

c)      (i)      At any time during a Sweep Period, the Lender may deliver one or more executed Instruction Letters to the Clearing Bank. The Borrower hereby agrees that if the bank, bank location or account number of the Property Account (as defined in the Clearing Bank Instruction letter) is changed prior to a Sweep Period, the Borrower will promptly execute a new letter substantially similar to the Instruction Letter with respect to such new bank, bank location or account number and deliver such new Instruction Letter to the Lender. In the event that the proposed Clearing Bank fails to acknowledge that its procedures with respect to the Property Account are governed by the Instruction Letter due to an objection to the terms thereof or otherwise, the Borrower hereby appoints the Lender as its attorney-in-fact with full authority to make changes to the Instruction Letter and to execute on behalf of the Borrower any new modified Instruction Letter acceptable to the proposed Clearing Bank. At the election of the Lender during any Sweep Period, the Borrower will establish a new Property Account (which shall become the Clearing Account) at a bank selected by the Lender (which such bank may be an affiliate of the Lender and/or the Servicer) and cooperate to cause all funds in the existing Clearing Account to be transferred to the new Clearing Account and any future Rents from the Property to be deposited in such new Clearing Account.

(ii)      On or prior to each Payment Date (as defined in the Note) on or after the commencement, and during the continuance, of a Sweep Period, the Lender or the Servicer shall direct the Deposit Bank to disburse, on such Payment Date (each, "Disbursement

MADISON 00167

Instructions"), amounts deposited into the Cash Collateral Account in the following listed order of priority:

(a)    First, payments to the Escrow Fund (as defined in the Security Instruments) in accordance with the terms and conditions of the Security Instruments;

(b)    Next, the payment of the Monthly Payment (as defined in the Note); and

(c)    Next, payments of any other amounts due under the Loan Documents not expressly set forth below in this Section 2(c)(ii); and

(d)    Lastly, payment to Borrower of any excess amounts.

Notwithstanding any provision of this Agreement to the contrary, following an Event of Default (as defined in the Security Instruments), Lender reserves the right to (x) take such enforcement actions as it deems appropriate under the Loan Documents or otherwise under law or in equity and (y) apply sums received to the amounts owed under the Loan Documents at such times and in such amounts, order and manner as Lender shall in its sole discretion elect from time to time. Each of Lender's rights and remedies under this Agreement shall be in addition to all of its other rights and remedies under the Note and Security Instruments.

Nothing in this Section 2(c) shall limit, reduce or otherwise affect Borrower's obligations to make payments of the Monthly Payments and/or payments to the Escrow Fund and/or such other funds due hereunder and under the Note and Security Instruments, whether or not Rents are available to make such payments.

(iii)    In the event that no Disbursement Instructions are received on or prior to a Payment Date occurring during the continuance of a Sweep Period, the Servicer or the Deposit Bank may allocate and disburse amounts in the Cash Collateral Account pursuant to the Disbursement Instructions received from the Lender or the Servicer with respect to the preceding Payment Date or otherwise as the Lender may determine in its reasonable discretion, consistent with the Note and the Security Instruments.

d)    Upon the commencement of a Sweep Period, the Lender shall have the right, at its option, to establish and maintain at the Deposit Bank one or more separate deposit accounts (which may be Trust Account(s)) (the "Escrow Fund") which shall be entitled "[LENDER] as Mortgagee of [BORROWER] Tax and Insurance Escrow Fund" (which may be the Escrow Fund previously established under the Security Instruments). The Lender shall deposit into the Escrow Fund from the Cash Collateral Account the amounts required to be deposited by the Borrower with the Lender pursuant to the Security Instruments (including, but not limited to, taxes, assessments and insurance premiums). Amounts on deposit in the Escrow Fund shall be disbursed at the direction of the Lender in accordance with the Security Instruments. The Escrow Fund shall be assigned the federal tax identification number of the Lender. The Escrow Fund may consist of the related reserve account previously established under the Security Instruments.

KE:0260\9044\328166v2

MADISON 00168

e)    The Lender from time to time, at Lender's sole discretion, direct the Deposit Bank (which direction may be given not more than one time per month), to invest amounts allocated to the Subaccounts in Permitted Investments selected by the Lender. It is the intention of the parties hereto that the entire amounts deposited in the Subaccounts (or as much thereof as the Lender may reasonably arrange to invest) may be invested in Permitted Investments, and that the Cash Collateral Account (to wit, all Subaccounts and the Escrow Fund) may be a so-called "zero balance" account. All funds in the Subaccounts that are invested in a Permitted Investment are deemed to be held in the Subaccounts for all purposes of the Security Instruments and the other Loan Documents. Except as otherwise provided in the Security Instruments, all earnings on Permitted Investments from the Subaccounts shall be for the benefit of the Lender. Any actual losses sustained on a liquidation of a Permitted Investment shall be deposited by the Borrower immediately, but in no event later than one Business Day following such liquidation, into the Subaccounts, if any.

f)    The Lender may from time to time, at Lender's sole discretion, direct the Deposit Bank (which direction may be given not more than one time per month) to invest amounts allocated to the Escrow Fund in Permitted Investments selected by the Lender. All earnings on Permitted Investments from the Escrow Fund shall be for the benefit of the Lender. Any actual losses sustained on a liquidation of a Permitted Investment shall be deposited by the Borrower immediately, but in no event later than one Business Day following such liquidation, into the Escrow Fund.

g)    In order to further secure the performance by the Borrower of the Obligations and as a material inducement for the Lender to make the Loan in accordance with the terms of the Loan Documents, the Borrower hereby (i) requests that the Cash Collateral Account be established on its behalf at the Deposit Bank in the name set forth above upon the commencement of a Sweep Period and (ii) acknowledges that (A) the Cash Collateral Account will be subject to the sole dominion, control and discretion of the Lender (which may be exercised through the Servicer), subject to the terms, covenants and conditions of this Agreement and the Security Instruments, (B) the Lender shall have the sole right to make withdrawals of Account Proceeds from the Cash Collateral Account during any Sweep Period, in accordance with this Agreement and the Loan Documents, and (C) neither the Borrower nor any other Person claiming on behalf of or through the Borrower or otherwise shall have any right or authority, whether express or implied, to make use of, or withdraw any Account Proceeds or any other funds, investments or other properties from, the Cash Collateral Account, or to give any instructions with respect to the Cash Collateral Account.

h)    Borrower currently maintains its operating account at Wells Fargo Bank, N.A. and agrees to maintain same in the ordinary course of its business.

3.    Fees.

The Borrower agrees to pay the fees of the Deposit Bank in accordance with the customary fees charged by the Deposit Bank for the services described herein, as such fees are established from time to time. Upon the request of the Borrower, the Lender shall cause the Deposit Bank to include their fees in an account analysis statement.

4.    Termination.

MADISON 00169

a)    The Lender may replace the Deposit Bank with a new Deposit Bank upon five days' notice to the Borrower. The Borrower hereby agrees that it shall take all reasonable action necessary to facilitate the transfer of the respective obligations, duties and rights of the Deposit Bank to the successor thereof selected by the Lender in its sole discretion.

b)    Upon the termination of any Sweep Period during which Lender has directed the Clearing Bank to remit funds to the Deposit Bank, Lender shall, promptly upon request of Borrower, direct the Clearing Bank to suspend transfers to the Deposit Bank (subject to reinstatement at the direction of Lender should another Sweep Period commence). The Lender shall terminate this Agreement upon the occurrence of a Mortgage Satisfaction Event.

5.    Matters Concerning the Borrower.

a)    At the option of the Lender, the Lender may require one or more of the following upon the commencement of and during the continuation of any Sweep Period:

(i)    The Borrower or the Manager shall immediately instruct all Persons that maintain open accounts with Borrower or the Manager or with whom the Manager or the Borrower does business on an "accounts receivable" basis with respect to the Property to deliver all payments due under such accounts to the Clearing Bank at a lock box address at the Clearing Bank (the "Lock Box Address") in the form of cashier's checks or equivalent instruments for the payment of money. Neither the Borrower nor the Manager shall direct any such Person to make payments due under such accounts in any other manner.

(ii)    Pursuant to an instruction letter in the form of Exhibit B hereto (a "Lessee Payment Direction Letter"), the Borrower or the Manager shall immediately notify and advise each tenant of the Property (collectively, the "Tenants") under each lease with respect to the Property (whether such lease is presently effective or executed after the date hereof), to send directly to the Lockbox Address promptly when due all payments, whether in the form of checks, cash, drafts, money orders or any other type of payment whatsoever of rent or any other item payable to the Borrower as landlord under such leases.

(iii)    Without limiting any of the foregoing provisions of this Section 5(a), the Borrower and the Manager shall deposit with the Clearing Bank within one Business Day of receipt all Rents received by the Borrower or the Manager, respectively, with respect to the Property.

b)    Without the prior written consent of the Lender, neither the Borrower nor the Manager shall (i) terminate, amend, revoke, modify or contradict any Instruction Letter or Lessee Payment Direction Letter in any manner or (ii) direct or cause any Tenant to pay any amount in any manner other than as provided specifically in the related Lessee Payment Direction Letter.

c)    The Borrower hereby pledges, transfers and assigns to the Lender, and grants to the Lender, as additional security for the payment and performance of the Obligations, a continuing perfected security interest in and to, and a general lien upon, (i) the Cash Collateral Account, the Clearing Account and all of the Borrower's right, title and interest in and to all cash, property or rights transferred to or deposited in the Cash Collateral Account and the

- 6 -

MADISON 00170

Clearing Account from time to time by the Borrower or on behalf of the Borrower in accordance with the provisions of this Agreement, (ii) all earnings, investments and securities held in the Cash Collateral Account and the Clearing Account in accordance with this Agreement and (iii) any and all proceeds of the foregoing. This Agreement and the pledge, assignment and grant of security interest made hereby shall secure payment of all amounts payable by the Borrower to the Lender under the Note and the other Obligations. The Borrower acknowledges that the Servicer and Deposit Bank are acting as the agent of, and at the direction of, the Lender in connection with the subject matter of this Agreement. The Borrower further agrees to execute, acknowledge, deliver, file or do at its sole cost and expense, all other acts, assignments, notices, agreements or other instruments as the Lender may reasonably require in order to effectuate, assure, convey, secure, assign, transfer and convey unto the Lender any of the rights granted by this section.

d)     In its sole discretion, the Borrower may, from time to time deposit amounts into the Cash Collateral Account in respect of any Subaccount or the Escrow Fund, in each case, from sources of the Borrower other than those received by the Clearing Bank with respect to the then-current Collection Period; provided, that if the Borrower deposits such amounts, the amounts deposited shall be subject to all of the terms hereof as if not separately deposited by the Borrower, and may not be withdrawn except as otherwise provided for in this Agreement.

e)     The Borrower hereby covenants and agrees that it shall cause any successor property manager to assume the duties and obligations of the Manager hereunder.

6.     Certain Matters Regarding the Lender.

The parties agree that the Deposit Bank shall pay over to the Lender all amounts deposited in any account maintained hereunder on demand, without notice to the Borrower, provided, that in making such demand, the Lender gives notice, in writing, signed by the Lender or an authorized agent thereof, that an event of default under the Loan Documents has occurred and is continuing. Notwithstanding the foregoing, the Borrower shall not be deemed to have waived any rights the Borrower may have against the Lender if it is determined that the Lender acted improperly.

7.     Costs.

All costs and expenses (including, without limitation, legal fees and expenses) incurred by Lender and/or Servicer in connection with this Agreement and the matters set forth herein shall be paid by Borrower upon demand by Lender and/or Servicer.

8.     Successors and Assigns; Assignments; Agents.

a)     This Agreement shall bind and inure to the benefit of and be enforceable by the Borrower, the Lender and the Manager and their respective successors and assigns.

b)     The Lender shall have the right to assign or transfer rights and obligations under this Agreement without limitation. Any assignee or transferee shall be entitled to all the benefits afforded the Lender under this Agreement; provided, that such assignee or transferee

MADISON 00171

shall have delivered to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and is also the assignee or transferee of the Note and the other Loan Documents.

c)    Any duties or actions of the Lender hereunder may be performed by the Lender or its agent(s).

9.    Amendment.

This Agreement may be amended from time to time in writing by all parties hereto. All amendments to this Agreement shall be in writing.

10.    Notices.

Notices to the Borrower and the Lender shall be deemed given if delivered in accordance with the Security Instruments. Notices to the Manager shall be given in accordance with the methods set forth in the Security Instruments (or such other address of which Lender has been given notice).

11.    Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF IN WHICH THE PROPERTY IS LOCATED WITHOUT REGARD TO THE CONFLICT OF LAWS RULES OF SUCH STATE.

12.    Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts transmitted by facsimile or email shall have the same force and effect as manually-signed counterparts.

**[Remainder of Page Intentionally Left Blank]**

PL:'.:'62(i)'9044\328166v2

MADISON 00172

IN WITNESS WHEREOF, the parties hereto have executed this CASH MANAGEMENT AGREEMENT in several counterparts (each of which shall be deemed an original) as of the date first above written.

BORROWER:

**SE MARINA WAY PARTNERSHIP, LP**

By: SE Marina Way, L.L.C.
    its general partner

By: _____
    Name: Tracy Suttles
    Title: Manager

LENDER:

**MADISON REALTY CAPITAL, L.P.**

By:    Madison Realty Capital GP, LLC,
    its general partner

By: _____
    Name: Mark Bahiri
    Title: Managing Member

MANAGER:

_____
Tracy Suttles

RE\50260\9044\328166v2

**EXHIBIT A**

**CLEARING BANK INSTRUCTION LETTER**
[to be signed at loan closing]

**TRACY SUTTLES**
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Wells Fargo Bank, N.A.
Business Banking, 3rd Floor
One O'Connor Plaza, MAC T5172-030
Victoria, Texas 77901

Re:    Cash Management Agreement dated January 29, 2007 between SE Marina Way Partnership, LP, as Borrower, Tracy Suttles, as manager, and Madison Realty Capital, L.P., as Lender.

Ladies and Gentlemen:

SE Marina Way Partnership, LP (the "Borrower") has borrowed a loan (the "Loan") from Madison Realty Capital, L.P. (together with its successors and/or assigns, as their interests may appear, the "Lender"), which Loan is secured by certain mortgages and/or deeds of trust on certain properties owned by the Borrower (the "Property"). The Property is currently being managed by Tracy Suttles (the "Manager").

Currently, the Borrower maintains the following account (the "Property Account") with you:

Name:        SE Marina Way Partnership, LP
Account No.: 878-5016448
Routing No.: 121000248

The Borrower hereby notifies you that the Lender has required that it implement certain automatic clearing and processing functions and hereby instructs you, commencing on _____ ____, _____ (the "Sweep Commencement Date"), to disburse all revenues from the Property ("Revenues") deposited in the Property Account from time to time in accordance with the following terms and provisions:

Promptly upon receipt of this letter, you shall establish a post office box address to which the Borrower shall cause all Revenues in the form of checks, money orders and similar instruments to be deposited. Within one business day of receipt, you, as the "Clearing Bank," shall receive and process all Revenues and shall deposit the same into the Property Account referred to above, which Property Account, or an appropriate substitution or replacement thereof, shall thereafter be referred to as the "Clearing Account." Items deposited with Clearing Bank that are returned for insufficient or uncollected funds will be redeposited the first time. Items

RE\50260\9044\328166v2

MADISON 00174

returned unpaid a second time shall be debited to the Clearing Account and returned to the Borrower.

The Clearing Account shall be an account of the Borrower but shall be under the sole dominion and control of the Lender and any servicer (a "Servicer") or other designee of the Lender named below or in a subsequent written notice from the Lender. The Clearing Account shall be assigned the federal tax identification number of the Borrower. You shall hold amounts on deposit in the Clearing Account as agent for the Lender and shall not commingle such amounts with any other amounts held by you on behalf of the Lender, the Borrower or any other person or entity. If, in accordance with standard operating procedures, the Clearing Account may be established as a trust account for the benefit of the Lender, Borrower directs that the Clearing Account be maintained as such an account.

The Borrower hereby notifies the Clearing Bank that, in accordance with the Cash Management Agreement, the Clearing Account and all amounts held therein from time to time, and all renewals, replacements and substitutions therefor, have been irrevocably pledged to the Lender as additional security for the Loan. In connection with such pledge, the Borrower hereby waives all right of withdrawal from the Clearing Account.

The Borrower hereby irrevocably instructs and authorizes you, beginning on the first business day after the Sweep Commencement Date, to disburse on the last business day of each week via the ACH System, if available, or otherwise by wire transfer, all amounts constituting available funds in excess of $5,000 on deposit in the Clearing Account to the following account:

| | |
|---|---|
| Bank: | Signature Bank |
| Bank Address: | 300 Park Avenue |
| | NY, NY 10021 |
| | |
| ABA #: | 026013576 |
| | |
| For credit to account: | Madison Realty Capital, L.P. |
| | |
| Address: | 261 Madison Avenue, 18th floor |
| | New York, NY 10016 |
| | |
| Account No: | 1500 671 455 |
| | |
| Attn: | Dan Nidus |

If transferring such amounts by the ACH System and if required by Clearing Bank, each such transfer shall be initiated by the Lender or by the Servicer. If the Clearing Bank provides electronic data transfer services, the Clearing Bank shall provide the Lender and the Servicer access to the Clearing Bank's electronic data transfer system for purposes of effecting such transfers. At any time that funds may not be transferred as described above in this paragraph, the Clearing Bank shall transfer amounts by wire transfer of immediately available funds.

MADISON 00175

The instructions set forth herein are irrevocable and are not subject to modification in any manner, except that the Lender or the Servicer may, by written notice to you, amend the instructions contained herein.

The Borrower hereby agrees that if the bank, bank location or account number of the Property Account is changed, the Borrower will execute a new letter substantially similar to this letter with respect to such new bank, bank location or account number and deliver such new letter to the Lender.

In the event that the Clearing Bank fails to acknowledge that its procedures with respect to the Property Account are governed by this letter due to an objection to the terms hereof or otherwise, the Borrower hereby appoints the Lender as its attorney-in-fact with full authority to make changes to this letter and to execute on behalf of the Borrower any new modified letter acceptable to the proposed Clearing Bank.

Matters not covered by this letter shall be determined in accordance with the customary procedures of the Clearing Bank and in the event of a conflict between the terms of this letter and the customary procedures of the Clearing Bank, the terms of this letter shall govern.

If you have any questions concerning this letter or the Cash Management Agreement, please contact Julie Breslin of the Lender at (646) 442-4209.

The address of the current Manager is:

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

**[Remainder Of Page Intentionally Blank]**

MADISON 00176



Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to each of the Lender (in care of the Servicer) and the Borrower an acknowledgment in the form of Schedule 1 hereto.

BORROWER:

**SE MARINA WAY PARTNERSHIP, LP**

By: SE Marina Way, L.L.C.
    *its general partner*

By:_____
    Name: Tracy Suttles
    Title:  Manager

MANAGER:

_____
Tracy Suttles

**ACKNOWLEDGED AND AGREED:**

LENDER:

**MADISON REALTY CAPITAL, L.P.**

By:    Madison Realty Capital GP, LLC,
    its general partner

    By:_____
      Name:  Mark Bahiri
      Title:   Managing Member

RE\50260\9044\328166v2

## SCHEDULE 1

## FORM OF ACKNOWLEDGMENT

### [DATE]

**BORROWER**

**LENDER**

Reference is made to that certain Clearing Bank Instruction Letter dated _____, 200__ (the "Instruction Letter") from [BORROWER] ("the Borrower"). I, [Bank Officer], on behalf of (the "Bank"), hereby acknowledge receipt of the instructions set forth in the Instruction Letter and notice of the pledges and security interest described therein. The Bank hereby agrees to perform the instructions set forth in the Instruction Letter for the benefit of _____, its successors and assigns, (the "Lender").

### [BANK]

By:_____
    Name:
    Title:

**LOCK BOX ADDRESS:**

_____
_____
_____

F:\E\50260\9044\328166v2

**EXHIBIT B**

Form of Lessee Payment Direction Letter

[MANAGER LETTERHEAD]

[Date]

[Addressee]

Re:    Payment Direction Letter for [Property]

Dear [        ]:

[BORROWER], the owner of the [PROPERTY] (the "Property"), has mortgaged the Property to [LENDER] (together with its successors and assigns, the "Lender") and has agreed that all rents due for the Property will be paid directly to a bank selected by the Lender. Therefore, from and after [DATE], all rent to be paid by you under the [LEASE] between you and [BORROWER/MANAGER] (the "Lease") should be sent directly to the following address:

[CLEARING BANK]
[Lockbox Address]

All checks should be made out to the "[PROPERTY]".

These payment instructions cannot be withdrawn or modified without the prior written consent of the Lender or its agent (the "Servicer"), or pursuant to a joint written instruction from the Borrower and the Lender or the Servicer. Until you receive written instructions from the Lender or the Servicer, continue to send all rent payments due under the Lease to [CLEARING BANK]. All rent payments must be delivered to [CLEARING BANK] no later than the day on which such amounts are due under the Lease.

If you have any questions concerning this letter, please contact [        ] at [        ].  We appreciate your cooperation in this matter.

[Signature]

MADISON 00179



**TRACY SUTTLES**
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Wells Fargo Bank, N.A.
Business Banking, 3rd Floor
One O'Connor Plaza, MAC T5172-030
Victoria, Texas 77901

Re:    Cash Management Agreement dated January 29,
2007 between SE Marina Way Partnership, LP, as
Borrower, Tracy Suttles, as manager, and Madison
Realty Capital, L.P., as Lender.

Ladies and Gentlemen:

SE Marina Way Partnership, LP (the "Borrower") has borrowed a loan (the "Loan") from Madison Realty Capital, L.P. (together with its successors and/or assigns, as their interests may appear, the "Lender"), which Loan is secured by certain mortgages and/or deeds of trust on certain properties owned by the Borrower (the "Property"). The Property is currently being managed by Tracy Suttles (the "Manager").

Currently, the Borrower maintains the following account (the "Property Account") with you:

Name:        SE Marina Way Partnership, LP
Account No.: 878-5016448
Routing No.: 121000248

The Borrower hereby notifies you that the Lender has required that it implement certain automatic clearing and processing functions and hereby instructs you, commencing on _____ ____, _____ (the "Sweep Commencement Date"), to disburse all revenues from the Property ("Revenues") deposited in the Property Account from time to time in accordance with the following terms and provisions:

Promptly upon receipt of this letter, you shall establish a post office box address to which the Borrower shall cause all Revenues in the form of checks, money orders and similar instruments to be deposited. Within one business day of receipt, you, as the "Clearing Bank," shall receive and process all Revenues and shall deposit the same into the Property Account referred to above, which Property Account, or an appropriate substitution or replacement thereof, shall thereafter be referred to as the "Clearing Account." Items deposited with Clearing Bank that are returned for insufficient or uncollected funds will be redeposited the first time. Items returned unpaid a second time shall be debited to the Clearing Account and returned to the Borrower.

RI :-5026\09904\328166v2

MADISON 00180

The Clearing Account shall be an account of the Borrower but shall be under the sole dominion and control of the Lender and any servicer (a "Servicer") or other designee of the Lender named below or in a subsequent written notice from the Lender. The Clearing Account shall be assigned the federal tax identification number of the Borrower. You shall hold amounts on deposit in the Clearing Account as agent for the Lender and shall not commingle such amounts with any other amounts held by you on behalf of the Lender, the Borrower or any other person or entity. If, in accordance with standard operating procedures, the Clearing Account may be established as a trust account for the benefit of the Lender, Borrower directs that the Clearing Account be maintained as such an account.

The Borrower hereby notifies the Clearing Bank that, in accordance with the Cash Management Agreement, the Clearing Account and all amounts held therein from time to time, and all renewals, replacements and substitutions therefor, have been irrevocably pledged to the Lender as additional security for the Loan. In connection with such pledge, the Borrower hereby waives all right of withdrawal from the Clearing Account.

The Borrower hereby irrevocably instructs and authorizes you, beginning on the first business day after the Sweep Commencement Date, to disburse on the last business day of each week via the ACH System, if available, or otherwise by wire transfer, all amounts constituting available funds in excess of $5,000 on deposit in the Clearing Account to the following account:

|  |  |
|---|---|
| Bank: | Signature Bank |
| Bank Address: | 300 Park Avenue |
|  | NY, NY 10021 |
| ABA #: | 026013576 |
| For credit to account: | Madison Realty Capital, L.P. |
| Address: | 261 Madison Avenue, 18th floor |
|  | New York, NY 10016 |
| Account No: | 1500 671 455 |
| Attn: | Dan Nidus |

If transferring such amounts by the ACH System and if required by Clearing Bank, each such transfer shall be initiated by the Lender or by the Servicer. If the Clearing Bank provides electronic data transfer services, the Clearing Bank shall provide the Lender and the Servicer access to the Clearing Bank's electronic data transfer system for purposes of effecting such transfers. At any time that funds may not be transferred as described above in this paragraph, the Clearing Bank shall transfer amounts by wire transfer of immediately available funds.

The instructions set forth herein are irrevocable and are not subject to modification in any manner, except that the Lender or the Servicer may, by written notice to you, amend the instructions contained herein.

MADISON 00181



The Borrower hereby agrees that if the bank, bank location or account number of the Property Account is changed, the Borrower will execute a new letter substantially similar to this letter with respect to such new bank, bank location or account number and deliver such new letter to the Lender.

In the event that the Clearing Bank fails to acknowledge that its procedures with respect to the Property Account are governed by this letter due to an objection to the terms hereof or otherwise, the Borrower hereby appoints the Lender as its attorney-in-fact with full authority to make changes to this letter and to execute on behalf of the Borrower any new modified letter acceptable to the proposed Clearing Bank.

Matters not covered by this letter shall be determined in accordance with the customary procedures of the Clearing Bank and in the event of a conflict between the terms of this letter and the customary procedures of the Clearing Bank, the terms of this letter shall govern.

If you have any questions concerning this letter or the Cash Management Agreement, please contact Julie Breslin of the Lender at (646) 442-4209.

The address of the current Manager is:

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

[Remainder Of Page Intentionally Blank]

MADISON 00182

Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to each of the Lender (in care of the Servicer) and the Borrower an acknowledgment in the form of Schedule 1 hereto.

BORROWER:

**SE MARINA WAY PARTNERSHIP, LP**

By: SE Marina Way, L.L.C.
    its general partner

By: _____
    Name: Tracy Suttles
    Title:  Manager

MANAGER:

_____
Tracy Suttles

**ACKNOWLEDGED AND AGREED:**

LENDER:

**MADISON REALTY CAPITAL, L.P.**

By:  Madison Realty Capital GP, LLC,
    its general partner

By: _____
    Name:  Mark Bahiri
    Title:   Managing Member

RE\50260\9044\328166v2

MADISON 00183

# EXHIBIT I



LAW OFFICES
### SCHLANGER, SILVER, BARG & PAINE, L.L.P.
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
109 NORTH POST OAK LANE, SUITE 300
HOUSTON, TEXAS 77024

TELEPHONE (713) 785-1700

FACSIMILE (713) 785-2091

March 22, 2007

## VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND OVERNIGHT DELIVERY SERVICE

To the Addressees listed on Schedule "A" attached hereto

Re:     Loan (the "**Loan**") in the original stated principal amount of $10,750,000.00, from Madison Realty Capital, L.P. ("**Lender**") to the addressees listed on Schedule "A" hereto (severally and collectively, "**Borrower**")

Ladies and Gentlemen:

This firm represents Lender, the owner and holder of the documents (collectively, the "**Loan Documents**") relating to the Loan and listed in Schedule "B" attached hereto. Terms used herein, which are not otherwise defined herein, shall have the meanings ascribed thereto as set forth in the Loan Documents.

Borrower is hereby advised that the Loan and the Loan Documents are governed by and construed in accordance with the laws of the State of New York and the United States of America.

You are hereby advised that defaults have occurred and are continuing under the Loan Documents which if not timely cured constitute Events of Default, including, without limitation, (1) the conveyance of the Mortgaged Property known as the Sharpstown Mall to Urban Mall Houston, LP, by General Warranty Deed dated February 1, 2007, and filed for record under Harris County Clerk's file No. 20070075930, (2) the transfer of the ownership interests in 7500 Bellaire Mall Management, Inc. and 7500 Bellaire Partners, LLC, the owners of all the partnership interests in 7500 Bellaire Mall, LP, to J.M.K. Investments, Ltd., a Nevada corporation, as evidenced by Notice of Transfer of Interest of Ownership in Equity Owner of Real Property filed for record on February 28, 2007 under Harris County Clerk's File No. 20070124406, (3) the failure to disclose to Lender the defaults under, and actions to collect, the loan from J.M.K. Investments, Ltd., which is the subject matter of Cause No. 2007-06838 in the District Court of Harris County, Texas, styled *7500 Bellaire Partners, II, LLC; 7500 Bellaire Partners, III, LLC; Sharpstown Mall Management, LLC; Urban Mall Houston, L.P.; 7500 Bellaire Mall Management, Inc.; 7500 Bellaire Partners, L.C. and 7500 Bellaire Mall, L.P. vs. J.M.K. Investments, Ltd., Defendant vs. Transwestern Property Company Southwest, L.P. d/b/a*

March 22, 2007
Page 2

*Transwestern Commercial Services, as Third-Party Defendant* and (4) the failure to disclose to Lender the defaults under the loans owed by SE Marina Way Partnership, LP to Texas Capital Bank NA and the actions to collect such loans resulting therefrom.

**Accordingly, on behalf of Lender, you are hereby advised that if (a) all such defaults are not cured to the satisfaction of Lender and (b) all attorneys' fees incurred by Lender as a result of the such defaults are not paid in full, on or before thirty (30) after this notice is deemed to be given in accordance with the terms of the Deed of Trust and Security Agreement securing the Loan, time being of the essence unless extended or waived in writing by Lender, (1) the Lender will accelerate and declare due and immediately payable all Debts as defined in the Note in accordance with the terms thereof, (2) Lender will exercise its rights and remedies under the other Loan Documents, including, without limitation, the recording of the Deeds of Trust which are held in escrow on the properties in Harris, Victoria and Hays Counties, Texas, and (3) the liens and security interests created by the Loan Documents will be foreclosed in accordance with the terms thereof to satisfy the obligations secured thereby. This notice is intended as notice of intention to accelerate the payment of the Debts and notice of default and opportunity to cure, if such defaults are not cured and attorneys' fees paid on or before the thirty (30) day period mentioned above.**

Under and pursuant to the Note, upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the Debt at the Default Rate provided for in the Note.

In the event the payment of the Debts shall become due and payable as provided for above, Lender will credit against the amount of the Debts, all interest, interest reserve and other sums for the use, forbearance or detention of the Debts, which have not accrued or been amortized, prorated, allocated and spread as provided for in the Note, to the extent required by the laws of the State of New York.

All of Lender's claims, demands and accruals regarding the Loan and the other amounts due under the Loan Documents, whenever made, whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with applicable usury laws, and are accordingly limited so that applicable usury laws are not violated. The terms of all clauses limiting the amount of interest that may be contracted for, charged, reserved or received and all usury savings clauses contained in any of the Loan Documents are incorporated herein by reference.

Lender reserves the right to exercise, in such order as Lender elects, any one or more of the remedies available to Lender under the Loan Documents or otherwise at law or in equity. Nothing contained in this letter shall constitute a waiver of any rights of Lender to pursue such rights and remedies. Without limiting the generality of the foregoing, Borrower is hereby notified that Lender will commence non-judicial foreclosure proceedings against the Property and will enforce its rights and remedies under the Loan Documents. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Lender

March 22, 2007
Page 3

as a result of any default or any Event of Default is intended to constitute a waiver of any right or remedy accruing to Lender as a result of that default or any other default or that Event of Default or any other Event of Default.

Neither this letter nor any statement by or on behalf of Lender as to the amount due and owing under any of the Loan Documents: (i) shall constitute a waiver of any rights of Lender to collect any additional amounts to which Lender may be lawfully entitled pursuant to the terms of the Loan Documents, or otherwise at law or in equity; or (ii) shall constitute an offer to settle or waive any rights of Lender under any of the Loan Documents.

Borrower is hereby notified that Lender shall enforce the Loan Documents in accordance with their respective terms.

Sincerely,

SCHLANGER, SILVER, BARG & PAINE, L.L.P.

By: _____

William G. Lawhon, P.C.

cc:    David A. Hannah
       9639 Judalon Lane
       Houston, Texas 77063

       Scott Douglas Cummingham
       7500 San Felipe, Suite 1010
       Houston, Texas 77063



## SCHEDULE "A"
### List of Addresses

SE Marina Way Partnership, LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

SE Marina Way, L.L.C.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Pirates Lake Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Pirate's Lake Management, L.L.C.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

7500 Bellaire Mall LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

7500 Bellaire Mall Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

6425 Gess, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

6425 Gess Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Wildflower TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Wildflower General Partner, LLC
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Shalamar San Marcos Properties, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Shalamar San Marcos Management, LLC
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Windsor TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Windsor TDS Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

9632 Partners, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

TraCyn, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

388196v1 (46446)

**SCHEDULE "B"**

List of Loan Documents

(All documents dated January 29, 2007, unless otherwise indicated)

1.     Loan Offer

2.     Note ($10,750,000.00) made by SE Marina Way Partnership, LP; Pirate's Lake, Ltd.; 7500 Bellaire Mall LP; 6425 Gess, Ltd.; Wildflower TDS, L.P.; Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and Tracy Suttles

3.     Deed of Trust (10,750,000.00) granted by SE Marina Way Partnership, LP; Pirate's Lake, Ltd. and 7500 Bellaire Mall LP

4.     Assignment of Leases and Rents granted by SE Marina Way Partnership, LP; Pirate's Lake, Ltd. and 7500 Bellaire Mall LP

5.     Environmental Indemnity Agreement

6.     Loan Guaranty by Tracy Suttles

7.     Cash Management Agreement and executed Clearing Bank Instruction Letter

8.     Conditional Assignment of Management agreement

9.     Pledge and Security Agreement (Membership Interests)

10.    Pledge and Security Agreement (Partnership Interests)

11.    Pledge and Assignment of Rollover Account

12.    UCC-1 Financing Statement (Marina)

13.    UCC-1 Financing Statement (Pirate's Lake)

14.    UCC-1 Financing Statement (Mall)

15.    UCC-1 Financing Statement (Membership Interest Pledge)

16.    UCC-1 Financing Statement (Partnership Interest Pledge)

17.    UCC-1 Financing Statement (Rollover Account)

18.    Statement of Undertaking

19.    Certification by General Partner (Marina)

388198v1 (46446)

20.    Certification by Member (Marina)

21.    Certification by General Partner (Pirate's Lake)

22.    Certification by Member (Pirate's Lake)

23.    Certification by General Partner (Mall)

24.    Certification by Officer (Mall)

25.    Certification by Member (Mall – Limited Partner)

26.    Certification of Rent Roll (Marina)

27.    Certification of Leases and Rent Roll (Marina)

28.    Escrow Agreement and Closing Instructions

29.    Affidavit of Title (Marina)

30.    Affidavit of Title (Pirate's Lake)

31.    Affidavit of Title (Mall)

32.    Attorney Opinion Letter

33.    Insurance Certificate

34.    Undertaking Agreement

35.    Escrow Holdback Agreement ($60,000.00)

36.    Written Loan Agreement Notice

37.    Loan Disbursal Authorization

38.    Mailing Address Verification

39.    Deed of Trust ($10,750,000.00) granted by 6425 Gess, Ltd.; Wildflower TDS, L.P.;
       Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and
       Tracy Suttles

40.    Assignment of Leases and Rents granted by 6425 Gess, Ltd.; Wildflower TDS, L.P.;
       Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and
       Tracy Suttles

388198v1 (46446)

41.    UCC-1 Financing Statement (Del Papa)

42.    UCC-1 Financing Statement (Memorial Village)

43.    UCC-1 Financing Statement (Town House and Treemount)

44.    UCC-1 Financing Statement (Shalimar)

45.    UCC-1 Financing Statement (The Carlingford)

46.    UCC-1 Financing Statement (Windsor Park)

47.    Certification by General Partner (Memorial Village)

48.    Certification by Member (Memorial Village)

49.    Certification by General Partner (Town House and Treemount)

50.    Certification by Officer (Town House and Treemount)

51.    Certification by General Partner (Shalamar)

52.    Certification by Member (Shalamar)

53.    Certification by General Partner (The Carlingford)

54.    Certification by Officer (the Carlingford)

55.    Certification by General Partner (Windsor Park)

56.    Certification by Officer (Windsor Park)

57.    Certification of Rent Roll (Del Papa)

58.    Certification of Rent Roll (Memorial Village)

59.    Certification of Rent Roll (Town House)

60.    Certification of Rent Roll (Treemount)

61.    Certification of Rent Roll (Shalamar)

62.    Certification of Rent Roll (The Carlingford)

63.    Certification of Rent Roll (Windsor Park)

64.     Affidavit of Title (Del Papa)

65.     Affidavit of Title (Memorial Village)

66.     Affidavit of Title (Town House

67.     Affidavit of Title (Treemount)

68.     Affidavit of Title (Shalamar)

69.     Affidavit of Title (The Carlingford)

70.     Affidavit of Title (Windsor Park)

71.     Escrow Agreement re: springing loan documents

2. Article Number

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
Vicky Carrilo    4-9-07

C. Signature
X Vicky Carillo    ☐ Agent
☐ Addressee

D. Is delivery address different from item 17    ☐ Yes
If YES, enter delivery address below:    ☐ No

7140 3901 9849 1294 5460

3. Service Type    CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)    ☐ Yes

1. Article Addressed to:

SE Marina Way Partnership, LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2006    Domestic Return Receipt

---

2. Article Number

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
Vicky Carrilo    4-9-07

C. Signature
X Vicky Carillo    ☐ Agent
☐ Addressee

D. Is delivery address different from item 17    ☐ Yes
If YES, enter delivery address below:    ☐ No

7140 3901 9849 1294 5293

3. Service Type    CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)    ☐ Yes

1. Article Addressed to:

Pirates Lake Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2006    Domestic Return Receipt

---

2. Article Number

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
Vicky Carrilo    4-9-07

C. Signature
X Vicky Carillo    ☐ Agent
☐ Addressee

D. Is delivery address different from item 17    ☐ Yes
If YES, enter delivery address below:    ☐ No

7140 3901 9849 1294 5286

3. Service Type    CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)    ☐ Yes

1. Article Addressed to:

7500 Bellaire Mall LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2006    Domestic Return Receipt

**2. Article Number**

7110 3901 9849 1291 5279

**A. Received by (Please Print Clearly)** Vicky Carrillo
**B. Date of Delivery** 4-9-07

**C. Signature** X Vicky Carrillo

☐ Agent
☐ Addressee

**D.** Is delivery address different from item 1?
If YES, enter delivery address below:
☐ Yes
☐ No

COMPLETE THIS SECTION ON DELIVERY

**3. Service Type**  CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

**1. Article Addressed to:**

6425 Gess, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005         Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 1291 5262

**A. Received by (Please Print Clearly)** Vicky Carrillo
**B. Date of Delivery** 4-9-07

**C. Signature** X Vicky Carrillo

☐ Agent
☐ Addressee

**D.** Is delivery address different from item 1?
If YES, enter delivery address below:
☐ Yes
☐ No

COMPLETE THIS SECTION ON DELIVERY

**3. Service Type**  CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

**1. Article Addressed to:**

Wildflower TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005         Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 1291 5255

**A. Received by (Please Print Clearly)** Vicky Carrillo
**B. Date of Delivery** 4-9-07

**C. Signature** X Vicky Carrillo

☐ Agent
☐ Addressee

**D.** Is delivery address different from item 1?
If YES, enter delivery address below:
☐ Yes
☐ No

COMPLETE THIS SECTION ON DELIVERY

**3. Service Type**  CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

**1. Article Addressed to:**

Shalamar San Marcos Properties, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005         Domestic Return Receipt

**2. Article Number**

7110 3901 9849 1296 5248

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) — Vicky Carrillo
B. Date of Delivery — 4-9-07
C. Signature — X Vicky Carrillo
☐ Agent
☐ Addressee
D. Is delivery address different from item 1?
If YES, enter delivery address below:
☐ Yes
☐ No

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** (Extra Fee) ☐ Yes

**1. Article Addressed to:**

Windsor TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 1296 5408

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) — Nina Daniels
B. Date of Delivery — 4/9/07
C. Signature — X Nina
☐ Agent
☐ Addressee
D. Is delivery address different from item 1?
If YES, enter delivery address below:
☐ Yes
☐ No

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** (Extra Fee) ☐ Yes

**1. Article Addressed to:**

9632 Partners, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 1296 5392

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) — Nina Daniels
B. Date of Delivery — 4/9/07
C. Signature — X Nina
☐ Agent
☐ Addressee
D. Is delivery address different from item 1?
If YES, enter delivery address below:
☐ Yes
☐ No

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** (Extra Fee) ☐ Yes

**1. Article Addressed to:**

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

2. Article Number

7160 3901 9847 1294 5477

2. Service Type  CERTIFIED MAIL
4. Restricted Delivery? (Extra Fee)  ☐ Yes
1. Article Addressed to:

SE Marina Way, L.L.C.
Attn:  Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

COMPLETE THIS SECTION ON DELIVERY
A. Received by (Please Print Clearly)  Vicky Camllo   B. Date of Delivery  4-9-07
C. Signature  X Vicky Caull
☐ Agent
☐ Addressee
D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2006        Domestic Return Receipt

---

2. Article Number

7160 3901 9847 1294 5378

3. Service Type  CERTIFIED MAIL
4. Restricted Delivery? (Extra Fee)  ☐ Yes
1. Article Addressed to:

Pirates Lake Management, L.L.C.
Attn:  Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

COMPLETE THIS SECTION ON DELIVERY
A. Received by (Please Print Clearly)  Vicky Camllo   B. Date of Delivery  4-9-07
C. Signature  X Vicky Caull
☐ Agent
☐ Addressee
D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2006        Domestic Return Receipt

---

2. Article Number

7160 3901 9847 1294 5361

3. Service Type  CERTIFIED MAIL
4. Restricted Delivery? (Extra Fee)  ☐ Yes
1. Article Addressed to:

7500 Bellaire Mall Management, Inc.
Attn:  Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

COMPLETE THIS SECTION ON DELIVERY
A. Received by (Please Print Clearly)  Vicky Camllo   B. Date of Delivery  4-9-07
C. Signature  X Vicky Caull
☐ Agent
☐ Addressee
D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2006        Domestic Return Receipt

**2. Article Number**

7110 3901 9849 1296 5354

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** (Extra Fee) ☐ Yes

**1. Article Addressed to:**

6425 Gess Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) Vicky Camllo    B. Date of Delivery 4-9-07

C. Signature X Vicky Caull    ☐ Agent ☐ Addressee

D. Is delivery address different from Item 1? ☐ Yes ☐ No
If YES, enter delivery address below:

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005        Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 1296 5347

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** (Extra Fee) ☐ Yes

**1. Article Addressed to:**

Wildflower General Partner, LLC
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) Vicky Camllo    B. Date of Delivery 4-9-07

C. Signature X Vicky Caull    ☐ Agent ☐ Addressee

D. Is delivery address different from Item 1? ☐ Yes ☐ No
If YES, enter delivery address below:

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005        Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 1296 5330

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** (Extra Fee) ☐ Yes

**1. Article Addressed to:**

Shalamar San Marcos Management, LLC
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) Vicky Camllo    B. Date of Delivery 4-9-07

C. Signature X Vicky Caull    ☐ Agent ☐ Addressee

D. Is delivery address different from Item 1? ☐ Yes ☐ No
If YES, enter delivery address below:

**Reference Information**

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005        Domestic Return Receipt

2. Article Number

|||||||||||||||||||||||||||||||||

7160 3901 9849 1296 5323

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
MiNA  JAmilus    4/9/07

C. Signature
X Nala                    ☐ Agent
                          ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)    ☐ Yes

1. Article Addressed to:

Windsor TDS Management, Inc.
Attn:  Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005        Domestic Return Receipt

---

2. Article Number

|||||||||||||||||||||||||||||||||

7160 3901 9849 1296 5316

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
Katina  Daniels    4/9/07

C. Signature
X Hina                    ☐ Agent
                          ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)    ☐ Yes

1. Article Addressed to:

TraCyn, Inc.
Attn:  Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

Reference Information

13002-46446 (Madison - Suttles)

William G. Lawhon, P.C.

PS Form 3811, January 2005        Domestic Return Receipt

# EXHIBIT J

LAW OFFICES

# SCHLANGER, SILVER, BARG & PAINE, L.L.P.

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

109 NORTH POST OAK LANE, SUITE 300

HOUSTON, TEXAS 77024

TELEPHONE (713) 785-1700                                                                      FACSIMILE (713) 785-2091

July 2, 2007

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND OVERNIGHT DELIVERY SERVICE**

To the Addressees listed on Schedule "A" attached hereto

Re:    Loan (the "*Loan*") in the original stated principal amount of $10,750,000.00, from Madison Realty Capital, L.P. ("*Lender*") to the addressees listed on Schedule "A" hereto (severally and collectively, "*Borrower*")

Ladies and Gentlemen:

This firm represents Lender, the owner and holder of the documents (collectively, the "*Loan Documents*") relating to the Loan and listed in Schedule "B" attached hereto. Terms used herein, which are not otherwise defined herein, shall have the meanings ascribed thereto as set forth in the Loan Documents.

By letter (the "Default Notice") dated March 22, 2007, this firm, on behalf of Lender, notified you of existing defaults under the Loan Documents and advised you that if such defaults were not cured on or before thirty (30) days after the Default Notice was given, (1) Lender would accelerate and declare due and immediately payable all Debts as defined in the Note in accordance with the terms thereof, (2) Lender would exercise its rights and remedies under the other Loan Documents, including, without limitation, the recording of the Deeds of Trust which are held in escrow on the properties in Harris, Victoria and Hays Counties, Texas, and (3) the liens and security interests created by the Loan Documents would be foreclosed in accordance with the terms thereof to satisfy the obligations secured thereby. To date, such defaults have not been cured or remedied. In the Default Notice, you were further advised that, as provided for in the Note, if such defaults were not cured within such 30-day period, Lender would be entitled to receive and Borrower would be required to pay interest on the Debt at the Default Rate provided for in the Note.

In addition, Lender has learned that the holder of the first lien deed of trust on the property owned by Pirate's Lake, Ltd. in Galveston County, Texas, has posted this property for foreclosure on July 3, 2007. This also constitutes a default under the Loan Documents

393841-2(46446)



July 2, 2007
Page 2

which default has not been cured or remedied. A foreclosure by the holder of the first lien would have a material, adverse affect on the collateral securing the Loan.

Accordingly, on behalf of Lender, you are hereby notified that (1) Lender has accelerated and declared due and immediately payable all Debts as defined in the Note in accordance with the terms thereof, (2) Lender will exercise its rights and remedies under the Loan Documents, including, without limitation, the recording of the Deeds of Trust which are held in escrow on the properties in Harris, Victoria and Hays Counties, Texas, and (3) the liens and security interests created by the Loan Documents will be foreclosed in accordance with the terms thereof to satisfy the obligations secured thereby.

In addition, as specified in the Default Notice, the Lender has, as of July 1, 2007, credited against the amount of the Debts, all interest, interest reserve and other sums for the use, forbearance or detention of the Debts, which have not accrued or been amortized, prorated, allocated and spread as provided for in the Note, to the extent required by the laws of the State of New York. Formal demand is hereby made for immediate payment of the unpaid balance of the Debts, after application of such amounts.

All of Lender's claims, demands and accruals regarding the Loan and the other amounts due under the Loan Documents, whenever made, whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with applicable usury laws, and are accordingly limited so that applicable usury laws are not violated. The terms of all clauses limiting the amount of interest that may be contracted for, charged, reserved or received and all usury savings clauses contained in any of the Loan Documents are incorporated herein by reference.

Lender reserves the right to exercise, in such order as Lender elects, any one or more of the remedies available to Lender under the Loan Documents or otherwise at law or in equity. Nothing contained in this letter shall constitute a waiver of any rights of Lender to pursue such rights and remedies. Without limiting the generality of the foregoing, Borrower is hereby notified that Lender will commence non-judicial foreclosure proceedings against the Property and will enforce its rights and remedies under the Loan Documents. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Lender as a result of any default or any Event of Default is intended to constitute a waiver of any right or remedy accruing to Lender as a result of that default or any other default or that Event of Default or any other Event of Default.

Neither this letter nor any statement by or on behalf of Lender as to the amount due and owing under any of the Loan Documents: (i) shall constitute a waiver of any defaults or Events of Default under the Loan Documents; (ii) shall constitute a waiver of any rights of Lender to collect any additional amounts to which Lender may be lawfully entitled pursuant to the terms of the Loan Documents, or otherwise at law or in equity; or (iii) shall constitute an offer to settle or waive any rights of Lender under any of the Loan Documents.

July 2, 2007
Page 3


      Borrower is hereby notified that Lender shall enforce the Loan Documents in accordance with their respective terms.

                        Sincerely,

                        SCHLANGER, SILVER, BARG & PAINE, L.L.P.

                        By: _____
                                William G. Lawhon, P.C.

cc:     David A. Hannah
       9639 Judalon Lane
       Houston, Texas 77063

       Scott Douglas Cummingham
       7500 San Felipe, Suite 1010
       Houston, Texas 77063



## SCHEDULE "A"
### List of Addresses

SE Marina Way Partnership, LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

SE Marina Way, L.L.C.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Pirates Lake Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Pirate's Lake Management, L.L.C.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

7500 Bellaire Mall LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

7500 Bellaire Mall Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

6425 Gess, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

6425 Gess Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Wildflower TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Wildflower General Partner, LLC
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Shalamar San Marcos Properties, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Shalamar San Marcos Management, LLC
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Windsor TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Windsor TDS Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

9632 Partners, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

TraCyn, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, Texas 77036

388196v1 (46446)

### SCHEDULE "B"
### List of Loan Documents
**(All documents dated January 29, 2007, unless otherwise indicated)**

1. Loan Offer

2. Note ($10,750,000.00) made by SE Marina Way Partnership, LP; Pirate's Lake, Ltd.; 7500 Bellaire Mall LP; 6425 Gess, Ltd.; Wildflower TDS, L.P.; Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and Tracy Suttles

3. Deed of Trust (10,750,000.00) granted by SE Marina Way Partnership, LP; Pirate's Lake, Ltd. and 7500 Bellaire Mall LP

4. Assignment of Leases and Rents granted by SE Marina Way Partnership, LP; Pirate's Lake, Ltd. and 7500 Bellaire Mall LP

5. Environmental Indemnity Agreement

6. Loan Guaranty by Tracy Suttles

7. Cash Management Agreement and executed Clearing Bank Instruction Letter

8. Conditional Assignment of Management agreement

9. Pledge and Security Agreement (Membership Interests)

10. Pledge and Security Agreement (Partnership Interests)

11. Pledge and Assignment of Rollover Account

12. UCC-1 Financing Statement (Marina)

13. UCC-1 Financing Statement (Pirate's Lake)

14. UCC-1 Financing Statement (Mall)

15. UCC-1 Financing Statement (Membership Interest Pledge)

16. UCC-1 Financing Statement (Partnership Interest Pledge)

17. UCC-1 Financing Statement (Rollover Account)

18. Statement of Undertaking

19. Certification by General Partner (Marina)

20.   Certification by Member (Marina)

21.   Certification by General Partner (Pirate's Lake)

22.   Certification by Member (Pirate's Lake)

23.   Certification by General Partner (Mall)

24.   Certification by Officer (Mall)

25.   Certification by Member (Mall – Limited Partner)

26.   Certification of Rent Roll (Marina)

27.   Certification of Leases and Rent Roll (Marina)

28.   Escrow Agreement and Closing Instructions

29.   Affidavit of Title (Marina)

30.   Affidavit of Title (Pirate's Lake)

31.   Affidavit of Title (Mall)

32.   Attorney Opinion Letter

33.   Insurance Certificate

34.   Undertaking Agreement

35.   Escrow Holdback Agreement ($60,000.00)

36.   Written Loan Agreement Notice

37.   Loan Disbursal Authorization

38.   Mailing Address Verification

39.   Deed of Trust ($10,750,000.00) granted by 6425 Gess, Ltd.; Wildflower TDS, L.P.;
      Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and
      Tracy Suttles

40.   Assignment of Leases and Rents granted by 6425 Gess, Ltd.; Wildflower TDS, L.P.;
      Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and
      Tracy Suttles

388198v1 (46446)

41.    UCC-1 Financing Statement (Del Papa)

42.    UCC-1 Financing Statement (Memorial Village)

43.    UCC-1 Financing Statement (Town House and Treemount)

44.    UCC-1 Financing Statement (Shalimar)

45.    UCC-1 Financing Statement (The Carlingford)

46.    UCC-1 Financing Statement (Windsor Park)

47.    Certification by General Partner (Memorial Village)

48.    Certification by Member (Memorial Village)

49.    Certification by General Partner (Town House and Treemount)

50.    Certification by Officer (Town House and Treemount)

51.    Certification by General Partner (Shalamar)

52.    Certification by Member (Shalamar)

53.    Certification by General Partner (The Carlingford)

54.    Certification by Officer (the Carlingford)

55.    Certification by General Partner (Windsor Park)

56.    Certification by Officer (Windsor Park)

57.    Certification of Rent Roll (Del Papa)

58.    Certification of Rent Roll (Memorial Village)

59.    Certification of Rent Roll (Town House)

60.    Certification of Rent Roll (Treemount)

61.    Certification of Rent Roll (Shalamar)

62.    Certification of Rent Roll (The Carlingford)

63.    Certification of Rent Roll (Windsor Park)

64.    Affidavit of Title (Del Papa)

65.    Affidavit of Title (Memorial Village)

66.    Affidavit of Title (Town House

67.    Affidavit of Title (Treemount)

68.    Affidavit of Title (Shalamar)

69.    Affidavit of Title (The Carlingford)

70.    Affidavit of Title (Windsor Park)

71.    Escrow Agreement re: springing loan documents

## Receipt 1

**2. Article Number**

7110 3901 9849 7648 4029

**3. Service Type** CERTIFIED MAIL.

**4. Restricted Delivery?** *(Extra Fee)* ☐ Yes

**1. Article Addressed to:**

SE Marina Way Partnership, LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

A. Received by *(Please Print Clearly)*: Nina Daniels
B. Date of Delivery: 7/3/07
C. Signature: X Nina L...
☐ Agent ☐ Addressee
D. Is delivery address different from Item 1? ☐ Yes ☐ No
If YES, enter delivery address below:

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005          Domestic Return Receipt

## Receipt 2

**2. Article Number**

7110 3901 9849 7648 4112

**3. Service Type** CERTIFIED MAIL.

**4. Restricted Delivery?** *(Extra Fee)* ☐ Yes

**1. Article Addressed to:**

Pirates Lake Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

A. Received by *(Please Print Clearly)*: Nina Daniels
B. Date of Delivery: 7/3/07
C. Signature: X Nina L...
☐ Agent ☐ Addressee
D. Is delivery address different from Item 1? ☐ Yes ☐ No
If YES, enter delivery address below:

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005          Domestic Return Receipt

## Receipt 3

**2. Article Number**

7110 3901 9849 7648 4105

**3. Service Type** CERTIFIED MAIL.

**4. Restricted Delivery?** *(Extra Fee)* ☐ Yes

**1. Article Addressed to:**

7500 Bellaire Mall LP
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

A. Received by *(Please Print Clearly)*: Nina Daniels
B. Date of Delivery: 7/3/07
C. Signature: X Nina Daniels
☐ Agent ☐ Addressee
D. Is delivery address different from Item 1? ☐ Yes ☐ No
If YES, enter delivery address below:

**Reference Information**

13002-46446

William G. Lawhon, P.C.

**2. Article Number**

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
Nina Daniels    7|3|07

7140 3701 9847 7448 4071

C. Signature
X Nina ☐ Agent
☐ Addressee

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

**1. Article Addressed to:**

6425 Gess, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
Nina Daniels    7|3|07

7140 3701 9847 7448 4088

C. Signature
X Nina ☐ Agent
☐ Addressee

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

**1. Article Addressed to:**

Wildflower TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard, Suite 201
Houston, TX 77036

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery
Nina Daniels    7|3|07

7140 3701 9847 7448 4075

C. Signature
X Nina ☐ Agent
☐ Addressee

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)**  ☐ Yes

**1. Article Addressed to:**

Shalamar San Marcos Properties
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

**Reference Information**

13002-46446

William G. Lawhon, P.C.

**2. Article Number**

7110 3901 9849 7148 4058

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)   B. Date of Delivery
Nina Janiels   7/3/07

C. Signature
x Nina Janiels
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

**3. Service Type   CERTIFIED MAIL**

**4. Restricted Delivery? (Extra Fee)**   ☐ Yes

**1. Article Addressed to:**

Windsor TDS, L.P.
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

REFERENCE INFORMATION

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 7148 4058

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)   B. Date of Delivery
Nina Janiels   7/3/07

C. Signature
X Nina
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

**3. Service Type   CERTIFIED MAIL**

**4. Restricted Delivery? (Extra Fee)**   ☐ Yes

**1. Article Addressed to:**

9632 Partners, Ltd.
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

REFERENCE INFORMATION

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

7110 3901 9849 7148 4044

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)   B. Date of Delivery
Nina Janiels   7/3/07

C. Signature
x Nina Janiels
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

**3. Service Type   CERTIFIED MAIL**

**4. Restricted Delivery? (Extra Fee)**   ☐ Yes

**1. Article Addressed to:**

Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

REFERENCE INFORMATION

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

2. Article Number

7140 3901 9849 7146 4037

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)   ☐ Yes

1. Article Addressed to:

SE Marina Way, L.L.C.
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by (Please Print Clearly)   Nina Daniels   B. Date of Delivery 7/3/07
C. Signature   X  Nina Daniels   ☐ Agent ☐ Addressee
D. Is delivery address different from Item 1?   If YES, enter delivery address below:   ☐ Yes ☐ No

Reference Information

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

2. Article Number

7140 3901 9849 7146 4020

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)   ☐ Yes

1. Article Addressed to:

Pirate's Lake Management, LLC
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by (Please Print Clearly)   Nina Daniels   B. Date of Delivery 7/3/07
C. Signature   X  Nina Daniels   ☐ Agent ☐ Addressee
D. Is delivery address different from Item 1?   If YES, enter delivery address below:   ☐ Yes ☐ No

Reference Information

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

2. Article Number

7140 3901 9849 7146 4013

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)   ☐ Yes

1. Article Addressed to:

7500 Bellaire Mall Management
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by (Please Print Clearly)   Nina Daniels   B. Date of Delivery 7/3/07
C. Signature   X  Nina   ☐ Agent ☐ Addressee
D. Is delivery address different from Item 1?   If YES, enter delivery address below:   ☐ Yes ☐ No

Reference Information

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

**2. Article Number**

7160 3901 9849 7648 4006

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)** ☐ Yes

**1. Article Addressed to:**

6425 Gess Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by (Please Print Clearly): Nита Daniels   B. Date of Delivery: 9/3/07

C. Signature: X ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes ☐ No

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005   Domestic Return Receipt

---

**2. Article Number**

7160 3901 9849 7648 3776

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)** ☐ Yes

**1. Article Addressed to:**

Wildflower General Partner
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by (Please Print Clearly): Nита Daniels   B. Date of Delivery: 9/3/07

C. Signature: X ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes ☐ No

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005   Domestic Return Receipt

---

**2. Article Number**

7160 3901 9849 7648 3356

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery? (Extra Fee)** ☐ Yes

**1. Article Addressed to:**

Shalamar San Marcos Management
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by (Please Print Clearly): Nита Daniels   B. Date of Delivery: 9/3/07

C. Signature: X ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes ☐ No

**Reference Information**

13002-46446

William G. Lawhon, P.C.



**2. Article Number**

7110 3901 9847 7048 3171

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** *(Extra Fee)*  ☐ Yes

**1. Article Addressed to:**

Windsor TDS Management, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by *(Please Print Clearly)*  Nita Daniels
B. Date of Delivery  7/3/07

C. Signature  X Nita D.  ☐ Agent  ☐ Addressee

D. Is delivery address different from Item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

7110 3901 9847 7048 3182

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** *(Extra Fee)*  ☐ Yes

**1. Article Addressed to:**

TraCyn, Inc.
Attn: Tracy Suttles
7500 Bellaire Boulevard
Suite 201
Houston, TX 77036

A. Received by *(Please Print Clearly)*  Nita Daniels
B. Date of Delivery  7/3/07

C. Signature  X Nita D.  ☐ Agent  ☐ Addressee

D. Is delivery address different from Item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

**Reference Information**

13002-46446

William G. Lawhon, P.C.

PS Form 3811, January 2005    Domestic Return Receipt

# EXHIBIT K

# FORBEARANCE AGREEMENT

Reference is made to Promissory Note (the "Note") dated January 29, 2007, made by SE Marina Way Partnership, LP; Pirate's Lake, Ltd.; 7500 Bellaire Mall LP; 6425 Gess, Ltd.; Wildflower TDS, L.P.; Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and Tracy Suttles (such parties, together with Guarantor hereafter identified, jointly and severally, "Borrowers") and payable to the order of Madison Realty Capital, L.P. ("Lender") in the original principal amount of $10,750,000.00, the Note being secured by, among other documents (collectively the "Loan Documents"), (a) Deed of Trust and Security Agreement (the "First Deed of Trust") of even date therewith filed for record under Harris County Clerk's File No. 20070059882 from SE Marina Way Partnership, LP; Pirate's Lake, Ltd. and 7500 Bellaire Mall LP covering properties in Harris and Galveston Counties, Texas, (b) Assignment of Lease and Rents of even date therewith filed for record under Harris County Clerk's File No. 20070059884 from SE Marina Way Partnership, LP; Pirate's Lake, Ltd. and 7500 Bellaire Mall LP for the benefit of Lender and (c) Loan Guaranty of even date therewith made by Tracy Suttles ("Guarantor").

In addition to the foregoing, the Note is also secured by (collectively, the "Springing Loan Documents") (a) unrecorded Deed of Trust and Security Agreement of even date therewith from 6425 Gess, Ltd.; Wildflower TDS, L.P.; Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and Tracy Suttles covering properties in Victoria, Hays and Harris Counties, Texas, (b) Assignment of Lease and Rents of even date therewith from 6425 Gess, Ltd.; Wildflower TDS, L.P.; Shalamar San Marcos Properties, Ltd.; Windsor TDS, L.P.; 9632 Partners, Ltd. and Tracy Suttles for the benefit of Lender (c) Clearing Bank Instruction Letter from SE Marina Way Partnership, (d) UCC-1 financing statement naming 6425 Gess, Ltd., as debtor, and Lender, as secured party; (e) UCC-1 financing statement naming Wildflower TDS, L.P, as debtor, and Lender, as secured party.; (f) UCC-1 financing statement naming Shalamar San Marcos Properties, Ltd , as debtor, and Lender, as secured party.; (g) UCC-1 financing statement naming Windsor TDS, L.P., as debtor and Lender, as secured party (h) UCC-1 financing statement naming 9632 Partners, Ltd., as debtor and Lender, as secured party, and (i) UCC-1 financing statement naming Tracy Suttles, as debtor, and Lender, as secured party.

Lender has requested the substitute trustees, and each of them acting alone, appointed under the First Deed of Trust to foreclose on the property in Galveston County, Texas, described in the First Deed of Trust, owned by SE Marina Way Partnership, LP and known as the "Marina" (the "Marina Property"), and, pursuant to that request, the Marina Property has been posted and noticed for foreclosure on October 2, 2007, (the "Marina Foreclosure").

Borrowers and Guarantor have requested Lender to postpone the Marina Foreclosure until the first Tuesday in December 2007, not to foreclose (the "Pirate's Lake Foreclosure") on the property owned by Pirate's Lake, Ltd. (the "Pirate's Lake Property") until the first Tuesday in December 2007 and not to file of record the Spring Loan Documents until after November 30, 2007.

For a sufficient consideration received by each, Lender, Guarantor and Borrowers, and each of them, jointly and severally, do hereby agree as follows:

1.     Borrowers, Guarantor and Lender agree that the amounts due and owing pursuant to the Loan Documents as of September 21, 2007 are (a) $10,062,850.97 of principal on the Note, (b) $556,811.09 of accrued unpaid interest on such principal and (c) attorney fees and collection expenses estimated to be $75,000. Borrowers and Guarantor agree that payment of such amounts are in default, that the Note was properly accelerated and that interest will continue to accrue as provided for in the Loan Documents and attorney fees and collection expenses will continue to be incurred until all amounts owed to Lender are paid in full.

2.     Borrowers and Guarantor consent and agree to the previous applications by Lender, as of July 1, 2007, of the debt service interest reserve account held by Lender against accrued, unpaid interest, attorney fees and collection expenses and as a partial prepayment of principal on the Note.

3.     Lender agrees to postpone the Marina Foreclosure until the first Tuesday in December, 2007, or such later date as may be selected by Lender, at Lender's sole discretion. So long as the holder of the first lien on the Pirate's Lake Property is not exercising its foreclosure rights to foreclose on the Pirate's Lake Property, Lender agrees not to foreclose on the Pirate's Lake Property until the first Tuesday in December, 2007, or such later date as may be selected by Lender, at Lender's sole discretion.

4.     Borrowers and Guarantor consent and agree to the posting of the Marina Property and/or the Pirate's Lake Property for foreclosure on the first Tuesday in December, 2007, or such later date as may be selected by Lender, at Lender's sole discretion. In the event the entire unpaid balance of the Note is not paid in full on or before November 30, 2007, Borrowers and Guarantor do hereby authorize and consent to the Marina Foreclosure and/or the Pirate's Lake Foreclosure, whether on the first Tuesday in December, 2007, or such later date as may be selected by Lender, at Lender's sole discretion. Borrowers and Guarantor agree not to take any action to hinder or delay the Marina Foreclosure and/or the Pirate's Lake Foreclosure, other than the payment in full of all amounts owed to Lender, or, if the Marina Foreclosure and/or Pirate's Lake Foreclosure occur(s), Borrowers and Guarantor agree not to contest the Marina Foreclosure and/or the Pirate's Lake Foreclosure. Furthermore, Borrowers and Guarantor agree not to take any action to hinder, delay or contest Lender's foreclosure of any other real or personal property serving as collateral for the Note.

5.     Lender agrees to not to record or file the Springing Loan Documents until after November 30, 2007, or such later date as may be selected by Lender, at Lender's sole discretion.

6.     Borrowers consent and agree to the recording and filing, at any time on or after December 1, 2007, with appropriate governmental officials, of the Springing Loan Documents or any of them, and agree to take whatever actions are necessary to cause the Springing Loan Documents to be recorded or filed when necessary to establish and prefect the liens and security interests created by the Springing Loan Documents. Borrowers hereby authorize, direct and instruct Escrow Agent (or any other party holding the Springing Loan Documents) to record

and/or file, at any time on or after December 1, 2007, the Springing Loan Documents where appropriate. Upon filing the Springing Loan Documents, Borrowers hereby authorize, direct and instruct the title company to issue mortgagee's title policies in favor of Lender covering the properties described in the Springing Loan Documents and agree to take whatever action may be necessary to cause such title policies to be issued.

7.    Borrowers, Guarantor, and each of them, do hereby RELEASE, ACQUIT and DISCHARGE Lender together with any representative, attorney, agent, employee, owner, affiliate, successor, or assign of Lender, from any and all claims, demands, actions, causes of action, costs, expenses and liabilities whatsoever, known or unknown, at law or in equity (collectively, the "Claims") which Borrowers, or Guarantor, or any of them, may now have against Lender or any representative, attorney, agent, employee, owner, affiliate, successor or assign of Lender, or any of them, and irrespective of whether any such Claim arises out of contract, tort, fraud, violation of laws or regulations or arises out of the Note, the loan evidenced thereby, the documents securing the payment thereof or the transactions involved therewith, or otherwise, including, without limitation, any Claim for contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable thereto, improper acceleration of the debt, wrongful foreclosure or otherwise.

8.    Borrowers and Guarantor acknowledge and agree that the prepayments of principal on the Note and the agreements of Borrowers and Guarantor herein are voluntary and optional, within Borrowers' and Guarantor's sole discretion, and not made under duress or as a result of any statement, representation or warranty, expressed or implied, made by Lender or any representative or agent of Lender.

9.    Neither this agreement nor any statement by or on behalf of Lender as to the amount due and owing under any of the Loan Documents nor the acceptance of the Partial Prepayment by Lender: (i) shall constitute a waiver of any defaults or Events of Default under the Loan Documents; (ii) shall constitute a waiver of any rights of Lender to collect any additional amounts to which Lender may be lawfully entitled pursuant to the terms of the Loan Documents, or otherwise at law or in equity, including but not limited to remaining principal, interest, and attorneys' fees; or (iii) shall constitute a waiver of any rights of Lender under any of the Loan Documents.

10.    Lender shall have the right to exercise, in such order as Lender elects, any one or more of the remedies available to Lender under the Loan Documents or otherwise at law or in equity. Except as otherwise set forth herein, nothing contained herein shall constitute a waiver of any rights of Lender to pursue such rights and remedies, including but not limited to the right to commence non-judicial foreclosure proceedings against Mortgaged Property or any other collateral held by Lender which has not been released. No past or future delay or omission in the exercise of any right or remedy accruing to Lender as a result of any default or any Event of Default is intended to constitute a waiver of any right or remedy accruing to Lender as a result of that default or any other default or that Event of Default or any other Event of Default.

11.    **WAIVER OF RIGHT TO A TRIAL BY JURY:** BORROWERS, GUARANTOR, AND LENDER WAIVE A TRIAL BY JURY ON ANY OR ALL ISSUES ARISING IN ANY ACTION OR

PROCEEDING BETWEEN THE PARTIES HERETO OR THEIR SUCCESSORS, UNDER OR IN ANY WAY RELATED TO THIS FORBEARANCE AGREEMENT, THE LOAN DOCUMENTS, OR ANY OF THEIR PROVISIONS.

12.    Borrowers and Guarantor acknowledge that they have read and thoroughly understood this Forbearance Agreement and have consulted with their legal counsel with regard to the execution of this Forbearance Agreement. Borrowers and Guarantor have not relied upon any representations, warranties or covenants by any other party, including but not limited to Lender, its employees, agents, representatives, and attorneys, in making this Forbearance Agreement other than as expressed in this Forbearance Agreement. Borrowers and Guarantor acknowledge and agree that this Forbearance Agreement, along with the Loan Documents, constitutes the entire agreement between Borrowers and Guarantor; no prior or contemporaneous oral promises or representations, shall be binding. This Forbearance Agreement and the Loan Documents shall not be amended, changed or extended except by written instrument signed by Borrowers, Guarantor and Lender.

EXECUTED as of September 28th, 2007.

SE MARINA WAY PARTNERSHIP, LP

By: SE Marina Way, L.L.C.
its general partner

By: _____
Name: Tracy Suttles
Title: Manager

PIRATE'S LAKE LTD.

By: Pirate's Lake Management, L.L.C.
its general partner

By: _____
Name: Tracy Suttles
Title: Manager

7500 BELLAIRE MALL LP

By: 7500 Bellaire Mall Management, Inc.
its general partner

By: _____
Name: Tracy Suttles
Title: President

398692_3.DOC

4

**6425 GESS, LTD.**

By: 6425 Gess Management, Inc.
    its general partner

By: _____
    Name: Tracy Suttles
    Title:    President

**WILDFLOWER TDS, L.P.**

By: Wildflower General Partner, LLC
    its general partner

By: _____
    Name: Tracy Suttles
    Title:    Manager

**SHALAMAR SAN MARCOS
PROPERTIES, LTD.**

By: Shalamar San Marcos Management, LLC
    its general partner

By: _____
    Name: Tracy Suttles
    Title:    Manager

**WINDSOR TDS, L.P.**

By: Windsor TDS Management, Inc.
    its general partner

By: _____
    Name: Tracy Suttles
    Title:    President

398692_3.DOC

**9632 PARTNERS, LTD.**

By: TraCyn Inc.
    its general partner

By: _____
Name: Tracy Suttles
Title:   President

_____
**TRACY SUTTLES**, individually and as
Guarantor

**MADISON REALTY CAPITAL, L.P.**

By: Madison Realty Capital GP, LLC
    its general partner

By: _____
Name: _____
Title: _____

STATE OF TEXAS      )
                   )  ss.:
COUNTY OF HARRIS  )

      On the ___28___ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of SE Marina Way, L.L.C., general partner of SE Marian Way Partnership, LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



CAMILLE L. NUIJTEN
Notary Public, State of Texas
My Commission Expires
10-21-2008

_____
Notary Public

398692_3.DOC

6

STATE OF TEXAS )
) ss.:
COUNTY OF HARRIS )

On the ___28___ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of Pirate's Lake Management, L.L.C., general partner of Pirate's Lake Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

STATE OF TEXAS )
) ss.:
COUNTY OF HARRIS )

On the ___28___ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of 7500 Bellaire Mall Management, Inc., general partner of 7500 Bellaire Mall LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

398692_3.DOC

7

STATE OF TEXAS                    )
                                 )    ss.:
COUNTY OF HARRIS                 )

On the _____ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of 6425 Gess Management, Inc., general partner of 6425 Gess, Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public

STATE OF TEXAS                    )
                                 )    ss.:
COUNTY OF HARRIS                 )

On the _____ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of Wildflower General Partner, LLC, general partner of Wildflower TDS L.P., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

398692_3.DOC

8

STATE OF TEXAS )
) ss.:
COUNTY OF HARRIS )

On the ___2P___ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of Shalamar San Marcos Management, LLC, general partner of Shalamar San Marcos Properties, Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



CAMILLE L. NUIJTEN
Notary Public, State of Texas
My Commission Expires
10-21-2008

_____
Notary Public

STATE OF TEXAS )
) ss.:
COUNTY OF HARRIS )

On the ___2P___ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of Windsor TDS Management, Inc., general partner of Windsor TDS, L.P., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



CAMILLE L. NUIJTEN
Notary Public, State of Texas
My Commission Expires
10-21-2008

_____
Notary Public

398692_3.DOC

STATE OF TEXAS                    )
                                 )   ss.:
COUNTY OF HARRIS                  )

On the ___28___ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, president of TraCyn Inc., general partner of 9632 Partners, Ltd., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

STATE OF TEXAS                    )
                                 )   ss.:
COUNTY OF HARRIS                  )

On the ___28___ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

398692_3.DOC

10

**9632 PARTNERS, LTD.**

By: TraCyn Inc.
    its general partner

By: _____
    Name: Tracy Suttles
    Title:   President


_____
**TRACY SUTTLES**, individually and as
Guarantor


**MADISON REALTY CAPITAL, L.P.**

By: Madison Realty Capital GP, LLC
    its general partner

By: _____
Name: _____
Title: _____

STATE OF TEXAS          )
                             )  ss.:
COUNTY OF HARRIS     )


        On the _____ day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Tracy Suttles, manager of SE Marina Way, L.L.C., general partner of SE Marian Way Partnership, LP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


*60 Day Forbearance Agreement (2)*

STATE OF NEW YORK        )

COUNTY OF NEW YORK       )    ss.:
                         )

On the 27 day of September, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Josh Zegen, a managing member of Madison Realty Capital GP, LLC, general partner of Madison Realty Capital, L.P., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ERIC ORENSTEIN
Notary Public, State of New York
No. 02OR6141733
Qualified in Nassau County
Commission Expires February 27, 2010

# EXHIBIT L

# CONDITIONAL ASSIGNMENT OF MANAGEMENT AGREEMENT

THIS CONDITIONAL ASSIGNMENT OF MANAGEMENT AGREEMENT ("Assignment") is made as of January 29, 2007, by **SE MARINA WAY PARTNERSHIP, LP**, a Texas limited partnership, having its principal place of business at 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036, Attention: Tracy Suttles ("**Borrower**"), to **MADISON REALTY CAPITAL, L.P.**, a Delaware limited partnership, its successors and/or assigns, as their interests may appear, having offices at 261 Madison Avenue, 18th Floor, New York, New York 10016 ("**Lender**") and is acknowledged and consented to by Tracy Suttles, having his principal place of business at 7500 Bellaire Boulevard, Suite 201, Houston, Texas 77036 ("**Agent**").

## RECITALS:

A.    Borrower by its note of even date herewith given to Lender (the "**Note**") is indebted to Lender in the principal sum of $10,750,000.00 in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Note (the indebtedness evidenced by the Note, together with such interest accrued thereon, shall collectively be referred to as the "**Loan**"), principal and interest to be payable in accordance with the terms and conditions provided in the Note.

B.    The Loan is secured by, among other things, a Deed of Trust (the "**Security Instrument**"), dated the date hereof, which grants Lender a lien on the property encumbered thereby (the "**Property**"). All and any of the documents other than the Note, the Security Instrument and this Assignment now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guarantee payment of the Note are referred to as the "**Other Security Documents**."

C.    Pursuant to a certain Management Agreement dated January 29, 2007 between Borrower and Agent (the "**Management Agreement**") (a true and correct copy of which Management Agreement is attached hereto as <u>Exhibit A</u>), Borrower employed Agent exclusively to rent, lease, operate and manage the Property.

D.    Lender requires as a condition to the making of the Loan that Borrower assign the Management Agreement as set forth below.

## AGREEMENT:

For good and valuable consideration the parties hereto agree as follows:

1.    <u>**Assignment of Management Agreement**</u>.  As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, in the event of a default by Borrower under the Note, the Security Instrument or any of the Other Security Documents, including but not limited to escrow agreements, and the failure of Borrower to cure such default within any applicable grace period.

MADISON 00185

2.   **Termination**.  At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Management Agreement shall terminate.

3.   **Borrower's Covenants**.  Borrower hereby covenants with Lender that during the term of this Assignment: (a) Borrower shall not transfer the responsibility for the management of the Property from Agent to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; (b) Borrower shall not terminate or amend any of the terms or provisions of the Management Agreement without the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; and (c) Borrower shall, in the manner provided for in this Assignment, give notice to Lender of any notice or information that Borrower receives which indicates that Agent is terminating the Management Agreement or that Agent is otherwise discontinuing its management of the Property.

4.   **Agreement by Borrower and Agent**.  Borrower and Agent hereby agree that in the event of a default by Borrower (beyond any applicable grace period) under the Note, the Security Instrument or any of the Other Security Documents during the term of this Assignment, at the option of Lender exercised by written notice to Borrower and Agent: (a) all rents, security deposits, issues, proceeds and profits of the Property collected by Agent, after payment of all costs and expenses of operating the Property (including, without limitation, operating expenses, real estate taxes, insurance premiums, repairs and maintenance and the fees and commissions payable under the Management Agreement), shall be applied in accordance with Lender's written directions to Agent; and (b) Lender may exercise its rights under this Assignment and may immediately terminate the Management Agreement and require Agent to transfer its responsibility for the management of the Property to a management company selected by Lender in Lender's sole and absolute discretion.

5.   **Lender's Right to Replace Agent**.  In addition to the foregoing, in the event that Lender, in Lender's reasonable discretion, at any time during the term of this Assignment, determines that the Property is not being managed in accordance with generally accepted management practices for properties similar to the Property, Lender shall deliver written notice thereof to Borrower and Agent, which notice shall specify with particularity the grounds for Lender's determination.  If Lender reasonably determines that the conditions specified in Lender's notice are not remedied to Lender's reasonable satisfaction by Borrower or Agent within thirty (30) days from receipt of such notice or that Borrower or Agent have failed to diligently undertake correcting such conditions within such thirty (30) day period, Lender may direct Borrower to terminate the Management Agreement and to replace Agent with a management company acceptable to Lender in Lender's sole discretion.

6.   **Subordination of Management Fees**.  Borrower and Agent hereby agree that Agent shall not be entitled to receive any fee, commission or other amount payable to Agent under the Management Agreement for and during any period of time that any amount due and owing Lender under the Note and the Security Instrument is not paid when due; provided, however, that Agent shall not be obligated to return or refund to Lender any fee, commission

-2-

MADISON 00186

or other amount already received by Agent, and to which Agent was entitled under this Assignment.

7.    **Consent and Agreement by Agent**.  Agent hereby acknowledges and consents to this Assignment and agrees that Agent will act in conformity with the provisions of this Assignment and Lender's rights hereunder or otherwise related to the Management Agreement. In the event that the responsibility for the management of the Property is transferred from Agent in accordance with the provisions hereof, Agent shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Management Agreement is terminated. Further, Agent hereby agrees (a) not to contest or impede the exercise by Lender of any right it has under or in connection with this Assignment; and (b) that it shall, in the manner provided for in this Assignment, give at least thirty (30) days prior written notice to Lender of its intention to terminate the Management Agreement or otherwise discontinue its management of the Property.

8.    **Lender's Agreement**.    So long as Borrower is not in default (beyond any applicable grace period) under this Assignment, the Note, the Security Instrument or the Other Security Documents, Lender agrees to permit any sums due to Agent under the Management Agreement to be paid directly to Agent.

9.    **Governing Law**.  This assignment shall be governed, construed, applied and enforced in accordance with the laws of the State of New York, and/or the State of Texas, at the Lender's sole discretion and the applicable laws of the United States of America.

10.    **Notices**.  All notices required or permitted hereunder shall be given to the addresses set forth on the first page of this Agreement in the manner as provided in the Security Instrument.

11.    **No Oral Change**.  This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

12.    **Liability**.  If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

13.    **Inapplicable Provisions**.  If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

-3-

MADISON 00187

14. **Headings, etc.** The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

15. **Duplicate Originals; Counterparts.** This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

16. **Number and Gender.** Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

17. **Miscellaneous.**

(a)    Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

(b)    Wherever pursuant to this Assignment it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

**[Remainder of Page Intentionally Left Blank]**

-4-

RE\50260\9044\328166v2

MADISON 00188

IN WITNESS WHEREOF the undersigned has executed this Assignment as of the date and year first written above.

**SE MARINA WAY PARTNERSHIP, LP**

By: SE Marina Way, L.L.C.
its general partner

By: _____
Name: Tracy Suttles
Title:  Manager

ACKNOWLEDGED AND AGREED TO:

AGENT:

_____
Tracy Suttles

RE\50260\9044\328166v2

MADISON 00189

# EXHIBIT A

## MANAGEMENT AGREEMENT

RE\50260\9044\328166v2

MADISON 00190

# MANAGEMENT AGREEMENT

**MANAGEMENT AGREEMENT** (this "**Agreement**") made as of the 29th day of January, 2007 between **SE MARINA WAY PARTNERSHIP, LP** (hereinafter, "Landlord") and **TRACY SUTTLES** (hereinafter called "Agent").

## W I T N E S S E T H:

**WHEREAS**, Landlord is the owner of the real property more particularly described on Schedule A attached hereto and made a part hereof (hereinafter the "**Property**"); and

**WHEREAS**, Landlord desires to appoint Agent as its sole and exclusive managing agent for the Property, and Agent desires to accept such appointment, all on the terms and provisions provided for herein.

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.

**EXCLUSIVE AGENCY** - Landlord hereby appoints Agent as its sole and exclusive management agent of the Property, and Agent hereby accepts such appointment, all on the terms and provisions further provided for in this Agreement.

## ARTICLE II.

(a)    **RENTING OF PREMISES**. Agent shall reasonably assist Landlord and any other agents and/or brokers engaged by Landlord in the renting of space at the Property and in the modification of existing leases at the Property.

(b)    **ADVERTISING AND SIGNS**. At the expense of Landlord, Agent shall advertise the Property or portions thereof, prepare and secure signs, renting plans, circular matter and other forms of advertising.

(c)    **AGENT TO NEGOTIATE LEASES**. All inquiries received by Landlord for any leases at the Property shall be referred to Agent, and all negotiations connected therewith shall be conducted solely by or under the direction of Agent.

(d)    **COLLECTION OF RENT**. Agent shall use diligent efforts in the management of the Property and due diligence in collecting the rents, license fees and other income therefrom (hereinafter collectively called the "**Rents**").

(e)    **LEGAL PROCEEDINGS**. Agent may, at the expense of Landlord and in the name of and at the expense of Landlord, institute any and all legal actions or proceedings for the collection of Rent or the ousting or dispossessing of tenants or other persons therefrom, and such expense may include the engaging of counsel for any such matter.

RE\50260\9044\328166v2

MADISON 00191

(f) **REPAIRS.** Agent is authorized, in the name of and at the expense of Landlord, to make or cause to be made such ordinary repairs and/or alterations to the Property as may be advisable or necessary, and to purchase such supplies as may be advisable or necessary.

(g) **SERVICE CONTRACTS.** Agent is authorized, in the name of and at the expense of Landlord, to make contracts for electricity, gas, steam, telephone, window cleaning, vermin extermination, and other services or such of them as Agent shall deem advisable.

(h) **EMPLOYEES.** Agent agrees on behalf of Landlord to supervise the work of, and to hire and discharge, employees for the Property. Agent agrees to use reasonable care in the hiring and discharging of such employees. It is expressly understood and agreed, however, that all such employees are in the employ of Landlord solely and not in the employ of Agent and that Agent is in no way liable to such employees for their wages or compensation nor to Landlord or others for any act or omission on the part of such employees.

(i) **OPERATING STATEMENTS.** Agent shall render to Landlord (a) within forty-five (45) days after the end of each quarter year, operating statements of revenues and expenses relating to the Property in a format approved by Landlord (b) within one hundred twenty (120) days after the end of each fiscal year, a balance sheet and earnings statements relating to the Property in formats approved by Landlord and (c) within reasonable time frames as specified by Landlord, any and all other statements or reports (including, if requested, an itemization of, and supporting data (e.g., bills, invoices, etc.) relating to the operation of the Property as are requested by Landlord, including, without limitation, any periodic statements relating to the Property which are required to be provided pursuant to the terms of any mortgage encumbering the Property.

(j) **REIMBURSEMENT OF AGENT.** Landlord shall reimburse Agent promptly for any monies which Agent may advance for the account of Landlord. Nothing herein contained, however, shall be construed to obligate Agent to make any such advances.

(k) **SEPARATION OF LANDLORD'S MONIES.** All monies received by Agent for or on behalf of Landlord shall be deposited by Agent in an operating bank account designated by Landlord (hereinafter called the "**Account**"). All funds in the Account shall be the property of Landlord.

(l) **MORTGAGE PAYMENTS.** As directed by Landlord from time to time, Agent shall be authorized to pay, from the Account or other sums of Landlord, (i) interest/amortization on mortgages encumbering the Property, (ii) taxes, tax escrows, assessments, water charges and premiums on insurance relating to the Property and (iii) such other items of expense relating to the Property as Landlord may from time to time direct.

(m) **SPECIAL SERVICES.** In connection with unemployment insurance and social security taxes, Agent will not perform any services beyond the furnishing of a copy of the payroll, unless specifically instructed by Landlord to prepare additional reports, in which event Landlord shall pay to Agent an additional fee in an amount agreed to at the time by Landlord and Agent.

2

MADISON 00192

# ARTICLE III.

(a)    **SAVE HARMLESS and REIMBURSEMENT**. Landlord agrees: (i) to hold and save Agent free and harmless from damages or injuries to person or property by reason of any cause whatsoever either in and about the Property or elsewhere when Agent is carrying out the provisions of this Agreement or acting under the express or implied directions of Landlord; (ii) to reimburse Agent upon demand for any monies which Agent is required to pay out for any reason whatsoever, whether in connection with, or as an expense in defense of, any claim, civil or criminal action, proceeding, charge or prosecution made, instituted or maintained against Agent or Landlord and Agent jointly or severally, affecting or due to the condition or use of the Property, or acts or omissions of Agent or employees of Landlord or Agent, or arising out of or based upon any law, regulation, requirement, contract or award relating to the hours of employment, working conditions, wages and/or compensation of employees or former employees of Landlord, or otherwise; (iii) to defend promptly and diligently, at Landlord's sole expense, any claim, action or proceeding brought against Agent or Agent and Landlord jointly or severally arising out of or connected with any of the foregoing, and to hold harmless and fully indemnify Agent from any judgment, loss or settlement on account thereof. It is expressly understood and agreed that the foregoing provisions of this Paragraph shall survive the termination of this Agreement, but this shall not be construed to mean that Landlord's liability does not survive as to other provisions of this Agreement. Nothing contained in subdivisions (i) or (ii) of this Paragraph shall relieve Agent from responsibility to Landlord for Agent's gross negligence or willful misconduct.

(b)    **COMPLIANCE WITH LAWS**. In carrying out its duties pursuant to this Agreement, Agent shall comply with all applicable laws, rules and/or regulations relating to the Property.

(c)    **INSURANCE**. Landlord agrees to carry public liability, elevator liability, steam-boiler, workmen's compensation, payroll hold-up insurance, superintendent's fidelity bond and such other insurance as may be required under any mortgage encumbering the Property. In each such policy of insurance, Landlord agrees, upon request of Agent, to designate Agent as a party insured together with Landlord and the mortgagee all proceeds held and disbursed in accordance with the terms of the mortgage most senior in lien. A certificate of each policy issued by the carrier shall be delivered promptly to Agent by Landlord.

# ARTICLE IV.

**GENERAL**. Agent is granted such other general authority and powers as may be necessary or advisable to carry out the spirit and intent of Agent's obligations set forth in this Agreement.

# ARTICLE V.

**AGENT'S COMPENSATION**. Landlord agrees to pay Agent monthly the following compensation which has been negotiated between Landlord and Agent (such compensation to be Agent's exclusive compensation hereunder):

RE\S0260\9044\328166v2

MADISON 00193

    (i)     For management:  A fee equal to two and one-half percent (2.5%) of the Property's gross income which is collected by Agent.

    (ii)    For leasing, construction management and/or other services: A fee mutually acceptable to Landlord and Agent as shall be customary in the industry with regard to the type and scope of services performed by Agent.

    (iii)    It is understood that the foregoing shall be in addition to reimbursement to Agent for any expenses incurred by Agent for Landlord pursuant to Article II(j) of this Agreement.

## ARTICLE VI.

    (a)    **RENEWAL.**  This Agreement shall become effective on the date hereof and shall continue in full force and effect until terminated by Landlord or Agent upon no less than thirty (30) days' prior notice.

    (b)    **SALE.**  Anything in this Article to the contrary notwithstanding, in the event of a bona-fide sale or demolition of the Property, Landlord or Agent may terminate this Agreement upon no less than thirty (30) days' prior notice.

    (c)    **BINDING EFFECT.**  This Agreement shall be binding on the parties hereto, their heirs, executors, administrators, successors and assigns, and may not be changed orally but only by a writing signed by the party to be charged hereby.

    (d)    **SUBORDINATION.**  This Agreement does not create any lien on, or any interest in, the Property in favor of Agent.  Without limiting the generality of the foregoing, this Agreement is and shall at all times remain subject and subordinate in all respects to any and all mortgages from time to time encumbering the Property and to any and all renewals, replacements, modifications and/or extensions thereof.

**[Remainder of Page Intentionally Left Blank]**

MADISON 00194



**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

LANDLORD:
**SE MARINA WAY PARTNERSHIP, LP**

By: SE Marina Way, L.L.C.
     *its general partner*

By: _____
    Name: Tracy Suttles
    Title:  Manager

AGENT:

_____
Tracy Suttles

RE\50260\9044\328166v2

MADISON 00195

# SCHEDULE A

DESCRIPTION OF RESERVE "A-1", OF MARINA ON THE LAKE SUBDIVISION, A SUBDIVISION IN GALVESTON COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 18, PAGE 77 OF THE MAP RECORDS IN THE OFFICE OF THE COUNTY CLERK OF GALVESTON COUNTY, TEXAS; SAVE AND EXCEPT FROM SAID RESERVE "A-1" THAT PART OF RESERVE "A-1" RE-PLATTED AS MARINA DEL SOL BY MAP OR PLAT RECORDED IN VOLUME 18, PAGE 160, OF THE MAP RECORDS IN SAID COUNTY CLERKS OFFICE, THE PROPERTY HEREIN DESCRIBED (BEING THE PORTION OF RESERVE "A-1" WHICH WAS NOT RE-PLATTED AS MARINA DEL SOL) IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at a 1/2" iron rod found in the Southerly right-of-way line of Twin Oaks Boulevard (based on a 90 00 foot wide right of way, said iron rod also being the Northwesterly corner of Lot 1, Reserve "H" of Marina Del Sol subdivision, as recorded in Volume 18, Page 160, in the Office of the County Clerk of Galveston County, Texas;

THENCE S18°54'06"E, along the Westerly line of said Lot 1, a distance of 232.22 feet to an "X" found in concrete for corner said "X" also being the Southwesterly corner of said Lot 1;

THENCE N72°11'28"E, along the Southerly line of Lots 1 thru 8 of said RESERVE "H", a distance of 677.25 feet to a 3/8" iron rod found for corner, said iron rod being the Southeasterly corner of Lot 8 of said Reserve "H", and lying in the Westerly line of Lot 9, of Reserve "G" of said Marina Del Sol subdivision,

THENCE S33°41'00"E, along the Southwesterly line of Lots 10, 11 and 12 of said Reserve "G", a distance of 320.00 feet to a 1/2" iron rod found for corner, said iron rod being the Southwesterly corner of said Lot 12;

THENCE N83°08'00"E, along the Southerly line of said Lot 12, a distance of 84 00 feet to a 1/2" iron rod found for corner in said the Southerly line of Reserve "A" of said Marina Del Sol subdivision,

THENCE, along the Southerly line of said Reserve "A", the following calls. S77°17'29"E, a distance of 36.60 feet to a 1/2" iron rod found for corner; N77°28'32"E, a distance of 41 66 feet to a found "X" for corner; N63°59'16"E, a distance of 30.97 feet to a fence post for corner, said point being the most Easterly corner of said Reserve "A-1";

THENCE S00°01'56"E, along the most Easterly line of said Reserve "A-1", a distance of 307.64 feet to a point for corner in the Northerly line of Reserve "F" of said Marina Del Sol subdivision,

THENCE N75°42'18"W, along the Northerly line of said Reserve "F", a distance of 19 98 feet to a found 1/2" iron rod found for corner,

MADISON 00196